UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SHAVONDA BAILEY, as Next Friend of K.A., and P.A.; and VIVIAN LAMPKINS, *As Next Friend of* J.L. | § § § § | |
| v. | § | CIVIL ACTION NO. 13-CV-700-FB |
| | § § | |
| CITY OF SAN ANTONIO, TEXAS; NATHAN PRESTON, *Individually* VIDAL DIAZ, *Individually* MICHAEL FLETCHER, *Individually* FRANCISCO GALVAN, *Individually* MATTHEW FLORES, *Individually* AUBREY PLAUCHE, *Individually* MATTHEW QUINTANILLA, *Individually* ROBERT TAMEZ, *Individually;* and PAUL TRIGO, *Individually* | § § § § § § § § § § | |

## AFFIDAVIT OF ALBERT ORTIZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me the undersigned authority on this day personally appeared Albert Ortiz, who, being by me duly sworn, deposed as follows:

"My name is Albert Ortiz. I am over the age of 18 and have never committed a felony. I am of sound mind and competent to make this affidavit.

I have been retained as an expert witness in the above referenced lawsuit. I served as a police officer in the San Antonio (Texas) Police Department (SAPD) for 33 ½ years. I held every rank in the police department before retiring as the Chief of Police in April of 2006. I hold a Bachelors Degree in Applied Arts and Sciences from Southwest Texas State University and a Masters Degree in Criminal Justice from now Texas State University. I previously taught Criminal Justice at San Antonio College. Throughout my career I received continuing education and training at the San Antonio Police Academy. I also attended a substantial number of additional training classes and conferences related to criminal justice and police administration outside the department. A copy of my resume is attached.

My opinions on this case are based on my education, knowledge, training, and experience, as well as a review of the following:

1) Plaintiffs First Amended Complaint;
2) Officers N. Preston, V. Diaz, M. Fletcher, F. Galvan, M. Flores, A. Plauche, M. Quintanilla, Robert Tamez and P. Trigo's Original Answer;
3) COSA's Original Answer;
4) COSA's Initial Disclosures w/ (5)CDs,
    (a) SAPD Internal Affairs Investigation File,
    (b) Dash-Cam Video, Crime Scene & Hospital Photographs of Officers & Decedent,
    (c) Police Radio Transmissions, Recording of Cell Phone Calls, KENS TV Posting of December 14, 2010, Crime Scene Investigation Video,
    (d) Crime Scene Photographs,
    (e) SAPD General Manual Effective as of August 4, 2011;
5) Defendant Officers' Initial Disclosures;
6) Plaintiff's Designation of Expert Witnesses;
7) Plaintiff's Designation of Witnesses;
8) COSA's Answers, Responses, & Objections to Plaintiffs' Interrogatories, Request for Production, and Request for Admissions;
9) Brenda Allen's August 8, 2011, Sworn Affidavit;
10) Lee Griffin's August 8, 2011, Sworn Affidavit;
11) Tiffany Allen's August 8, 2011, Sworn Affidavit;
12) Gary Hovermale's August 8, 2011 Sworn Affidavit;
13) Scene Analysis Provided by W. Hodge, Taft Foley Law Firm;
14) COSA EMS Patient Care Report;
15) Bexar County Medical Examiner's Office (Autopsy & Toxicology) Report;
16) Bexar County Medical Examiner's Office Records of Decedent;
17) SAPD-Training Academy Class Transcripts for Defendant Officers;
18) Texas Commission of Law Enforcement Officers Standards & Education (TCLEOSE) Resumes for Defendant Officers;
19) Defendant Officers' Answers to Plaintiffs' Interrogatories & Request for Production;
20) COSA's Answers to Plaintiffs' Interrogatories & Request for Production;
21) COSA's Responses to Plaintiffs' Request for Admissions;
22) Bailey's Responses to Defendants' Request for Production;
23) Bailey's Responses to Defendants' Request for Admissions;
24) Bailey's Responses to Defendants' Interrogatories;
25) Lampkins' Responses to Defendants' Request for Admissions;
26) Lampkins' Responses to Defendants' Request for Production;
27) Lampkins' Responses to Defendants' Interrogatories;
28) The expert report of Dr. Vincent DiMaio;
29) The expert report of J. Rod McCutcheon;
30) The condensed deposition of Shavonda Bailey;
31) The condensed deposition of Vivian Lampkins;
32) The condensed deposition of Tiffany Allen, with exhibit;
33) The condensed deposition of JaJuan Williams, with exhibit;
34) The condensed deposition of Horton Howard, with exhibit;
35) The condensed deposition of Gary Hovermale, with exhibits; and,
36) The Individual Defendant Officers' First Supplemental answers, responses and objections to the Plaintiffs' Interrogatories and Request for Production.

