| | |
|---|---|
| **SHAVONDA BAILEY**, *as Next Friend of* **K. A.**, and **P. A.**; and **VIVIAN LAMPKINS**, *as Next Friend of* **J. L.** §§§§ | |
| **v.** § | **CIVIL ACTION NO. 5:13-cv-700-AEJ** |
| **CITY OF SAN ANTONIO, TEXAS; NATHAN PRESTON**, *Individually*; **VIDAL DIAZ**, *Individually*; **MICHAEL FLETCHER**, *Individually*; **FRANCISCO GALVAN**, *Individually*; **MATTHEW FLORES**, *Individually*; **AUBREY PLAUCHE**, *Individually*; **MATTHEW QUINTANILLA**, *Individually*; **ROBERT TAMEZ**, *Individually*; and **PAUL TRIGO**, *Individually* §§§§§§§§§§§ | **JURY TRIAL** |

<u>**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

**NOW COME** Plaintiffs, Shavonda Bailey, a/n/f of K.A. and P.A., Vivian Lampkins a/n/f of J.L., Belinda Carranco, a/n/f of Z.A., Brandie Oliver a/n/f of A.O., and Christine Owens a/n/f of M.O., filing this, their *Plaintiffs' Response to Defendants' Motion for Summary Judgment*, showing unto this Honorable Court as follows:

**I.**
<u>**STATEMENT OF CASE AND ISSUES**</u>

1.      On August 2, 2013, Plaintiffs, filed their *Plaintiffs' Original Complaint*, wherein they alleged, *inter alia*, that Defendants violated Pierre Abernathy's rights pursuant to 42 U.S.C. §1983 by using excessive force and/or failing to prevent the use of excessive force, and certain other state-law causes of action, which are the subject of this response.

2.     Thereafter, on March 2, 2015, Defendants Nathan Preston, Vidal Diaz, Michael Fletcher, Francisco Galvan, Matthew Flores, Aubrey Plauche, Matthew Quintanilla, Robert Tamez and Paul Trigo filed their *Defendants' Motion for Summary Judgment Pursuant* (hereinafter referred to as "*Defendants' Motion for Summary Judgment*" or "*Motion for Summary Judgment*"), wherein Defendants assert as follows:

    1)    That, as to Plaintiffs' excessive force claims, there is no evidence of excessive force and/or that they are entitled to qualified immunity;

    2)    That there is no evidence to support Plaintiffs' "bystander" claims; and

    3)    That Plaintiffs elected under section 101.106 of the Texas Tort Claims act to proceed on intentional torts only against Defendant City.

3.     In response, Plaintiffs respond as follows:

    1)    That there is ample evidence to support Plaintiffs' excessive force claims and to defeat any assertion of qualified immunity;

    2)    That there is evidence to support Plaintiffs' "failure to intervene" claims; and

    3)    That section 101.106 of the Texas Tort Claims act does not prevent the filing of alternative/intentional causes of action against individual defendants.

## II.
## EXHIBITS IN SUPPORT

During this pleading, Plaintiffs may refer to some of the exhibits submitted to this Court by Defendants in their *Motion for Summary Judgment*. To the extent other exhibits are referenced by Plaintiffs, Plaintiffs have attached (and incorporate herein by reference) as Appendix I, their *Exhibit List in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment*.

## III.
## OBJECTIONS TO DEFENDANTS' EXHIBITS

As to certain exhibit portions submitted by Defendants, Plaintiffs have attached (and incorporate herein by reference) as Appendix I, their *Plaintiffs' Objections to Defendants' Summary*

*Judgment Evidence*, which Plaintiffs now request this Court rule upon. Based on those arguments addressed in the attached Appendix I, Plaintiffs respectfully requests that the Court strike those cited portions of those exhibits, or in the alternative, strike those portions the Court finds objectionable.

## IV.
## SUMMARY OF UNCONTESTED AND CONTESTED FACTS

Plaintiffs assert, in pertinent part, that the uncontroverted facts are as follows:

a.  On August 4, 2011, Pierre Abernathy was driving the wrong way on the highway (Exhibit "D" to *Defendants' Motion for Summary Judgment*);

b.  Mr. Abernathy suffered from schizophrenia and received disability for his illness (Exhibit "1" *Deposition of Shavonda Bailey* p. 16/14-21);

c.  Mr. Abernathy was hospitalized for twenty-eight days because of a prior incident with the Bexar County Sheriff's Department officers (Exhibit "1" *Deposition of Shavonda Bailey* p. 25/16-22);

d.  Mr. Abernathy was afraid if he pulled over he would be tased (Exhibit "1" *Deposition of Shavonda Bailey* p. 63/10-22);

e.  Mr. Abernathy drove to his aunt's house (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*);

There are two version of the events that took place after Mr. Abernathy arrived at his aunt's house. Defendants' version and the version of the witnesses that were present at the time of the events.

