Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SHAVONDA BAILEY, as Next Friend )
of K.A. and P.A.; and VIVIAN )
LAMPKINS, as Next Friend of J.L. )
)
v.                              )  CIVIL ACTION NO.
                                )  13-CV-700-FB
CITY OF SAN ANTONIO, TEXAS;     )
NATHAN PRESTON, Individually    )
VIDAL DIAZ, Individually        )
MICHAEL FLETCHER, Individually  )
FRANCISCO GALVAN, Individually  )
MATTHEW FLORES, Individually    )
AUBREY PLAUCHE, Individually    )
MATTHEW QUINTANILLA, Individually )
ROBERT TAMEZ, Individually;     )
and PAUL TRIGO, Individually    )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

SHAVONDA BAILEY

APRIL 8, 2014                          COPY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of SHAVONDA BAILEY, produced as a witness at the instance of the Defendants Nathan Preston, Vidal Diaz, Michael Fletcher, Francisco Galvan, Matthew Flores, Aubrey Plauche, Matthew Quintanilla, Robert Tamez, and Paul Trigo, and duly sworn, was taken in the above-styled and numbered cause on the 8th day of April, 2014, from 9:48 a.m. to 12:03 p.m., before

Page 14

1  two-thousand-and -- I'm going to say I moved back home
2  in 2008 because my daughter was born in 2009. And from
3  the time that I moved back home till I moved out again,
4  I lived there and so did he.
5      Q. All right. And that would have -- when you
6  say when you "moved back home," is that Hunt Lane?
7      A. Yes.
8      Q. And so how long after 2008 -- well, strike
9  that.
10         So he lived with you from the time --
11 from 2008 until his death in August of 2011?
12     A. Right. Yes.
13     Q. Okay. And during that period of time, was
14 Mr. Abernathy employed?
15     A. No.
16     Q. And when in 2008 did he first move in with
17 you?
18     A. Well, I was -- we were coming from living in
19 an apartment together, so . . .
20     Q. Okay. When did you and Mr. Abernathy first
21 begin living together?
22     A. Two-thousand-and- -- either between -- 2005 or
23 2006.
24     Q. And did you and Mr. Abernathy live together
25 continuously between 2005 or '6 and the date of his

Page 15

1  death on August 4th, 2011?
2      A. I don't know how to answer that. I'm going to
3  say yes, but there were split-ups in between there.
4      Q. Well, that's what I'm trying to figure out,
5  so --
6      A. Okay.
7      Q. Well, can you tell us, roughly, when the
8  split-ups were and for what duration?
9      A. They were never longer than six months, if
10 that. There was multiple. I really couldn't say.
11     Q. Were there any -- let's just call them
12 "separations."
13     A. Okay.
14     Q. Were there any separations between -- or,
15 rather, after the children were born and the date of his
16 death? That's Kambri and Pierre III.
17     A. Yes.
18     Q. And can you tell us how many separations there
19 were after, let's say, Kambri was born until the date of
20 his death?
21     A. I don't know. I don't know.
22     Q. Can you tell us, do you think maybe there were
23 less than five or --
24     A. Yes.
25     Q. And would those have been for, roughly, six

Page 16

1  months' durations also?
2      A. No.
3      Q. How long would those have been for?
4      A. A month, maybe.
5      Q. When you would split up, where would
6  Mr. Abernathy be staying, if you know?
7      A. With another one of his children's mothers.
8      Q. Okay. So did Mr. Abernathy provide any
9  monetary support for the children during his life -- for
10 your children during -- strike that.
11         Did Mr. Abernathy provide any monetary
12 support for Kambri and Pierre during his lifetime?
13     A. Yes.
14     Q. And can you tell us about that, please? And
15 what -- how much did he give them? When did he give it
16 to them? How often?
17     A. I can't even really give a dollar amount but
18 he, of course, would receive Social Security or
19 disability for his schizophrenia. So when he would get
20 his check, then he would either provide the money or
21 provide the things that they needed to be taken care of.
22     Q. And during their lifetimes, Kambri's and
23 Pierre's, was his only -- Mr. Abernathy's only source of
24 income Social Security or disability?
25     A. He would do like little side jobs but -- like

Page 17

1  not a regular job so he would still like kind of get
2  additional monies.
3      Q. What sort of side jobs?
4      A. Like he would help my grandfather do some work
5  at times.
6      Q. And can you tell us, when that would occur,
7  roughly how much he would make on an average basis, if
8  you can tell us that?
9      A. On an average basis, it was like $300 a week.
10     Q. When he would -- Mr. Abernathy would work for
11 your grandfather and make $300 a week, would he do that
12 for more than one week at a time or would it just be one
13 week at a time?
14     A. It was kind of inconsistent. Sometimes it
15 could be for more than one week.
16     Q. What would it typically be?
17     A. I don't know.
18     Q. What did he do for your grandfather?
19     A. They would break down like moving boxes.
20     Q. And what is your grandfather's name?
21     A. Jimmy.
22     Q. Jimmy Bailey?
23     A. Bryant.
24     Q. Oh. B-r-y-a-n-t?
25     A. Uh-huh.