## BACKGROUND

The incident made the basis of this lawsuit occurred on August 4, 2011, at about 03:30 a.m. in San Antonio, Texas. The incident began earlier when Pierre Tourell Abernathy chose to ingest cocaine then get into his vehicle and operate it on public roadways. The sequence of events and some of the details may vary from one account to another. It is not unusual for participants in highly stressful, dangerous, quickly changing, and chaotic incidents such as this to remember the events differently. At different times and places during this prolonged struggle, different officers used non-lethal force, including ASP batons and TASERs (Electronic Control Device), against Mr. Abernathy. The application of force by each officer against Mr. Abernathy will be detailed later in this report. A plastic bag of alleged cocaine was found on the driver's side floorboard of the vehicle Mr. Abernathy was operating during the pursuit.

Officer F. Galvan observed a 2002 Ford Explorer driven by Abernathy traveling east in the westbound lane of La Cantera Parkway at IH 10W. Officer Galvan observed a second vehicle traveling westbound on La Cantera brake to a stop in order to avoid a head-on collision with Abernathy's vehicle. According to Officer Galvan, Abernathy went around the vehicle and continued driving in the wrong lane of traffic.

Officer Galvan notified the dispatcher, got behind Abernathy's vehicle and turned on his emergency lights. Mr. Abernathy refused to stop and drove onto the property of a mall located at this intersection. Abernathy exited the mall property and drove onto the IH10 West access road. He drove back onto the mall property before exiting again. Mr. Abernathy refused to stop and was pursued by Officer Galvan and other SAPD officers. When Mr. Abernathy exited from IH10 East onto Loop 410, Officer N. Preston joined the chase and became the primary pursuit vehicle. His vehicle is equipped with an on-board camera and part of the pursuit and subsequent altercation between Abernathy and the arresting officers was caught on videotape.

The pursuit continued in a circuitous route for approximately thirty (30) minutes and about twenty-three (23) miles. During the pursuit, Abernathy committed more than twenty (20) traffic violations which were witnessed by pursuing officers and/or were videotaped by Officer Preston's on-board camera. Eventually, Abernathy stopped his vehicle partially in the street and partially in the driveway of his mother's house located at 10807 Deep Water Bay. Mr. Abernathy's vehicle was not registered to his mother or to this address so there was no way for the officers to know this was his mother's home. After stopping his vehicle on Deep Water Bay, Mr. Abernathy was ordered out of his vehicle, onto the ground, and was being handcuffed when he began to resist.

It appears that after Mr. Abernathy exited his vehicle Officer Preston managed to get a handcuff on Abernathy's right wrist. Abernathy began to resist with such intensity Preston and two other officers attempting to handcuff Abernathy could not control him. Abernathy managed to break free of the officers and ran toward his mother's house. The officers chased him and a second struggle ensued on the porch. Mr. Abernathy again managed to free himself from the officers and ran to a neighbor's house. The officers ran after him again and when they caught up to him a third struggle ensued. Mr. Abernathy managed to break free a third time and ran back to his mother's house. Officer Fletcher caught up to him and attempted to handcuff him

which resulted in a fourth struggle. During the struggle Officer Fletcher and Mr. Abernathy fell against the door shattering the glass of the storm door. An officer attempted to strike Abernathy with his ASP baton but he accidentally struck Officer Fletcher causing his finger to dislocate or break.

Officer Fletcher was temporarily disabled and Abernathy broke free for the fourth time. He ran toward a neighbor's house at 10802 Deep Water Bay with six officers and a police dog in pursuit. This part of the incident was caught on Officer Preston's on-board camera and clearly shows Abernathy was not handcuffed or in the custody of the officers, when the police dog became involved. The canine apprehended Mr. Abernathy and held him up long enough for Officer Preston to tackle him. They fell into a flower bed which included thorny rosebushes. It was during this fifth and lengthy struggle that the officers were finally able to handcuff Abernathy's other hand. They pulled him out of the flower bed and summoned EMS. It is the policy of the SAPD to summon EMS to attend to any prisoner who has been subdued with the use of a TASER. EMS was also needed in order to tend to injured officers.

Officers V. Diaz and M. Flores were observing Mr. Abernathy while they waited for the EMS unit to arrive. EMS arrived and the EMT's were already at the scene when Officer Flores noticed Abernathy was in distress. Officer Diaz immediately summoned one of the EMTs and asked him to check Mr. Abernathy. Officer Flores and the EMT performed cardiopulmonary resuscitation (CPR) on Mr. Abernathy. Mr. Abernathy was transported to the hospital where he later died.

Mr. Abernathy's mother, Brenda Allen, gave a sworn statement to police. She stated her son is paranoid schizophrenic and takes medication (Saraquill) for it. She said he does not take it regularly as prescribed. She also stated that on the night in question, Abernathy called her at about 3:10 a.m. and left her a message saying the police were pulling him over. She said her son has been pulled over twice before and the officers used TASERs against him and beat him up. Consequently, he is afraid of police officers.