In his deposition, JaJuan Williams (a Tech Sergeant in Telecommunications in the Air Force), who was a witness to the events the subject of this suit, portrayed a much different scenario than Defendants. (Exhibit "2," *Deposition of JaJuan Williams* pp. 5/2-10/7). Mr. Williams was on the lawn at 10807 Deepwater Bay, in front of Mr. Abernathy's aunt's house. (Exhibit "2," *Deposition of JaJuan Williams* p. 24/12-22). As he was standing there, he saw "somebody shoot off, you know, running as fast as humanly possibly, as fast as he could, which I - - come to find out it

was Pierre . . . [t]he dogs and policemen follow him." (Exhibit "2," *Deposition of JaJuan Williams* pp. 22/25-23/10). Mr. Williams then saw Mr. Abernathy begin to run again and then something (he wasn't sure if it was the police or the dog) knocked him down and then he got up again and ran. (Exhibit "2," *Deposition of JaJuan Williams* p. 24/1-6). It was then after the officers were all on Pierre that the real trouble began. In Mr. Williams own words, he stated that he witnessed the police taking turns hitting Mr. Abernathy..."it was like they were pushing each other out of the way to get a hit in. That's what - - what it felt like. And while I was standing there - - and the thing that pretty made me irate - - and I gave a police report - - and when I went down to the police station, the detective, he guided my statement, telling me what I did and what I didn't see, protecting his own. (Exhibit "2," *Deposition of JaJuan Williams* pp. 26/18-27/14). Mr. Williams stated that he was really angered, because of what he believed was excessive force and Mr. Abernathy was screaming . . ."you could hear him towards the end screaming, "Mom, Mom, please help me. And the two or three cops in the street in front of 10817, about a foot or two off the curb, were facing me, making sure I didn't go over there. And it took every inch within my body not to go over there......They were laughing. "What are you going to do about it?... Various chatter back and forth. "Back up before it happens to you". They thought it was amusing" (Exhibit "2," *Deposition of JaJuan Williams* pp. 27/18-28/24). Mr. Williams, who is 6'3" could see clearly and he saw the officers pulling each other off so that the other officer could get in. He could also hear the sounds of the Defendants' boots hitting Mr. Abernathy. (Exhibit "2," *Deposition of JaJuan Williams* pp. 30/15-31/1). Further into his deposition Mr. Williams testified...'as I told the detective at the station. I could see - - when you're about to kick someone and you're about to hold on to something you hear the sound of boots, I see the scuffling. It was like - - between the - - him screaming, pleas for help, the Tasers going off - - because I could see everybody get back, they'd taser him, he'd scream. He let out this blood-

4

curdling scream. These are the things I did not forget about that night. And various things. And I remember saying to the - - to the two or three cops on the street - - it started out with two. And they started getting aggressive towards me because I started saying, "You're killing him." (Exhibit "2," *Deposition of JaJuan Williams* pp. 31/2-32/2). Mr. Williams could not see Mr. Abernathy's hands because "as I stated earlier, he's on the porch and for me to his hands, he'd have to be standing upright. With that many cops, the dogs, and the Tasers and all the sounds of the beatings going on over there, no man can stand up for that. Not even me." (Exhibit "2," *Deposition of JaJuan Williams* p. 34/14-21). Mr. Williams stated that the officer's were having fun, pulling each other out of the way, were jovial, and Mr. Abernathy was not fighting back and it appeared to him that the officers were not trying to cuff him. (Exhibit "2," *Deposition of JaJuan Williams* pp. 35/5-37/8). Mr. Abernathy was not trying to run, he went and curled in a ball in front of one of the houses. (Exhibit "2," *Deposition of JaJuan Williams* p. 38/7-24). Mr. Williams saw eight officers, beating kicking and tasing Mr. Abernathy. (Exhibit "2," *Deposition of JaJuan Williams* p. 39/10-16). Mr. Williams testified "is what I saw. So even though you did not see the color of my show when someone is striking the ground because the table is blocking me right now, you can see my foot come down in a striking motion as I'm pulling away. Saw a lot of that. It was a lot of pulling away so someone could get a hit in, is what I saw. Now, did I see their boot strike him or the color of their boots or the things of that nature? No." But he did see things that led him to believe Mr. Abernathy was being kicked. He saw the closed fist come up and the closed fist come down. And with all that going on, all Mr. Abernathy did was to continue screaming "Please help me, Mom, mom please help me." (Exhibit "2," *Deposition of JaJuan Williams* pp. 41/1-42/15). When things were starting to die down, Mr. Williams became more vocal and told the Defendants "you're killing him." "It don't take this many people to subdue one man." The Defendants told Mr. Williams to move on and go