Page 22

1  that is for Kambri and -- that could be used for Kambri
2  and Pierre, would have been two to three hundred dollars
3  a month for their entire lives?
4      A.  Out of his disability, yes.
5      Q.  Yes. I'm sorry. I meant to limit it to that.
6  Okay. And then he also made sometimes $300 a week
7  working for your grandfather.
8      A.  Right. Yes.
9      Q.  And did he -- did you and he ever discuss what
10 amount of money he would pay toward your children's
11 child support?
12     A.  Whatever he did bring home, he would give me
13 half.
14     Q.  And is there -- do you know whether your
15 grandfather kept any records of any sort regarding how
16 much he paid Mr. Abernathy?
17     A.  No, I do not think so.
18     Q.  Did you keep any records regarding how much
19 Mr. Abernathy gave you during Kambri and Pierre's lives?
20     A.  No.
21     Q.  Apart from working for your grandfather
22 periodically and getting his Social Security and
23 disability, did he have -- Mr. Abernathy have any other
24 source of income you're aware of during Kambri and
25 Pierre's lives?

Page 23

1      A.  No.
2      Q.  And the money that Mr. Abernathy would give
3  you, did you use that just generally for household
4  support?
5      A.  When you say "household support," what do you
6  mean?
7      Q.  I mean, did you pay like the electricity
8  and -- or electricity and water and all the --
9      A.  It was used on the kids.
10     Q.  Okay. Well, when you say "used on the kids,"
11 what do you mean by that?
12     A.  Diapers, food, formula, wipies. Like the
13 children's necessities.
14     Q.  And so did the children's necessities account
15 for all of the money that he gave you or was there some
16 left over that you could apply toward household
17 expenses?
18     A.  Well, the majority of that time we were living
19 at home with my grandmother.
20     Q.  So you didn't have any expenses?
21     A.  Not at that time.
22     Q.  How about -- and when you say "at that time,"
23 what time are you referring to exactly?
24     A.  Let's say from the time Kambri was born, which
25 was, what, 2009?

Page 24

1      Q.  May of 2009?
2      A.  Yes.
3      Q.  So it would be your testimony that all of the
4  money that Mr. Abernathy gave you would go to your two
5  children after -- well, first Kambri for a year and then
6  both of them together for the entire time that he was
7  making money?
8      A.  Yes.
9      Q.  So let's say on a best month basis, a
10 four-week month, if he worked every single week for your
11 grandfather working -- making $300 a week and brought
12 home, say, on a best month again, $300 a month from
13 Social Security or disability, then you would get half
14 of the 1,200 that he would make and half of the maximum
15 300 that he would make for the kids.
16     A.  Just like a what if, if that ever happened?
17     Q.  Right.
18     A.  Yes.
19     Q.  What would you say that the actual average in
20 amount of money that he would give you each month would
21 be?
22     A.  I don't know.
23     Q.  Would it be -- well, it'd be some -- it would
24 be less than 750.
25     A.  Yes.

Page 25

1      Q.  Okay. Can you give us any estimate between
2  zero and 750 that he would give you on an average basis?
3      A.  I don't know. It was always different.
4      Q.  All right. During the period of time after
5  Kambri was born up until Mr. Abernathy's death, we know
6  that he didn't have any additional sources of income
7  other than we've talked about, first of all, correct?
8      A.  Right.
9      Q.  Okay.
10     A.  Yes.
11     Q.  During that period of time, was he
12 hospitalized in the State hospital?
13     A.  After Kambri was born?
14     Q.  Yes, ma'am.
15     A.  No.
16     Q.  Okay. He was hospitalized for some period of
17 time after an incident with the Bexar County sheriff's
18 deputies --
19     A.  Yes.
20     Q.  -- correct? How long was he in the hospital
21 that time?
22     A.  28 days.
23     Q.  And on that occasion, I take it he had some
24 recovery period after he got out of the hospital,
25 correct?

Page 62

1  A. Yes.
2  Q. And he was, roughly, two hours early, right?
3  A. Right.
4  Q. And were you concerned that he might be on
5  something at that point?
6  A. Not necessarily that he might have been on
7  something, but obviously that he had been on something
8  prior. Did I think that he was -- think he was already
9  trickling down, if that makes sense.
10 Q. Okay. All right. And when is the -- when is
11 the next time -- well, strike that.
12      I assume you did not talk to him again
13 between one o'clock and the time of the incident,
14 correct?
15 A. No. He called me at -- I don't know -- I want
16 to say 2:00 and I was on a call at work, so I
17 couldn't -- well, I picked up the phone, but my call
18 ended up taking over an hour where I couldn't get to
19 him.
20 Q. Did he leave a message at 2:00?
21 A. He didn't leave a message because I actually
22 picked up the phone. When he would call, I would pick
23 up the phone; he would wait until I could walk out and
24 actually say hello. So I picked up the phone so he
25 couldn't leave a message.