The two incidents to which Ms. Allen refers involved Bexar County Sheriff's Office deputies and the events were strikingly similar to the instant case. The first incident occurred March 1, 2011. The report indicates deputies were summoned to a disturbance involving Mr. Abernathy. The complainant, Vivian Lampkins (plaintiff in this lawsuit), informed the responding deputies that Abernathy had ingested crack cocaine and refused to leave her residence. When the deputies attempted to detain Abernathy he exhibited extraordinary strength and resisted violently. The deputies deployed the TASER against Abernathy but it seemed to have no effect on him. It took the efforts of seven deputies to finally get Abernathy handcuffed and under control. Mr. Abernathy had crack cocaine and a crack pipe in his possession.

The second incident occurred on August 4, 2011. In that case, the reports indicate Mr. Abernathy was operating a black Ford Explorer which is the same one he was driving in the instant case. He drove into oncoming traffic and almost collided with a sheriff's deputy traveling in the opposite direction. The deputy attempted to stop Abernathy but he refused to stop his vehicle and a pursuit ensued. When Abernathy finally stopped, he resisted violently while

exhibiting extraordinary strength. The deputies deployed the TASER against Abernathy but reported it seemed to have no effect on him. It took five deputies to finally subdue him.

The reports on the incident made the basis of this lawsuit seem to indicate the officers believed Mr. Abernathy's actions of flailing his arms, keeping them separated, hiding his arm(s) under his body, and generally being combative were not random, reflexive movements of someone who may be suffering the effects of cocaine intoxication or paranoid schizophrenia. Instead, they appeared to be purposeful and part of his continuing efforts to evade and resist arrest by refusing to stop his vehicle, taking evasive actions with his vehicle, running away from the arresting officers, and resisting arrest by preventing the officers from handcuffing him by keeping his arms apart.

Dr. Kimberley Molina of the Bexar County Medical Examiner's Office conducted the autopsy on Mr. Abernathy. The autopsy was attended by SAPD Detective R. Hines. Dr. Kimberley described Abernathy as being 30 years old, 5' 11" tall and weighing 240 pounds. Dr. Molina's findings indicate Mr. Abernathy experienced acute cocaine intoxication and had an enlarged heart. She also reported that he had two previous encounters with law enforcement officers (Bexar County Sheriff's deputies) while intoxicated with cocaine and they used a TASER against him each time. She informed Detective Hines that the injuries to the deceased were consistent with the force the officers reportedly used while attempting to arrest Mr. Abernathy. She informed him that none of the injuries inflicted by the officers could have caused Mr. Abernathy's death.

In their autopsy report, the doctors at the Bexar County Medical Examiner's Office concluded: "It is our opinion that Pierre Tourell Abernathy, a 30 year old male, died as a result of the combined effects of intoxication with cocaine, a prolonged struggle, and a cardiomyopathy (an enlarged heart)."

## CLAIMS

According to the Plaintiffs' Original Complaint, Mr. Abernathy was on his way to pick up his fiancé when the officers began to follow him. "Because of past encounters with law enforcement, Mr. Abernathy feared for his safety". He drove to his mother's house where he thought he would be safe. The plaintiffs claim that when he exited his vehicle the defendant officers "... began tazing him". They handcuffed Mr. Abernathy with his hands behind his back and decided to punish him by allowing a police dog to maul him. The plaintiffs also claim the defendant officers "...savagely beat Mr. Abernathy, while he lay there defenseless in the fetal position".

The plaintiffs claim the defendant officers used excessive and/or deadly force against Mr. Abernathy. They also claim the officers failed to intervene to prevent the violations and/or injuries suffered by the plaintiffs and/or Mr. Abernathy.

The plaintiffs claim the COSA failed to supervise and/or adequately train, and/or acquiesced in the unconstitutional behavior of its officers.

## OPINIONS

I am familiar with the SAPD's Training Academy curriculum for police cadets and In-Service Training. The SAPD training curriculum meets and in many instances exceeds the minimum standards set by the Texas Commission on Law Enforcement (TCOLE), formally the Texas Commission on Law Enforcement Officers Standards and Education (TCLEOSE). TCOLE is the agency responsible for setting the standards and licensing of all peace officers in the State of Texas. The SAPD's training curriculum includes but is not limited to such areas as the Penal Code, Code of Criminal Procedure, reasonable suspicion, probable cause, vehicle pursuits, use of force, treatment of prisoners and civil rights. The directives and guidelines that govern SAPD officers may be found in the rules and regulations, policies and procedures handbook commonly referred to as the SAPD's General Manual. The provisions of the General Manual are taught to police cadets during their initial twenty-seven (27) week training at the SAPD Academy. The provisions of the General Manual and training curriculum are further reinforced through on-the-job training. Each newly graduated officer is required to ride with a specially trained, veteran officer (Field Training Officer / FTO) for six weeks. Every SAPD officer is required to attend forty (40) hours of continuing education, training, and work-related updates during the department's annual In-Service Training. TCOLE only requires forty (40) hours of In-Service Training every two years. An officer of the SAPD may not carry any weapon, including a handgun, ASP baton, and/or an Electronic Control Device (TASER), while on duty unless he/she is trained and certified in its operation and use. Every SAPD officer is required to be licensed by TCOLE. It is my opinion the COSA provides its police officers with the training, guidance and discretion necessary for the lawful discharge of their official duties.