inside his house and "get your ass up the street," and "get in your fucking house." The Defendants followed him and stood on his property and told him to go in his house. Mr. Williams told the defendants that he pays his taxes, it's his house, and he was not obstructing them in any way. The Defendants did not want anyone to see, they were telling everyone to go inside the house. (Exhibit "2," *Deposition of JaJuan Williams* pp. 43/8-25; 77/20-24). The Defendants kept taunting Mr. Williams and asking him "what are you going to do?" As Defendant was asking this question he pulled out some black gloves and started to put them on. Mr. Williams responded that he was not going to do anything, that he was not going to risk his career in the Air Force but that he knew what was going on between the Defendants and Mr. Abernathy was wrong. Defendants keep asking Mr. Williams "what are you doing to do?" Mr. Williams told the Defendants' "you're real tough," "that's unnecessary" and "you're killing him". It seemed to Mr. Williams as if the Defendants were enjoying themselves and they were laughing (Exhibit "2," *Deposition of JaJuan Williams* pp. 45/11-25; 71/10/20; 72/20-73/10). Mr. Williams testified that the officer's should have subdued him but not with the amount of force and the other things were not okay that it should not have taken that many people to handcuff one man and judging from Mr. Abernathy's voice, the blood curdling screams and the whimpers of please help me, while the Defendants continued to kick him he believes the force was excessive. Mr. Williams has been trained in the Law of Armed Conflict which teaches people that are being deployed how to deal with combative individuals so he doesn't understand why the Defendant's used the amount of force in which they did and the fact that they were laughing and pulling each other out of the way to subdue one man. It was more like a street fight. (Exhibit "2," *Deposition of JaJuan Williams* pp. 19/18-52/11). Mr. Williams said that Mr. Abernathy was fleeing for his life and was in fear. Mr. Williams never saw Mr. Abernathy throw a punch, never saw him resist, never heard him use foul language towards the Defendants, he never heard Defendants

6

tell Mr. Abernathy to quit resisting, nor did he ever see any of the Defendants life be in danger. (Exhibit "2," *Deposition of JaJuan Williams* pp. 66/3-25; 74/25-75/11; 83/5-7). Mr. Williams was upset because no mother should ever watch their son be beaten, hearing the last breaths of her son with the cops laughing in the mother's face as her son was crying out, he found that despicable, and he felt helpless to help Mr. Abernathy. (Exhibit "2," *Deposition of JaJuan Williams* pp. 75/23-76/21).

In addition, other witnesses confirm Mr. Williams version of events. Those witnesses confirm that Mr. Abernathy was calling to his mother to help him while he was behind some vehicles in the neighbor's yard. (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4" *Affidavit of Tiffany Allen*). Ms. Allen could hear the popping of the tazers and Mr. Abernathy was surrounded by 6 to 8 police officers. (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4" *Affidavit of Tiffany Allen*). When Ms. Allen attempted to approach Mr. Abernathy, she was stopped by one of the police officers. (Exhibit "3," *Affidavit of Brenda V. Allen*). The sounds of the Defendants striking Mr. Abernathy's body were audible as he screamed out in agony all the while the Defendants cheering each other on ""Get some man, get some!" while they were hitting (with their fists and asps), kicking and tazing Mr. Abernathy. (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4" *Affidavit of Tiffany Allen*; Exhibit "5, *Affidavit of Lee Griffin*). Ms. Allen, her son and her daughter kept telling the police not to taze Mr. Abernathy as he was high and that he was a paranoid schizophrenic, but the barrage of tazing nontheless did not stop. (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4" *Affidavit of Tiffany Allen*; Exhibit "5, *Affidavit of Lee Griffin*). All of the sudden, Mr. Abernathy stopped calling for his mother to help (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4," *Affidavit of Tiffany Allen*; Exhibit "5," *Affidavit of Lee Griffin*). Lee Griffin said that at no time did he hear the Defendants tell Mr. Abernathy to stop resisting or give him any kind of direction