Page 63

1  Q. And then he just ultimately hung up before you
2  could talk to him or --
3  A. I'm assuming because then he made all the
4  other calls.
5  Q. Do you know who else he called?
6  A. He called my grandmother.
7  Q. Your grandmother?
8  A. Yes.
9  Q. And what is her name?
10 A. Ruth.
11 Q. What's her last name?
12 A. Cockrum, C-o-c-k-r-u-m.
13 Q. And do you know her address?
14 A. 3328 Hunt Lane.
15 Q. And what did she tell you about the
16 conversation he had with her?
17 A. That he told her the police were following him
18 and he was scared to pull over. She said, "You have to
19 stop. You know you have to stop. Where are you at?"
20      He said, "I'm going to pick up Shavonda
21 but I can't stop because I know they're going to tase
22 me."
23 Q. And what did she say, if you know?
24 A. She just kept trying to get him to stop. And
25 then he told her he would call her back.

Page 64

1  Q. And did he call her back before the incident?
2  A. I don't know if she talked to him again.
3  Because he had called multiple times before she ever
4  answered the phone. She was asleep. So she missed a
5  few of his calls.
6  Q. And how about, do you know anyone else that
7  he -- well, let me make sure. Okay. So that's the only
8  conversation that you're aware of that he had with --
9  that Mr. Abernathy had with your grandmother that
10 morning, correct?
11 A. With my grandmother, yes.
12 Q. Okay. Then who else did he call, to your
13 knowledge?
14 A. He called his uncle.
15 Q. And can you tell us his name?
16 A. Lorenzo Abernathy.
17 Q. And did he talk to him?
18 A. He did talk to him.
19 Q. And do you know what that conversation was?
20 A. I'm not too -- well, he was -- from what I
21 know, he was -- Lorenzo was the last person to talk to
22 him because he was on the phone with Lorenzo as the
23 police approached the vehicle, so he had already stopped
24 at his mother's house at that point.
25 Q. And where does Lorenzo live, if you know?

Page 65

1  A. 8314 Running Horse.
2  Q. All right. What did Lorenzo tell you about
3  his conversation with Mr. Abernathy?
4  A. I don't remember. I remember it was more
5  along the lines of him hearing all the commotion of like
6  the police telling him to get out of the car and things
7  like that. I don't -- I don't remember what the rest
8  was.
9  Q. And does Lorenzo still live at 8314 Running
10 Horse?
11 A. Yes.
12 Q. Do you know his telephone number?
13 A. (Reviews her cell phone.) 210.505.3533.
14 Q. Do you know whether -- okay. Did he make any
15 other calls that you're aware of?
16 A. Yes. He called his mom. He did leave her a
17 voice mail.
18 Q. And do you know if there's a recording of that
19 voice mail still around?
20 A. Yes. I don't know if there's still -- if -- I
21 don't know if she still has it. I think she does.
22 Q. And was it just one voice mail or more than
23 one?
24 A. I think it was more than one phone call, but I
25 think it was only one voice mail. I'm not sure.

17 (Pages 62 to 65)

SHAVONDA BAILEY, ET AL.                                      SHAVONDA BAILEY
CITY OF SAN ANTONIO, ET AL

Page 88

1         I, SHAVONDA BAILEY, have read the
2    foregoing deposition and hereby affix my signature that
3    same is true and correct, except as noted above.
4
5                        _____
                              SHAVONDA BAILEY
6
7    THE STATE OF  Texas    )
8    COUNTY OF  BexaR       )
9         Before me, Hortencia R Valadez on this
10   day personally appeared SHAVONDA BAILEY, known to me (or
11   proved to me under oath or through _____)
12   (description of identity card or other document) to be
13   the person whose name is subscribed to the foregoing
14   instrument and acknowledged to me that they executed the
15   same for the purposes and consideration therein
16   expressed.
17        Given under my hand and seal of office
18   this  12  day of  May  , 2014.
19
20   [SEAL: HORTENCIA R VALADEZ, NOTARY PUBLIC, State of Texas, Comm. Exp. 09-27-2016]
21                          _____
22                          NOTARY PUBLIC IN AND FOR
                            THE STATE OF  Texas
23   My commission expires:  09-27-2016
24
25   ✓  No Changes Made        _____ Amendment Sheet(s) Attached

Gulfstream Court Reporting
Tel: (210) 490-6444                              Fax: (210) 579-6507

Electronically signed by Stephanie Clark (601-353-121-5420)    586f783c-e194-4104-8415-b91ab710ca04

Exhibit "1"