In some instances the policies and procedures, customs and practices governing members of the SAPD are more restrictive than the provisions of the law. However, in all instances they are constructed to ensure all persons in police custody are treated humanely and their constitutional rights safeguarded. In my opinion there are no written or unwritten patterns, customs, or practices in the SAPD that condone the use of excessive or unnecessary force or otherwise infringe on the rights and privileges guaranteed by the U.S. Constitution.

It is my opinion the defendant officers were at all times during the incident made the basis of this lawsuit, on duty and wearing the distinctive regulation police uniform of the San Antonio Police Department. During the pursuit of Mr. Abernathy, they were operating marked police cars and utilized their emergency lights, sirens with continuous and intermittent blasts, and the public address system in their attempts to get Mr. Abernathy to stop his vehicle. It is also my opinion the identity and authority of the defendant officers were known or should have been known by Mr. Abernathy.

The SAPD utilizes a first line supervisor position (sergeant) for every patrol section of the city. Should the supervisor from a particular section be otherwise engaged, the officer may seek supervisory assistance from any nearby section. Besides initial and on-going training, supervisors are sent to Supervisors School which is specially designed to teach them their supervisory responsibilities. The sergeant is assigned in the field with his/her patrol officers and monitors their activities for compliance with the policies of the SAPD. Sergeants also assist officers in handling police calls for service and identifying training, administrative, and

disciplinary needs of their officers and the Department. In addition, SAPD policy (Procedure 609 – Emergency Vehicle Operation) forbids officers from engaging in a vehicle pursuit unless it is authorized by a supervisor. In the instant case, Sgt. David Bornhauser was immediately notified a suspected violator was refusing to stop. Sgt. Bornhauser approved the pursuit and monitored it continually throughout its duration. Sgt. Bornhauser immediately made the scene of the struggle and subsequent apprehension and supervised the officers at the scene on Deep Water Bay. Sergeants J. Walters and R. Martinez, as well as Lieutenant A. de la Garza, and Captain C. Andersen responded to the scene to assist Sgt. Bornhauser in the investigation and to ensure the policies and procedures of the SAPD were followed in regards to this incident. In my opinion, the officers involved in the incident made the basis of this lawsuit were at all times properly and adequately supervised by the sergeants, lieutenant, and captain.

In his reports, Officer Galvan states he observed Mr. Abernathy driving east in the westbound lane of La Cantera Parkway and almost collide head-on with a vehicle traveling west in the proper lane of traffic. Officer Galvan immediately notified the dispatcher and the other officers working on the same police channel of what he observed. The lanes of traffic in that area of La Cantera are clearly marked and the east and west bound lanes are divided by a median. It is my opinion that any officer in the same or similar circumstances as Officer Galvan could reasonably believe probable cause existed to believe Abernathy had committed a violation of traffic and/or penal code laws; or that Abernathy may be impaired. It is also my opinion that any officer in the same or similar circumstances as officer Galvan could reasonably believe he had a duty to take immediate action to stop Mr. Abernathy from further endangering his life and the lives of others on or near the public roadway. In my opinion, any officer in the same or similar circumstances as Officer Galvan could have acted in the same or similar manner as Officer Galvan.

After observing Mr. Abernathy commit the aforementioned traffic violations, Officer Galvan pulled his car behind Mr. Abernathy and engaged the emergency lights on his police vehicle. This is the universally understood sign a driver is supposed to pull over and stop. It is also the law. Officer Galvan reported over his police radio that Mr. Abernathy was refusing to stop his vehicle. It is my opinion that any officer in the same or similar circumstances as Officer Galvan and the other defendant officers involved in the ensuing pursuit and struggle with Abernathy, could reasonably believe Abernathy was evading arrest and probable cause existed to arrest him for evading arrest and the traffic violations he committed. It is also my opinion any officer in the same or similar circumstances as the defendant officers could reasonably believe Abernathy was a danger to himself and others and it was imperative they take him into custody.

During the pursuit of Mr. Abernathy, Officer Galvan and/or Officer Preston saw Mr. Abernathy commit more than twenty traffic violations. The violations included driving east on the westbound lane of La Cantera Parkway, weaving in and out of his traffic lane, failing to stop at red lights, improper lane changes, improperly signaling or failing to properly signal his intent, and attempting to evade arrest. Most of the violations were recorded on the on-board camera in Officer Preston's police vehicle. It is my opinion that any officer in the same or similar circumstances as Officers Galvan and Preston could reasonably believe probable cause existed to believe Mr. Abernathy was driving while under the influence (DWI), was a danger to himself and others, and needed to be apprehended as quickly as possible.

The nature of this incident required the officers involved to rely upon the observations and information provided by other officers in determining whether reasonable suspicion existed to detain Abernathy, and/or probable cause existed to arrest him, and how to respond to the actions of Mr. Abernathy. It is my opinion that it is reasonable for any officer in the same or similar circumstances as the defendant officers to rely upon the observations and information relayed to them by or through the police dispatcher, or other officers involved in an incident of this nature, including observations and information provided by other defendant officers.