whatsoever.  (Exhibit "5, *Affidavit of Lee Griffin*).  Even when the screaming stopped and Mr. Abernathy laid their silent and motionless, the Defendants continued to taze Mr. Abernathy.  (Exhibit "5," *Affidavit of Lee Griffin*). Defendant Preston hurt his hand because of all of the beating he did to Mr. Abernathy.  (Exhibit "3," *Affidavit of Brenda V. Allen*; Exhibit "4," *Affidavit of Tiffany Allen*; Exhibit "5, *Affidavit of Lee Griffin*).  Ms. Allen never saw the police attempt to give her son any type of aid.  When the paramedics arrived it was the first time she saw anyone attempt to provide any type of life saving techniques on Mr. Abernathy.  While her son was in the ambulance, Ms. Allen heard the Defendants outside bragging to each other where they tazed and hit Pierre.  They were saying things such as " Man, I got him over there and over there and over there," all the while laughing and joking and have a good time.  She was later told ,when Chief McManus came to her house, that her son was dead.  (Exhibit "3," *Affidavit of Brenda V. Allen*).

During the autopsy of Mr. Abernathy, the Bexar County Medical Examiner noted  several apparent contusions and abrasions to his face, head, neck, torso, hips and legs (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p.16), the tazer probes still remained in his back (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p.21), he had numerous puncture wounds to hia upper chest from being tased multiple times (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 32), puncture wound to his back  (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 32), numerous bite marks from the K-9 on his legs and his buttocks (Exhibit "G," to *Defendants' Motion for Summary Judgment*, pp. 32-33), NUMEROUS blunt force injuries covering the entirety of his outer body (Exhibit "G," to *Defendants' Motion for Summary Judgment*, pp. 33-34), and many hemorrhages to his head (legs (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 34).   The Medical Examiner further found that there was a prolonged struggle: abrasions and contusions, bite wounds, multiple strikes with an  electric muscular

disruption device. (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 37). The MANNER OF DEATH was determined to be HOMICIDE. (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 38). All of the injuries are noted in the autopsy report (Exhibit "G," to *Defendants' Motion for Summary Judgment*, p. 39)

Even the Defendants' admit in their reports the following:

• Defendant Galvan - I pulled my TASER back out and turned it on Officer Preston was unable to handcuff the actor and the actor stood up. I yelled, "TASER TASER" and I fired at center mass. I pulled the trigger again activating it for another five seconds. Also admits to hitting him in the upper back and stomach (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*).

• Defendant Preston - The officers straggling with. the suspect gave him a little room and I deployed my taser at the suspect. When I got within 5 to 7 feet of the suspect again there were no officers physically engaged with the suspect so I deployed my taser again. Also admits to tackling him while the dog was biting him on his buttocks and hitting him at least two times in the head while the other officers were tasing him (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*).

• Defendant Fletcher - Got the suspect in a bear hug causing him to fall through the plate glass door. This is when an Officer started swinging an ASP baton and struck my 1eft hand multiple times as I was holding the suspect near the left lower backside. This immediately took me out of the fight (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*).

• Defendant Flores - I leaned in very close to the suspect and I put the Taser on the left side of the suspect's back, I deployed the laser and I shocked the suspect for the five seconds. He then tased Mr. Abernathy a second time "I moved in close to the suspect to do a "dry stun". (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*)

• Defendant Quintanilla - I was holding the suspect down and I then heard, "Taser, Taser." I then saw Officer Flores shoot the Taser at the guy hitting him in his lower back just above his buttocks. This was the first time I. saw anyone use a Taser on the guy. The probes were in the guys back. The guy stopped fighting during the first cycle. I don't know who the officer was but someone grabbed the guys arm and started to bring it back to put the handcuffs on. The guys arm got hung up in the wires and one of the probes came out. (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*).

• Defendant Tamez - I struck him twice in the face with my asp, while other officers were tasing him. As he was running I saw off. Plauche's dog make contact with suspect's leg or buttocks. He took the dog off so I went and got my dog. I could hear the dog make contact with the suspect again and he went down. I struck him twice with a closed. fist to his face.

- Defendant Trigo - I struck the. suspect on the upper right shoulder with my ASP two times. I struck him with. my ASP two more times. I saw the suspect's rib cage on his right side and I started punching him to try to knock the wind out of him. I kicked his left thigh several times trying to stun him (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*).

- Defendant Plauche - Saw suspect with his hands up and thought it was no big deal that's when I heard someone say "tase him, tase him," as I freed the dog and gave him the command to go again the dog got a bite on the suspect's buttocks area. The officers. were striking him. I saw punches to the suspect. They were punching him in his upper body . (Exhibit "D-3" to *Defendants' Motion for Summary Judgment*),

While Defendants has valiantly painted the facts of this case as being one where the amount of force waged was necessary, they have failed to illustrate any reason for same. The summary judgment evidence shows that Mr. Abernathy was at no time attempting to harm any of the officers, was merely responding to the multitude of harms exacted upon him and that there was no reason to use such a variety and continuous use of force upon him.