Officer Galvan initiated the pursuit and subsequent apprehension of Mr. Abernathy based on the aforementioned belief that probable cause existed to arrest him for traffic and/or penal code violations, as well as the danger he posed to himself, the arresting officers and others. In his reports, Officer Galvan documented his use of force against Abernathy. He used police presence (marked police vehicle, emergency lights, siren and police uniform) but Abernathy refused to stop his vehicle. After Abernathy stopped his vehicle and exited, several officers gave him verbal commands in order to get him to stop resisting. He ignored the commands and resisted arrest efforts. The officers used their physical strength but could not control Abernathy or handcuff him. Galvan deployed his TASER twice. It had no effect on the Abernathy and he ran away. Galvan resorted to striking Abernathy on his back and stomach with his fist but it did not have any effect on him, either.

It is my opinion that any officer in the same or similar circumstances as Officer Galvan could reasonably believe his use of force was reasonable and necessary to overcome the resistance offered by Mr. Abernathy and take him into custody. It is further my opinion that any officer in the same or similar circumstances as Officer Galvan could have reacted in the same or similar manner as Officer Galvan. Officer Preston heard on his police radio of Officer Galvan's efforts to arrest Mr. Abernathy which resulted in a vehicle pursuit. According to his reports, he took over as lead pursuit vehicle because his vehicle was equipped with an on-board camera. As previously mentioned, Officer Preston had a reasonable belief Abernathy had committed violations of traffic and penal laws, was a danger to himself, the arresting officers, and others. And, he had a reasonable belief probable cause existed to arrest Abernathy. In his reports, Officer Preston documented his use of force. Officer Preston used police presence (marked police vehicle, emergency lights, siren, loudspeaker, and police uniform) to get Abernathy to stop his vehicle. After Abernathy stopped, Officer Preston used verbal commands, physical strength and the help of other officers to overcome the resistance offered by Abernathy. He was only able to place one handcuff on Abernathy before he and the other officers lost control of him. Officer Preston expressed concern that Abernathy could use the handcuff as a weapon to hurt officers. Abernathy ran to a house and attempted to get inside. Officer Preston observed Abernathy struggling violently with another officer on the porch of the house. Officer Preston deployed his TASER against Abernathy but it only temporarily stunned him and he ran to a neighbor's house. Officer Preston chased him and deployed the TASER again. Abernathy fell to his knees but got back up and ran away. Officer Preston saw the police dog latch on to Abernathy and hold him upright until the officer could tackle Abernathy. Another struggle ensued and Officer Preston struck Abernathy twice in the area of the head with his fist. The struggle continued between several officers and Abernathy before he was finally subdued.

It is my opinion that any officer in the same or similar circumstances as Officer Preston could reasonably believe his use of force was reasonable and necessary to overcome the resistance offered by Mr. Abernathy and take him into custody. It is also my opinion that any officer in the same or similar circumstances as Officer Preston could have acted in the same or similar manner as Officer Preston.

Officer M. Fletcher was monitoring his police radio when he heard Officer Galvan say he was attempting to stop a wrong-way driver. He reported he was not directly involved in the pursuit but stayed in the area. When Abernathy finally stopped he heard the officers yelling verbal commands at Abernathy. He observed Officer Preston, Galvan and a third officer in a struggle with Abernathy who refused to be handcuffed. He observed Abernathy run to his mother's house where another struggle ensued then break free and run to a neighbor's house where another struggle ensued. He saw Abernathy break free again and run back to his mother's house. Officer Fletcher grabbed him in a bear hug and they broke the glass on the storm door. An officer attempted to strike Abernathy with his ASP baton but struck Fletcher's hand disabling him temporarily. Abernathy broke free and ran away.

It is my opinion that any officer in the same or similar circumstances as Officer Fletcher could reasonably believe that probable cause existed to believe Mr. Abernathy had committed violations of traffic and penal code laws and was a danger to himself, the arresting officers and others. In my opinion, any officer in the same or similar circumstances as Officer Fletcher could reasonably believe the use of police presence, verbal commands, and physical strength (bear hug) were necessary to overcome the resistance offered by Abernathy and take him into custody. It is also my opinion that any officer in the same or similar circumstances as Officer Fletcher could have acted in the same or similar manner as Officer Fletcher.

Officer M. Flores was made aware by the dispatcher that a vehicle pursuit was in progress. His reports indicate he was not directly involved in the pursuit but stayed in the area. He saw Abernathy fail to stop for the stop sign at Military Drive and Rousseau streets. He went to the scene at Deep Water Bay in response to an emergency tone indicating that officers were in trouble. When he arrived he saw a large male, weighing about 240 to 250 pounds struggling with four or five officers. Officer Flores heard the officers giving Abernathy commands which he disregarded. He saw Abernathy was keeping his left hand underneath his body and officers attempting to bring his hands together to handcuff him. He saw the officers were getting exhausted and that Abernathy was successfully resisting their efforts to handcuff him. Officer Flores became concerned that Abernathy may take a gun or other weapon from the officers. He decided to deploy his TASER against Abernathy and they were finally able to subdue him.