In summary and as argued below, it would appear that there do exist material fact issues in this case concerning the necessity and the severity of the use of force that should preclude summary judgment. Accordingly, *Defendants' Motion for Summary Judgment* should be denied.

## V.
## STANDARDS OF REVIEW

A motion for summary judgment is governed by Federal Rule of Civil Procedure 56(c). "[T]he plain language of [FED. R. CIV. P.] 56(c) mandates the entry of summary judgment, after **adequate time for discovery** and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (**emphasis added**). The movant must initially demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the movant meets this burden then the nonmovant must go beyond the

pleadings to prove that a genuine issue of material fact exists. *Id.* at 325. Importantly, the trial court must:

(1) Accept all of the non-movant's evidence as true;
(2) Indulge all reasonable inferences in the non-movant's favor; and
(3) Resolve all disputes in the non-movant's favor.

*Adickes v. S. H. Kress and Co.*, 396 U.S. 144, 158-59 (1970). The movant's burden of proof for obtaining summary judgment depends upon whether he is seeking summary judgment on a matter where he will bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the movant bears the burden of proof at trial, he has the burden to make "a *prima facie* showing that [he] is entitled to summary judgment," by presenting sufficient evidence to demonstrate that he would be entitled to a directed verdict at trial if the opposing party does not offer controverting evidence. *Celotex Corp. v. Catret*, 477 U.S. 317, 330-31 (1986).

On the other hand, when a party moves for summary judgment on an issue where the non-movant will bear the burden of proof at trial, summary judgment is mandated if the non-movant fails to make a sufficient showing to establish all elements essential to its case. *Id.* at 324. In these circumstances, the movant satisfies its burden of proof by either: (1) submitting "affirmative evidence that negates an essential element of the non-moving party's claim;" or (2) identifying a specific claim or element of a claim on which the opposing party, after sufficient discovery, has been unable to produce evidence sufficient to establish an essential element of his claim. *Id.* at 331.

## VI.
## ARGUMENTS AND AUTHORITIES

A.  *__Genuine Issues of Material Facts Exist Regarding Plaintiffs' 42 U.S.C.A. §1983 Claims__*

The Civil Rights Act of 1871, now codified as 42 U.S.C.A. §1983 (hereinafter §1983) provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage,

of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or any other person within the jurisdiction thereof to the deprivation of any laws,

privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in

an action at law, suit in equity, or other proper proceeding for redress."   42 U.S.C.A. §1983.

In order to prevail on a 42 U.S.C. §1983 claim, Plaintiffs must show: 1) an injury which; 2)

resulted directly and only from the use of force that was clearly excessive to the need; and the

excessiveness of which was 3) objectively unreasonable.  *Johnson v. Morel*, 876 F.2d 477, 480 (5th

Cir. 1989); *Harper v. Harris County, Texas*, 21 F.3d 597, 600 (5th Cir. 1994).

A governmental official sued in his individual capacity is entitled to qualified immunity to

the extent that his conduct does not violate clearly-established rights of which a reasonable person

would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To establish that Defendants

are not entitled to qualified immunity in their individual capacities, Plaintiffs must satisfy the

following test:

- Plaintiffs must show that they were deprived of a statutory or constitutional right that was clearly established at the time of the violation;

- The Court must determine whether the record shows that the violation occurred, or at least gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct that violated the clearly-established right; and

- If it is established that the conduct was unconstitutional, then the Court must decide whether the conduct was nonetheless objectively reasonable.

*Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Contrary to Defendants' picture in this case, the evidence indicates something else and

supports Plaintiffs' assertion that Pierre Abernathy was taken down by a police dog, was tackled into

a glass door, taken down, tased well over 6 times, bitten, hit with fists and asps, kicked by the

Defendants who laughed and had fun at the expense of a victim who did nothing more than try to

escape the unwielding actions taken against him. Based on such and in light of the fact that all inferences must be drawn in their favor, Plaintiffs request that *Defendants' Motion for Summary Judgment* be denied.