After the officers handcuffed Mr. Abernathy, Officers Flores and Diaz continued to monitor his condition and noticed when he went into distress. They summoned an EMT that was already on the scene and together they provided medical care to Mr. Abernathy.

In my opinion, any officer in the same or similar circumstances as Officer Flores could reasonably believe probable cause existed to arrest Mr. Abernathy for traffic and penal code violations and that Abernathy was a danger to himself, arresting officers, and others. It is also my opinion that any officer in the same or similar circumstances as Officer Flores could

reasonably believe his use of the TASER was necessary to overcome the resistance offered by Abernathy and could have acted in the same or similar manner as Officer Flores.

Canine Officer A. Plauche was monitoring his police radio and became aware that an officer was attempting to stop a wrong-way driver but the suspect was refusing to stop his vehicle. He reported that he was not directly involved in the pursuit but stayed in the area. When he arrived on Deep Water Bay he heard the officers giving Mr. Abernathy commands to get out of his vehicle, get on the ground, and let the officers see his hands. He noticed Abernathy display extraordinary strength to the point that four officers could not control him. He saw the officers deploy their TASER twice against Abernathy to no avail. He decided to get his police dog out of the truck. By the time he got his dog Abernathy had struggled with the arresting officers at four different locations and Abernathy had broken free from them and ran away three different times. He saw Abernathy running away with several officers in pursuit so he released his dog. The dog caught up with Abernathy, bit him, and was able to detain him until the officers were able to take Abernathy to the ground. Another struggle ensued but the offices were finally able to subdue Abernathy.

It is my opinion that any officer in the same or similar circumstances as Officer Plauche could reasonably believe probable cause existed to arrest Mr. Abernathy for traffic and penal code violations. It is also my opinion any officer in the same or similar circumstances as Officer Plauche could reasonably believe the use of his canine against Abernathy was reasonable and necessary to overcome the resistance offered by Abernathy and to prevent his escape; especially in light of the fact all other previous efforts made by the arresting officers had proven to be unsuccessful. It is also my opinion any officer in the same or similar circumstances as Officer Plauche could have acted in the same or similar manner.

Officer R. Tamez heard on his police radio that officers were in pursuit of a wrong-way driver who refused to stop. His reports indicate he was not directly involved in the pursuit but stayed in the area. He observed Abernathy run the red light on Military Drive and Highway 151. When he arrived at the scene on Cold Water Bay, the arresting officers had already engaged in two different struggles with Abernathy. At the third site of a struggle (a neighbor's house), Officer Tamez ordered Abernathy to the ground several times but he ignored his command. Tamez grabbed Abernathy by the shoulder and Abernathy responded by balling his hand into a fist. Officer Tamez struck him twice on the shoulder with his ASP baton. Abernathy went down and Tamez grabbed his arm in order to handcuff him. Abernathy wrestled himself free and ran away. Officer Tamez rejoined the altercation after the police dog had caught Abernathy and other officers were struggling with him. Abernathy grabbed Officer Tamez's leg and started moving up toward his gun. Officer Tamez struck him twice in the face with his fist and Abernathy released his grip. The struggle continued until the officers were finally able to handcuff him.

In my opinion, any officer in the same or similar circumstances as Officer Tamez could reasonably believe probable cause existed to arrest Mr. Abernathy for traffic and penal code violations, and Abernathy was a danger to himself, arresting officers, and others. It is also my opinion any officer in the same or similar circumstances as Officer Tamez could reasonably believe his use of force was reasonable and necessary to overcome the resistance offered by

Abernathy. In my opinion, any reasonable officer in the same or similar circumstances as Officer Tamez could have acted in the same or similar manner as Officer Tamez.

Officer P. Trigo heard the dispatcher announce officers were involved in the pursuit of a vehicle. He reported that he was not directly involved but stayed in area and observed the pursuit. When Officer Trigo arrived on Deep Water Bay he heard the officers giving Mr. Abernathy commands which he ignored. He saw Abernathy beside his car successfully resisting the efforts of the officers to handcuff him so he went to assist the officers. They were unable to subdue him but Officer Preston managed to put one handcuff on Abernathy's hand. Someone deployed his TASER against Abernathy but it had no effect on him and he ran away. Officer Trigo followed him to the porch of the house belonging to Abernathy's mother where tried to get inside the house. He ran away again and Officer Trigo commanded him twice to stop. He refused and Trigo struck him with an ASP baton twice on the shoulder. Other officers converged on them but Abernathy pushed his way through them and ran away. Officer Trigo ordered Aberanthy to get on the ground two more times. Abernathy refused so the officer struck him two more times with the ASP baton. Abernathy ran away again but was detained by the police dog. During the ensuing struggle with the arresting officers, Officer Trigo punched Abernathy twice in the stomach and kicked him in the leg in an attempt to get him to quit resisting. It was to no avail. It was not until another officer deployed his TASER against Abernathy that they were able to subdue him.