As to Defendants' seeming assertion that Mr. Abernathy was not injured and/or that his death was not caused by Defendants' actions, such is simply not true. There is more than ample evidence to support such. In that regard, it is first important to note that it is no longer necessary for Plaintiffs to show a "significant injury" in order to satisfy the constitutional requirement for a §1983 claim - instead, a Plaintiff must merely show to have sustained "some form of injury." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). As to that issue alone, Defendants' *Motion for Summary Judgment* must fail, as Defendants have not addressed in any form what exactly were Mr. Abernathy's injuries. Plaintiffs have alleged that as a result of Defendants' actions, Mr. Abernathy sustained contusions and abrasions to his face, head, neck, torso, hips and legs, numerous puncture wounds throughout his body from tasers, numerous bite marks on his legs from the K-9 that was released, numerous blunt force injuries covering the entirety of his outer body and his legs, and many hemorrhages to his head, ultimately causing his death. (Exhibit "G," to *Defendants' Motion for Summary Judgment*). While such alone would suffice to meet the §1983 injury requirement, it is also important to note that in determining such requirement, any injury sustained must be evaluated "in the context in which the force was deployed" and that in determining the "context" of the force utilized, it is important to determine whether the actions were accompanied by the <u>malice</u> of the acting officer. *Id.*

The injuries in this case were a result of the malicious intent of Defendants in assaulting, tasing, beating (with their fists and asps), kicking and releasing a canine on a man that was according to witnesses at the scene not resisting and was simply running for his life. In short, the injuries

inflicted upon Mr. Abernathy were not *de minimis* and when viewed in the context of the situation, were obviously "inspired by malice, so as to amount to an abuse of official power that shocks the conscience." *Stevens v. Corbell*, 832 F.2d 884, 889 (5th Cir. 1987), *cert denied*, 486 U.S. 1033 (1988). As to the death of Mr. Aernathy as being a consequence of such actions, Defendants' own experts support that fact and that while Defendants may argue that their actions were not the cause of his death, the evidence shows that the "prolonged struggle" (whether such was a constitutionally justified use of force is to be seen) was the cause of the "elevated" circumstances leading to his death.

Accordingly, *Defendants' Motions for Summary Judgment* should be denied.

Defendants rely heavily on the opinion put forth by their expert, Albert Ortiz, who do not take into account any disputed facts in the matter and instead relies solely on Defendants' version of events. It is no surprise that said expert finds no wrongdoing on the part of the officers. But such fact is insufficient to overcome the fact that material issues of fact exist in this case. Such point is better addressed by the court in the case of *Gutierrez v. City of San Antonio*, where it states:

> "Claiming that a **"battle of the experts"** thus exists, Solis and Walters assert that they are entitled to qualified immunity because "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). We do not believe that the Supreme Court intended by this statement to mean that summary judgment must be granted in favor of the police whenever they can find an expert to testify that their actions were reasonable; in such a scenario, the police would virtually always win summary judgment. Moreover, an expert's opinion does not establish reasonableness as a matter of law, especially when directly contradicted by another expert's well-supported opinion. [FN2] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that credibility determinations are to be determined by the trier of fact, not by the court on a summary judgment motion); 7 Wigmore on Evidence § 1920, at 18 (Chadborn rev., 1978) (holding that an expert cannot usurp the jury's function as a trier of fact because the jury can choose to reject the expert's opinion). We can still conclude, of course, that one expert accurately expresses what a reasonable police officer would do, but we are not forced to so conclude by the mere presence of an expert's opinion."

*Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998); see also Bazan ex rel. Bazan v. Hidalgo County 246 F.3d 481, 492 (5th Cir. 2001); see also *Kalimah v. City of McKinney*, 213 F.Supp.2d 698, 703 (E.D. Tex. 2002) (citing to *Bazan* for proposition that "the award of summary judgment to the defense in a deadly force case should be made with particular care where the officer defendant is the only witness left alive to testify").

Expert testimony is admissible only if it is helpful to the jury in understanding the evidence or determining a fact in issue. FED. R. EVID. 702; *Hayter v. City of Mount Vernon*, 154 F.3d 269, 274 (5th Cir. 1998) (citing to *Orthopedic & Sports Injury Clinic v. Wang Lab., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (which noted that affidavits "setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment[,]" and that "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible"). In this case, Defendants' expert offers numerous opinions which are subjective opinions alone and as such are not helpful to a jury. It is not enough for Defendants' expert to simply state that something is so and present that to the jury. In other words, the evidence supporting that opinion might be helpful to the jury, but the opinion itself is not.