It is my opinion that any officer in the same or similar circumstances as Officer Trigo could reasonably believe probable cause existed to arrest Mr. Abernathy for traffic or penal code violations, and Abernathy was a danger to himself, arresting officers, and others. It is also my opinion that any officer in the same or similar circumstances as Officer Trigo could reasonably believe his use of force was reasonable and necessary to overcome the resistance offered by Abernathy. In my opinion, any reasonable officer in the same or similar circumstances as Officer Trigo could have acted in the same or similar manner as Officer Trigo.

Officer V. Diaz became aware of the vehicle pursuit through the police radio. He reported that he was not directly involved in the pursuit but stayed in the area. He went to the scene on Deep Water Bay in response to an emergency tone for officers in trouble. When he arrived he saw three officers struggling with Mr. Abernathy. Abernathy had a handcuff on his right hand and was moving it violently while keeping his left hand underneath his body. He saw the officers were getting exhausted. He heard someone announce they were going to deploy the TASER. After the deployment, Officer Diaz was able to grab Abernathy's left arm and pull it behind him. However, Abernathy regained his strength and was able to pull his arm back toward himself along with Officer Diaz's arms. Another officer was finally able to handcuff Abernathy.

Officer Diaz and Flores stayed with Abernathy while the other officers recuperated from the prolonged struggles. They watched Abernathy until they saw him go into distress and notified an on-scene EMT to attend to Abernathy.

It is my opinion that any officer in the same or similar circumstances as Officer Diaz could reasonably believe probable cause existed to arrest Mr. Abernathy for penal code violations. It is also my opinion that any officer in the same or similar circumstances as Officer Diaz could

reasonably believe his use of force was necessary to overcome the resistance offered by Abernathy. In my opinion, any officer in the same or similar circumstances as Officer Diaz could have acted in the same or similar manner as Officer Diaz.

Officer M. Quintanilla's reports indicate he was notified by the dispatcher that officers were in pursuit of a driver who refused to stop his vehicle. He was not directly involved in the pursuit but stayed in the area. When he arrived at the scene on Deep Water Bay he observed the struggle between Abernathy and the arresting officers. One of the officers asked for his help because the officers struggling with Abernathy were exhausted. He tried unsuccessfully to get Abernathy's arms together so he could be handcuffed. He also assisted the officers by pinning Abernathy's legs down so he could not use them as leverage and/or weapons against the officers.

It is my opinion that any officer in the same or similar circumstances as Officer Quintanilla could reasonably believe probable cause existed to arrest Mr. Abernathy for traffic and/or penal code violations. It is also my opinion that any officer in the same or similar circumstances as Officer Quintanilla could reasonably believe his use of force was necessary to overcome the resistance offered by Abernathy. It is also my opinion that any officer in the same or similar circumstances as Officer Quintanilla could act in the same or similar manner as Officer Quintanilla.

Nothing in the record of this case indicates any of the defendant officers were aware of, received information, and/or believed their own actions or those of the other defendant officers were improper, violated the law, or the policies and procedures of the SAPD. In my opinion, no officer in the same or similar circumstances as the defendant officers could reasonably believe the actions taken by the defendant officers to effectuate the arrest of Mr. Abernathy by overcoming his resistance were such that the officer(s) should intervene to stop them from accomplishing this legitimate police objective.

It is my opinion that at all times during the incident made the basis of this lawsuit, the defendant officers were on-duty, acting within the course and scope of their duties as police officers for the City of San Antonio, and in the lawful discharge of their official discretionary duties as peace officers for the State of Texas. It is also my opinion the defendant officers acted in good faith.

In my opinion, any damages and/or injuries alleged by the plaintiff were the direct result of his own intentional, illegal, and unjustifiable acts and/or omissions.

Further affiant sayeth naught."

_____
Albert Ortiz

Subscribed To and Sworn before me on this the 24th day of November, 2014.

_____
Notary Public in and for the State of Texas

PHILIP A. LEAL
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 10-21-2015

**Albert Ortiz**
3926 River Falls
San Antonio, Texas 78259
(210) 545-6659

**EMPLOYMENT:**

| | |
|---|---|
| *2002-2006* | *Chief of Police, San Antonio Police Department* |

- Responsible for administration of $257+ million dollar budget and management of 2800 employees

*2000-2002* — *Assistant Chief of Police, Administration Bureau Commander*
- Supervise two deputy chiefs and two captains
- Responsible for a 237 million dollar budget
- Direct the Resource Management Division which includes: Accounting and Personnel Unit; Research and Planning Unit; Management Accountability Program (MAP); Training Academy; and Recruiting Detail
- Manage the Professional Standards Section which includes: Internal Affairs Unit; Accreditation Detail; and Staff Inspection Detail
- Oversee the Support Services Division which includes: Community Services Section; Communications Unit; Records Unit; Victims Advocacy Section; Psychological Services; Vehicle Storage Unit; and Property and Evidence Room Detail