Federal courts have rejected expert testimony on pure questions of law. *See Askanase v. Fatjo*, 130 F.3d 657, 672 (5th Cir. 1997); *Specht v. Jensen*, 853 F. 2d 805, 807 (10th Cir. 1988); *Harbor Ins. Co. V. Continental Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990). FEDERAL RULES OF EVIDENCE 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. . . [t]hat is, they cannot testify about legal issues on which the judge will instruct the jury. *United States v. Sinclair*, 74 F3d 753, 758 n. 1 (7th Cir. 1996). As the *Specht* Court explained, "It must be posited as an *a priori* assumption [that] there is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for each dispute or issue, it requires

15

only one spokesman of the law, who of course is the judge." *Specht*, 853 F. 2d at 807. As another court put it: "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Buckhart v. Washington Metropolitan Area Trans. Auth.*, 112 F. 3d 1207, 1213 (D.C. Cir. 1997). Apart from illustrating no specific basis for any of his statements, these opinions are in essence the very questions to be answered by a jury in this cause. Although Defendant is allowed to present evidence illustrating to the Jury that the answer to certain questions should be "no," it cannot present the answer in the form of an expert. Accordingly, Defendants' *Motion for Summary Judgment* should therefore again be denied.

B.      **Failure to Intervene Claims**

Although Defendants assert - without much clarification - that "the controlling law in the Fifth Circuit concerning the elements of a failure to intervene claim," Defendants do so with their fingers crossed behind their back. In *Hale v. Townley*, the Fifth Circuit, citing to numerous former cases concerning the same subject, made very clear that when "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).[1] As such, Defendants' *Motions for Summary Judgment* should be denied.

In this case, Defendants have clearly failed in their burden to produce any evidence sufficient to establish the time element at issue in a failure to intervene claim. On such basis alone, *Defendants' Motion for Summary Judgment* should be denied. Even though, Plaintiffs have

---

[1]

Citing to *Harris v. Chanclor,* 537 F.2d 203, 205-06 (5th Cir. 1976); *Smith v. Dooley,* 591 F.Supp. 1157, 1168 (W.D.La. 1984), *aff'd,* 778 F.2d 788 (5th Cir. 1985); *see also Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 205 n. 3 (1st Cir. 1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991).

presented sufficient evidence to raise a fact issue as to whether Defendants had a reasonable

opportunity to realize the excessive nature of the force used upon Mr. Abernathy and/or to intervene

to stop it.  As noted in *Hale*, the evidence "is sufficient to create a genuine issue of material fact

regarding [Defendants'] acquiescence in the alleged use of excessive force."  *Hale v. Townley*, 45

F.3d 914, 919 (5th Cir. 1995).

C.      **Individual Defendants' Request for Dismissal of Texas State-Law is Without Merit**

§101.106(f) of the Texas Tort Claims Act ("TTCA") states as follows:

> "If a suit is filed against an employee of a governmental unit based on conduct within
> the general scope of that employee's employment and if it **could have been brought
> under this chapter against a governmental unit**, the suit is considered to be against
> the employee in the employee's official capacity only. **On the employee's motion**,
> the suit against the employee shall be dismissed unless the plaintiff files amended
> pleadings dismissing the employee and naming the governmental unit as defendant
> on or before the 30th day after the motion is filed."

TEX. CIV. PRAC. & REM. CODE ANN. §101.106(f) (**emphasis added**).  As to this particular provision,

it is not applicable for one simple reason: assault claims cannot be brought under the chapter against

a governmental entity.[2]  As such and to the extent that *Defendants' Motion for Summary Judgment*

can possibly be construed as relying on this inapplicable provision, it should be denied.

While Defendants rely on the hard-to-follow opinion of the Texas Supreme Court in *Franka*

*v. Velasquez* for support the proposition that Plaintiffs' claims for the intentional torts brought

against the individual defendants should be dismissed, Plaintiffs are uncertain whether such assertion

is a waiver of immunity by Defendant City for such claims or if it just a veiled attempt to have

Plaintiffs substitute in a party which cannot be sued for such claims and hence, have Plaintiffd

---

[2] This chapter does not apply to a claim: (2) arising out of assault, battery, false imprisonment, or any other
intentional tort, including a tort involving disciplinary action by school authorities.  TEX. CIV. PRAC. & REM.
CODE ANN. §101.057(b).

substitute a party in that will inevitably be dismissed for lack of the waiver of immunity. While *Franka* seemingly decides just that, Plaintiffs would assert that such is not the case and that the Court in *Franka* was dealing with a medical malpractice action that can be - albeit in limited circumstances - brought against a governmental entity. In the instant case, the intentional tort brought by Plaintiffs simply <u>cannot</u> be brought - under any circumstances whatsoever - against a governmental entity. As such and without arguing the logic of the *Franka* opinion (see the dissent by Justice Medina and joined by Justice Lehrmann), such opinion is not applicable to the case at hand. In short, Plaintiffs could not sue Defendant City for such intentional state law claims and did so properly against the individual Defendants alone. Accordingly, if Plaintiffs correctly sued only individuals for such torts that cannot be brought against the entity, should his claims nevertheless be dismissed so that Plaintiffs can then improperly sue Defendant City and be imperilled by the inevitable dismissal (due to a lack of waiver of immunity) of such claims? Such a result would be perverse at best.