*1999-2000* — *Deputy Chief, Chief of Staff*
- Managed day-to-day operations of the department
- Coordinated all police operations
- Supervised all personnel reporting to the chief of police

*1994-1999* — *Deputy Chief, Criminal Investigations Division Commander*
- Supervised three captains
- Directed all Major Crime Investigations including: Homicide; Sex Crimes; Robbery; Forgery; Narcotics; Vice; Traffic Investigations; Night Criminal Investigations Unit; Vehicle Crimes; Repeat Offenders Program; Evidence Unit; and Youth Crimes
- Administered a 30.9 million dollar budget

*1994-1994* — *Captain, Property Crimes Commander*
- Supervised three Lieutenants
- Directed the Burglary Unit; Theft Unit; Forgery Detail; and Auto Theft Unit

*1992-1994* — *Lieutenant, Intelligence Unit Commander*
- Supervised one sergeant
- Planned and directed organized crime investigations
- Directed criminal investigations of public officials and police officers
- Coordinated dignitary protection plans with various federal agencies for visiting heads of state

*1987-1992* — *Lieutenant, Homicide Unit Commander*
- Supervised three sergeants
- Directed the investigations of the Homicide Detail; the Sex Crimes Detail; Aggravated Assaults and Assaults Detail
- Created and Commanded the Officer Involved Shooting Team which investigated all shootings involving SAPD officers
- Prepared and administered a 5 million dollar budget

*1985-1987* — *Lieutenant, Special Operations Unit Commander*
- Supervised two sergeants and a uniformed complement of sixteen officers who engaged in directed and saturation patrol
- Created and commanded the unit for the purpose of addressing gang and drug-related activity, as well as unique crime problems that were beyond the capabilities of the regular patrol officers
- Planned, coordinated, and directed the operations of the unit

*1984-1985* — *Sergeant, Sex Crimes Detail*
- Supervised 12 detectives
- Identified training needs for the detail
- Trained incoming personnel
- Coordinated investigation with outside agencies
- Handled complaints against officers and recommended disciplinary actions

| | |
|---|---|
| 1983-1984 | *Sergeant, Night Vice Unit* |
| | • Supervised 15 detectives |
| | • Planned and executed covert operations |
| | • Identified training needs for the detail |
| | • Trained incoming personnel |
| | • Coordinated investigations with outside agencies |
| | • Handled complaints against officers and recommended disciplinary actions |
| 1983-1983 | *Sergeant, Patrol Supervisor* |
| | • Supervised 15 Patrolmen |
| | • Handled complaints against officers and recommended disciplinary actions |
| 1980-1983 | *Detective, Vice Unit (Undercover Operative)* |
| | • Investigated prostitution, gambling, pornography, and liquor law violations |
| | • Provided direct support for other operational units |
| 1972-1980 | *Patrolman* |
| | • Field Training Officer |
| | • Special Weapons and Tactics (SWAT) Team |

## OTHER EMPLOYMENT:

| | |
|---|---|
| 2000-2002 | Professor, Criminal Justice Department, San Antonio College |
| 1972-1980 | United States Army Reserves |

## EDUCATION:

Texas State University, Master's in Criminal Justice, 2004
Southwest Texas State University, Bachelor of Applied Arts and Sciences, 1997
San Antonio College, Associates in Public Administration, 1989
South San Antonio High School, 1970

## AWARDS/HONORS:

Master Peace Officer Certification
B'Nai B'Rith- "Officer of the Year" Award
Alamo Area Rape Crisis Center- "Distinguished Community Service" Award
Texas Department of Human Services-"Contributions to Child Abuse Issues" Award
Alamo Area Rape Crisis Center- "Outstanding Voluntary Service" Award
Texas Department of Regulatory and Protective Services-Served on the original Child Death Review Panel for Bexar County
Created the Officer Involved Shooting Team
Created the Special Operations Unit
Served on the Board of Directors and instrumental in the planning and development of the Alamo Children's Advocacy Center
Pinnacle of Achievement Award – Bexar Family Support Conference (Mental Health Issues)
Crisis Intervention Program Award – Center for Health Care Services
Leadership Award – San Antonio Hispanic Police Officers Organization
Equality in Law Enforcement Award – League of United Latin American Cities (LULAC)

## MEMBERSHIPS:

IACP- International Association of Chiefs of Police
MCC- Major Cities Chiefs
FBI NA- Federal Bureau of Investigation National Academy Associates
HAPCOA- Hispanic American Police Command Officers Association
SAPOA- San Antonio Police Officers' Association

## SKILLS:

Read, Write, and Speak Spanish Fluently
Computer Literate in Microsoft Applications and Web Navigation
Recognized as an expert at the State and Federal court level in the field of Criminal Investigations and Police Procedures

## PERSONAL:

Married to Elizabeth Ortiz, one son, Danny