In addition, the Open Courts provision of the Texas Constitution requires that a state law must afford meaningful legal remedies to the State's citizens, such that the Legislature cannot abrogate the right of a citizen to seek redress for a cause of action founded in common law.[3] Tex.Const. Art. 1, § 13. ; *See also Offenbach v. Stockton*, 285 S.W.3d 517 (Tex. App. – Dallas 2009), reh'g overruled, (Apr. 13, 2009); *Edwards Aquifer Authority v. Day*, 274 S.W.3d 742 (Tex. App. – San Antonio 2008); *Satterfield v. Crown Cork & Seal Co., Inc.*, 268 S.W.3d 190 (Tex. App. – Austin 2008); *Rankin v. Methodist Healthcare System of San Antonio, Ltd.*, 261 S.W.3d 93 (Tex. App. – San Antonio 2008); *Gomez v. Pasadena Health Care Management, Inc.*, 246 S.W.3d 306

---

[3] Assault (formerly considered assault and battery) is such a common law claim. *Baribeau v. Gustafson,* 107 S.W.3d 52, 60 (Tex.App. – San Antonio 2003, *pet. denied*).

(Tex. App. – Houston [14th Dist. 2008]); *In re D.M.*, 191 S.W.3d 381 (Tex. App. – Austin 2006); *Ford v. Performance Aircraft Services, Inc.*, 178 S.W.3d 330 (Tex. App. – Fort Worth 2005); *Leonard v. Abbott*, 171 S.W.3d 451 (Tex. App. – Austin 2005). Such is specifically what Defendants are asserting the Legislature did and *Franka* approved of. That is unfortunately - for Defendants - not the case.

As such, *Defendants' Motion for Summary Judgment* should be denied.

## VIII.
## <u>CONCLUSION</u>

A Court's determination of a summary judgment motion requires deference to the non-moving party. *Willis v. Roche Biomedical Labs., Inc.*, 21 F.3d 1368, 1371 (5th Cir. 1994). If there is any evidence in the record from any source from which a reasonable inference in the Plaintiffs' favor may be drawn, summary judgment cannot be granted. *Id*. at 1372. In the *Willis* case, the Fifth Circuit stated the principle that:

> [C]ourts must be vigilant in determining whether either an inference or circumstantial evidence might suffice to create the existence of a factual dispute about the claims – lest courts "use summary judgment as a 'catch penny contrivance to take unwary litigants into [their] toils and deprive [the litigants] of a trial [to which they are actually entitled].'" (citations omitted)

*Id*. at 1371.

By and through the above argument, Defendants have failed in their burdens and Plaintiffs have has clearly met their burden necessary to establish their claims versus Defendants. In conclusion, when Plaintiffs' evidence is accepted as true and all reasonable inferences indulged and disputes resolved in Plaintiffs' favor, there exist genuine issues of material facts concerning the claims addressed herein. Accordingly, *Defendants' Motions for Summary Judgment* should be denied.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that the Court deny Defendants'

*Motions for Summary Judgment* and grant Plaintiffs such other and further relief, either at law or

equity, to which they may be justly entitled.

Respectfully submitted,

GALE LAW GROUP, PLLC
P.O. Box 2591
Corpus Christi, Texas 78403
Telephone: (361)808-4444
Telecopier: (361)232-4139
E-mail: chris@galelawgroup.com

By: /s/ Christopher J. Gale
    Christopher J. Gale
    Southern District Bar No. 27257
    Texas Bar Number 00793766
    *Attorney-in-Charge for Plaintiffs*

## NOTICE OF ELECTRONIC FILING

The undersigned counsel hereby certifies that he has electronically submitted for filing a true
and correct copy of the above and foregoing in accordance with the Electronic Case Files System of
the Western District of Texas on the 10th day of April, 2015.

/s/ Christopher J. Gale
Christopher J. Gale

## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of April, 2015, a true and correct copy of the above and foregoing has been sent to the following counsel of record by means indicated below:

Mr. Michael Siemer                     ***Via E-File Notification***
Office of the City Attorney
City of San Antonio, Litigation Division
111 Soledad Street, 10th Floor
San Antonio, Texas 78205

Mark S. Ralls                          ***Via E-File Notification***
HOBLITT FERGUSON DARLING, L.L.P.
300 Convent Street, Suite 1450
San Antonio, Texas 78205

                                       /s/ Christopher J. Gale
                                       Christopher J. Gale