SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SHAVONDA BAILEY, as Next Friend   )
of K.A. and P.A.; and VIVIAN      )
LAMPKINS, as Next Friend of J.L.  )
                                  )
v.                                )    CIVIL ACTION NO.
                                  )      13-CV-700-FB
CITY OF SAN ANTONIO, TEXAS;       )
NATHAN PRESTON, Individually      )
VIDAL DIAZ, Individually          )
MICHAEL FLETCHER, Individually    )
FRANCISCO GALVAN, Individually    )
MATTHEW FLORES, Individually      )
AUBREY PLAUCHE, Individually      )
MATTHEW QUINTANILLA, Individually )
ROBERT TAMEZ, Individually;       )
and PAUL TRIGO, Individually      )

**************************************************

ORAL DEPOSITION OF

JAJUAN WILLIAMS

APRIL 10, 2014

**************************************************

     ORAL DEPOSITION of JAJUAN WILLIAMS, produced as a

witness at the instance of the Defendants Nathan

Preston, Vidal Diaz, Michael Fletcher, Francisco Galvan,

Matthew Flores, Aubrey Plauche, Matthew Quintanilla,

Robert Tamez, and Paul Trigo, and duly sworn, was taken

in the above-styled and numbered cause on the 10th day

of April, 2014, from 9:05 a.m. to 11:15 a.m., before

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 2

 1    Stephanie Clark, CSR in and for the State of Texas,

 2    reported by machine shorthand, at the offices of

 3    Hoblit Ferguson Darling, LLP, Bank of America Plaza,

 4    300 Convent Street, Suite 1450, San Antonio, Texas

 5    78205, pursuant to the Federal Rules of Civil Procedure

 6    and the provisions stated on the record or attached

 7    hereto.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gulfstream Court Reporting

Tel: (210) 490-6444                        Fax: (210) 579-6507
                                                   Exhibit "2"

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                              Page 3

  1                    A P P E A R A N C E S

  2

  3    FOR THE PLAINTIFFS:

  4         MR. ROBERT WILSON
            GALE, WILSON & SANCHEZ, PLLC
  5         115 East Travis Street, 19th Floor
            San Antonio, Texas 78205
  6              Phone:  210.222.8899
                 Fax:  210.222.9526
  7

  8
       FOR THE DEFENDANTS NATHAN PRESTON, VIDAL DIAZ, MICHAEL
  9    FLETCHER, FRANCISCO GALVAN, MATTHEW FLORES, AUBREY
       PLAUCHE, MATTHEW QUINTANILLA, ROBERT TAMEZ, AND PAUL
 10    TRIGO:

 11         MR. N. MARK RALLS
            HOBLIT FERGUSON DARLING, LLP
 12         Bank of America Plaza
            300 Convent Street, Suite 1450
 13         San Antonio, Texas 78205
                 Phone:  210.224.9991
 14         Fax:  210.226.1544

 15

 16    FOR THE DEFENDANT CITY OF SAN ANTONIO, TEXAS:

 17         MR. BRAD BENNETT
            CITY OF SAN ANTONIO
 18         Office of the City Attorney
            111 Soledad Street, 10th Floor
 19         San Antonio, Texas 78205
                 Phone:  210.207.8784
 20         Fax:  210.207.4357

 21

 22    ALSO PRESENT:  Mr. Jajuan Williams, Witness
                      Ms. Stephanie Clark, RPR, CSR
 23

 24                    * * * * * * *

 25
```

                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                              Page 4

  1                     I N D E X
                                                          PAGE
  2
       Appearances ...................................    3
  3
       JAJUAN WILLIAMS
  4        Examination by Mr. Ralls ...................    5
           Examination by Mr. Wilson ..................   57
  5        Further Examination by Mr. Ralls ...........   96
           Further Examination by Mr. Wilson ..........  110
  6
       Changes and Signature .........................  114
  7    Reporter's Certificate ........................  116

  8

  9

 10                     E X H I B I T S
       NO.  DESCRIPTION                                   PAGE
 11
       1    Map, bird's-eye view of cul-de-sac           20
 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                              Page 5

 1            (All parties present have hereby waived

 2   the necessity of the reading of the statements by the

 3   deposition officer as required by Rule 30(b)(5).)

 4                     JAJUAN WILLIAMS

 5   having been first duly sworn, testified as follows:

 6                     EXAMINATION

 7   QUESTIONS BY MR. RALLS:

 8       Q.   Would you tell us your name for the record,

 9   please.

10       A.   Jajuan A. Williams.

11       Q.   And it's Sergeant Williams, right?

12       A.   Yes.

13       Q.   Sergeant, my name is Mark Ralls and I'm here

14   representing the individual police officers that have

15   been sued in this lawsuit.  Do you understand that?

16       A.   Yes.

17       Q.   Have you ever given a deposition before?

18       A.   Yes.

19       Q.   On how many occasions?

20       A.   Once.

21       Q.   How long ago was that?

22       A.   A few months.

23       Q.   What kind of case was that?

24       A.   Allstate.  Somebody ran into me and -- and

25   lied, said they didn't.

                    Gulfstream Court Reporting

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 6

 1        Q.   Oh, okay.  So there was litigation that ensued
 2   and you were deposed in that?
 3        A.   Yes.
 4        Q.   And were you -- so were you suing the person
 5   that ran into you?
 6        A.   Well, Allstate was.  They made me flip my car
 7   and then tried to say they did not.  But they ultimately
 8   ended up being guilty of that.
 9        Q.   All right, sir.  Okay.  And a deposition --
10   when I say a "deposition," you actually sat down in a
11   room like this --
12        A.   Yes.
13        Q.   -- with a court reporter?  Okay.
14        A.   Yes, sir.
15        Q.   Well, let me -- notwithstanding the fact that
16   you've given one recently, let me kind of go over what
17   this is that we're doing here today.  It's -- this
18   lawsuit is filed in federal court so it's just as
19   though -- even though we're here in my conference room,
20   it's just as though you were testifying live in front of
21   a judge and jury.  All right?
22        A.   Yes, sir.
23        Q.   Because of that, it's very important that you
24   listen to each of our questions.  And if, for any reason
25   whatsoever, you don't understand one of our questions

---

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                                    Page 7

1    that you ask us to rephrase it until you do understand

2    it.  Okay?

3         A.   Yes, sir.

4         Q.   If you do answer a question, we're going to

5    assume that you understood the question and that the

6    answer you gave to the question was the one you intended

7    to give.  Is that fair?

8         A.   Yes, sir.

9         Q.   If you will, do as you are doing, please, and

10   give us a verbal response to each of our questions, so

11   the court reporter doesn't have to try and interpret

12   whether you're shaking your head "no" or nodding your

13   head "yes" or that sort of thing.  Okay?

14        A.   Yes, sir.

15        Q.   And if you will, please do as you are doing

16   and wait until we finish our questions before you begin

17   your answer and we will, in turn, wait for you to finish

18   your answer before we begin our next question.  All

19   right?

20        A.   Yes, sir.

21        Q.   All right, sir.  I'd like to get just a little

22   bit of background information about you, please.  First

23   of all, I think I know your address.  Is it still 10802

24   Deepwater Bay?

25        A.   No, sir.

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507
                                                   Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 8

1       Q.   Okay.  Where do you currently live?

2       A.   It's 10815 Deepwater Bay.

3       Q.   Okay.  And how have you -- back in August of

4   2011, did you live at 10802?  Oh, I'm sorry.  Never

5   mind.  My mistake.  Sorry.  Okay.

6             So how long have you lived at 10815

7   Deepwater Bay?

8       A.   Since March of 2008.

9       Q.   And are you married?

10      A.   No, sir.

11      Q.   Does anyone live there with you?

12      A.   Yes.

13      Q.   Can you tell us who that is, please?

14      A.   My best friend.

15      Q.   Okay.

16      A.   Laquion Rodriguez.

17      Q.   And how long has Mr. Rodriguez lived there

18  with you?

19      A.   I'm not sure the exact date, but I think about

20  three years.  He was there the night it happened, but he

21  was asleep, though.

22      Q.   And did Mr. Rodriguez get up at all during

23  this incident?

24      A.   No, sir.  He's a nurse so he sleeps pretty

25  sound through the night.

---

Gulfstream Court Reporting

Tel: (210) 490-6444                     Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

                                                        Page 9

 1        Q.   Okay.  And this incident happened, actually,

 2   the early morning hours of August 4th, 2011.  Do you

 3   recall that?

 4        A.   Yes, sir.

 5        Q.   I think -- well, let me ask you some more

 6   about your background.  Was there anyone else that was

 7   living there with you on August 4th, 2011?

 8        A.   No, sir.  Lee Griffin was spending the night.

 9   He was home from college, I believe.  I'm not quite sure

10   about that.  But when he's in town, he usually spends

11   the night at my house.

12        Q.   Okay.

13        A.   Sleeps on the couch downstairs.

14        Q.   Doesn't his mother live basically --

15        A.   Next door.

16        Q.   -- next door to you?

17        A.   Two doors down, actually.

18        Q.   Right.  Do you know why he stays at your house

19   as opposed to her house?

20        A.   He's like a little brother to me.  Ever since

21   I moved in the neighborhood, he pretty much cut my grass

22   and we look after him.  Me and my best friend look after

23   him like he's our little brother.

24        Q.   Okay.  All right.  And you're currently in the

25   Air Force; is that correct?

---

                    Gulfstream Court Reporting

Tel: (210) 490-6444                      Fax: (210) 579-6507

                                          Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
 1      A.   Yes, sir.

 2      Q.   And hold the rank of E-6?

 3      A.   Yes, sir.

 4      Q.   Which is tech sergeant?

 5      A.   Yes, sir.

 6      Q.   What is your military occupation specialty?

 7      A.   Telecommunications.

 8      Q.   Has your -- I'll call it "MOS."  Has your MOS

 9  been telecommunications for the entire time that you've

10  been in the Air Force?

11      A.   In one form or another, yes.

12      Q.   You've never served as an Air Force police or

13  anything like that?

14      A.   No, I did not.  I pulled security details

15  while deployed and various things like that.

16      Q.   Okay.  And "deployed," do you mean Iraq or --

17      A.   Yes.

18      Q.   -- Afghanistan?

19      A.   Iraq.

20      Q.   And when you say "security details," are you

21  talking about like there would be a -- can you explain

22  what you mean by that?

23      A.   Police augmentee.

24      Q.   I'm sorry?

25      A.   Police augmentee.
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 11

```
 1        Q.   So you would assist police officers or Air
 2   Force police in --
 3        A.   Yes.
 4        Q.   -- on transports or something or --
 5        A.   I can't really speak on --
 6        Q.   Oh, okay.
 7        A.   -- what I was doing, but . . .
 8        Q.   All right, sir.  Did you receive any training
 9   as a police officer in the Air Force?
10        A.   Light training.
11        Q.   Can you tell us what that entailed, basically?
12        A.   Basically -- trying to figure out how can I
13   word this for you.  Being in the military and doing what
14   I do, I'm already trained in light combatives, use of
15   guns, use of force.  We're trained on use of lethal
16   force, nonlethal force, this, that, and the third.  For
17   that training, you just learn the nuances of what the
18   security forces are doing.
19        Q.   All right, sir.  And when you say that you're
20   trained on the use of nonlethal force, can you tell us
21   what kind of nonlethal force you're talking about?
22        A.   Let's see, restraining.  If I -- if you were,
23   say, for example, doing something, then I would
24   basically restrain you without having to draw my gun
25   and kill you.
```

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 12

     1        Q.   Did you have any -- were you trained on any

     2   intermediate weapons in between use of hands and use of

     3   lethal force?

     4        A.   Intermediate how?

     5        Q.   Intermediate like a baton or a Taser or

     6   anything like that?

     7        A.   Had some Taser training and -- not a baton,

     8   though.

     9        Q.   Okay.

    10        A.   No.

    11        Q.   When did you have Taser training?

    12        A.   I forget.  It was many years ago.

    13        Q.   And was it on the Taser Taser?  I mean, I

    14   don't know if there's more than one manufacturer of what

    15   is copyrighted, I think, as Taser, but some people call

    16   it an electronic --

    17        A.   Went to a seminar in Yuma, Arizona, where we

    18   basically did the dog training, the -- the thing --

    19   shoot the Taser out and -- with the stems that goes out

    20   and shoots into you and various stuff like that.

    21   Nothing really extensive.

    22        Q.   Okay.  Did you carry a Taser?

    23        A.   No.

    24        Q.   Have you ever tased anyone?

    25        A.   No.

                    Gulfstream Court Reporting

Tel: (210) 490-6444                    Fax:  (210) 579-6507
                                          Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 13

```
 1        Q.   When you were working as a police augmentee,
 2   did you ever see anyone in the Air Force tase anyone
 3   else?
 4        A.   No.
 5        Q.   So apart from going to the seminar regarding
 6   the use of a Taser, that's pretty much the extent of
 7   your experience?  Or actually, I guess I should say that
 8   pretty much the total amount of your education and/or
 9   experience with using a Taser would be the seminar that
10   you attended in the Air Force?
11        A.   Yes.
12        Q.   And that was many years ago?
13        A.   Yes.
14        Q.   Can you give us an estimate about when that
15   might have been?
16        A.   I was still AWACS, so maybe 2000, I think.
17   I'm not sure.  I'm not sure of the exact year, so I
18   don't want to give a date.
19        Q.   Sure.  Okay.  But you think it was somewhere
20   around that time?  I'm not going to pin you down to a
21   specific --
22        A.   Yes.
23        Q.   -- date.
24        A.   It was in Yuma, Arizona.  The Yuma Proving
25   Grounds.  But yeah, it's somewhere around that time.
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 14

1        Q.   All right, sir.  Okay.  And have you, as a --
2    in your capacity as a police augmentee, have you had to
3    actually subdue people?
4        A.   No.  No, I have not.
5        Q.   Have you ever handcuffed anyone?
6        A.   In training, yes.  But other than that, no.  I
7    also used to run exercises with the policemen up in
8    Anchorage, Alaska, when I was stationed at Elmendorf.
9    We'd run exercises with them.
10       Q.   And when you say you'd "run exercises" with
11   them, can you tell us what you mean by that?
12       A.   It was various scenarios.  Somebody break into
13   a building, you subdue them, you cuff them, various
14   things like that.
15       Q.   All right.  So they'd be training exercises?
16       A.   Yes.
17       Q.   And during those training exercises, were you
18   required to subdue suspects?
19       A.   Oh, yeah.  I -- actually, it goes both ways.
20   I actually got that from the training exercise up in
21   Alaska.  They put the cuff on you, they turn it to see
22   someone's breaking point, various things like that.
23       Q.   All right.  And when you say -- because she
24   can't take down --
25       A.   I have a mark on my right hand.

Gulfstream Court Reporting

Tel:  (210) 490-6444                        Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 15

```
 1        Q.    Thank you.

 2        A.    From the handcuffs from the training exercise.

 3   But yes, I had various training exercises.

 4        Q.    And is that something that they taught in the

 5   Air Force, was that you would twist the handcuff until

 6   someone cried "uncle" or whatever?

 7        A.    I wouldn't say the Air Force taught that, but

 8   there was various techniques they would -- I would say

 9   use, show.  Another one is the butt-stroke.  You take a

10   M16, you pop someone in the chest cavity to -- these are

11   nonlethal things you can do to kind of stop someone.

12        Q.    Can you describe any other things that they

13   taught you as far as nonlethal methods of stopping or

14   subduing someone?

15        A.    Various arm bars, holds, ways of restraining

16   someone.  Things like that.

17        Q.    And did they teach you that once you started

18   beginning trying to get someone subdued, if that

19   individual resisted your attempts, that you should use

20   additional force to meet whatever force they were using

21   to resist?

22        A.    That's where the twisting of the handcuffs

23   comes in and the butt-stroke comes in at.

24        Q.    So basically there was a -- did they teach you

25   a force continuum?  Have you heard that term before?
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 16

```
 1      A.   No.
 2      Q.   Like just an escalation of the amount of force
 3   that you as a police augmentee would use to overcome the
 4   amount of resistance that's being used by the suspect.
 5      A.   So if I'm understanding this correctly, what
 6   you're saying is the harder they fight, the more force
 7   you use?
 8      Q.   Correct.
 9      A.   Yes.  It's -- it's extremely understood and
10   taught.
11      Q.   Because generally what you're attempting to do
12   is get the suspect under control, correct?
13      A.   Yes.
14      Q.   All right, sir.  And can you tell us, do you
15   have any college education?
16      A.   Very little.  I'm -- more of certification
17   education than anything.
18      Q.   Air Force certifications?
19      A.   Commercial certifications.  Like right now I'm
20   starting -- I'm studying for Security Plus.  Most of my
21   education, because I do IT, is, you know, Cisco, various
22   civilian certifications that we apply in the Air Force.
23      Q.   All right, sir.  So most of your informal or
24   certification education would be regarding
25   intellectual -- IT stuff?
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 17

1       A.   Yes.

2       Q.   Okay.  And can you tell us when you were

3   deployed to Iraq?

4       A.   '04 to Kirkuk, I want to say.  Between the

5   years of 2003 and 2006, I went to Kirkuk and Balad.

6       Q.   Okay.  And when you were in -- I'm not sure

7   that I'm -- that you can answer this, but can you give

8   us an idea like maybe on a percentage basis -- while you

9   were deployed, what percentage of your time would have

10  been as a police augmentee versus anything else?

11      A.   Well, my job is my main job, but I -- I

12  don't -- I don't really know a percentage.  It wouldn't

13  be more than my main job, I guess you would say.  But as

14  a deployed member, everyone's a police augmentee.

15      Q.   All right, sir.

16      A.   So . . .

17      Q.   Okay.

18      A.   It's a -- it's a -- it's -- for lack of a

19  better term, it's a war.  Everyone has a gun.  I'm going

20  to protect myself.  I will subdue someone if need be.  I

21  will use lethal force if need be.

22           We have this thing called "Law of Armed

23  Conflict" where you're taught these things in

24  extensive -- and this is Air Force training, combative

25  training.  So I was combative.  I wasn't -- wasn't in

Gulfstream Court Reporting

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                              Page 18

 1    the Bahamas; I was in Iraq.

 2         Q.   Gotcha.  All right.  Actually, my son did two

 3    tours in the Marines in Iraq --

 4         A.   Uh-huh.

 5         Q.   -- so I'm pretty familiar with the whole

 6    concept.

 7         A.   Yeah.

 8         Q.   Okay.  Well, let's just go ahead and -- well,

 9    let me ask you this -- and I don't mean to embarrass you

10    and I think I know the answer to this already, but:

11    Have you ever been arrested?

12         A.   No.

13         Q.   All right.  Let's talk about -- well, let me

14    ask you this first:  Have you ever been with anyone --

15    apart from -- and I'm not -- not that you were with Mr.

16    Abernathy on the morning of August the 4th, 2011, Pierre

17    Abernathy -- but have you ever been with anyone who was

18    arrested?

19         A.   Thinking back on all my years.  Not that I

20    recall.

21         Q.   All right, sir.  Okay.  On August the 4th,

22    2011, the morning of August the 4th, 2011, what was the

23    first thing that you can recall that alerted you to the

24    fact that there was something going on in your

25    cul-de-sac?

Tel: (210) 490-6444                          Fax:  (210) 579-6507

                                                    Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 19

 1        A.   It was early morning.  I heard a lot of noise.

 2   It was -- it was extremely loud.  It -- almost like it

 3   was in my house, so I thought Lee was downstairs, up

 4   with my brother, because when they're -- when he's off

 5   of work, they'll sit up and watch movies all night and

 6   watch Predator over and over again or whatever -- have

 7   you.

 8                And so I went downstairs because I had to

 9   work the next morning.  I went downstairs and -- well,

10   my brother's door was shut to his room upstairs and Lee

11   was asleep on the couch downstairs.  So I'm -- I was

12   confused as to where the noise is coming from because I

13   could still hear it.

14                So around that time, I stepped out my

15   front door and I looked right and I saw a few police

16   cars lined up against the street.  Some lights on, some

17   not.  And my street's a pretty quiet cul-de-sac, so that

18   doesn't happen.  And I look left and I see people in my

19   neighbor's yard.

20                And between my house and Lee and Pierre's

21   house, there's another house name -- his name is Larry.

22   So it's their house, Larry's house, then my house.  You

23   know, we're, you know, two doors apart.  So that's

24   initially how I saw everything --

25        Q.   Okay.

                                        Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 20

1       A.   -- I did see.

2       Q.   All right.  What did you see besides the

3  police cars?

4       A.   At that time I couldn't see much because I

5  have four or five -- I'm not sure the exact number of

6  trees, but they're 15-foot trees in between the houses

7  with a slit of about that far in between them.

8  (Gestures.)

9            So I saw the -- I knew they were police

10  officers.  At the time I didn't know it was Pierre.  I

11  didn't know what was going on.  So it was a lot of

12  tussling.  A lot of -- when I say it was a lot of

13  tussling, sir, I mean it was someone screaming and you

14  can hear the -- the movements next door.  And it was --

15  it was kind of dark over there.  It was.  And I wasn't

16  sure what was going on at that point.

17       Q.   All right.  And when you're saying "over

18  there," at this point you're talking about just next

19  door to you?

20       A.   Exactly, next door to me.

21            (Exhibit No. 1 referenced.)

22       Q.   (By Mr. Ralls) Let me hand you what I've

23  marked as Deposition Exhibit No. 1.  And this, I think,

24  is a -- that's a bird's-eye view of the cul-de-sac that

25  you live on, I believe.  Do you --

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 21

1         A.    This is my house.

2         Q.    Okay.  Do you recognize Deposition Exhibit

3    No. 1 as accurately depicting the cul-de-sac that you

4    live on?

5         A.    Yes.

6         Q.    And you pointed just a second ago to your

7    house being what we previously talked about, 10815?

8         A.    Yes.

9         Q.    And so you came out into your front yard

10   and --

11        A.    Yeah.

12        Q.    -- and were looking to your left?

13        A.    Yes.  I'm standing right here.

14        Q.    Okay.  Can you --

15        A.    A little bit past my porch, my little front

16   step.

17        Q.    You want to take my pen and just put an X

18   where you were?

19        A.    I was standing right here, a little -- about

20   a -- a step or two into the grass.

21        Q.    Okay.

22        A.    Trying to see to my left in between the trees.

23   The reason why I knew my brother was home beyond a

24   shadow of a doubt, in this picture that we're showing

25   here, that black car in his driveway, that's his black

Gulfstream Court Reporting

Tel: (210) 490-6444                        Fax:  (210) 579-6507

Exhibit "2"

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 22

 1    BMW M3.  Anytime that car is home, he's home, because my

 2    car's in the garage.

 3         Q.   All right, sir.  Okay.  And so you were

 4    looking -- and we can see the line of trees, I think --

 5         A.   Yes.

 6         Q.   -- between the two houses.

 7         A.   And it was over here in this area.  Like it

 8    was on Larry's porch.

 9         Q.   Okay.  Let me -- I think maybe this red

10    Sharpie might work out better for us.

11         A.   Then it was in this area.  And Larry has a

12    cubby hole on his porch where I can't directly see his

13    front door.  But I saw -- like I said, as I -- as I

14    stated, the police cars were on either side of the

15    street over here and there was more cars coming up.  I

16    was standing where I marked the X in front of my porch.

17         Q.   Okay.  With the blue ink?

18         A.   Yes.  With the blue ink.  Well, it's red ink

19    now.

20         Q.   All right.

21         A.   Like I said, I heard the tussle over here.

22    And I was looking in between the two trees trying to

23    figure out what's going on and -- I don't know -- do you

24    want me to continue?

25         Q.   Sure.

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 23

1         A.   From that point there, as I'm looking, I see

2    somebody shoot off, you know, running as fast as humanly

3    possible, as fast as he could, which I -- come to find

4    out it was Pierre.  I noticed him right away, soon as I

5    saw him taking off, because I saw Shavonda's truck.

6              And he'd run over here to -- I don't -- I

7    don't know his name.  I call him Jack Nicklaus.  He

8    looks like Jack Nicklaus to me.  So from there, I

9    leave -- is -- he runs that way.  The dogs and the

10   policemen follow him.

11        Q.   All right.

12        A.   Over there.

13        Q.   Let me interrupt you right here if you don't

14   mind, please.

15        A.   Yes.

16        Q.   And -- okay.  So he runs from the front porch

17   on 10811 Deepwater Bay.

18        A.   Yes.

19        Q.   And does he run in a straight line over to the

20   front yard of 10802?

21        A.   Well, first -- I'm sorry, I -- I forgot a

22   part.

23        Q.   Okay.

24        A.   The -- it was years ago, so I'm trying to

25   piece together the memories --

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                      JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 24

1      Q.   Sure.

2      A.   -- from it.  He started to run.  Then

3   something knocked him down in the yard.  I don't know if

4   it was the police or the dogs; something knocked him

5   down.  Then he got up and he ran -- he -- he started

6   again from 1011 [sic] Deepwater Bay to 10802 Deepwater

7   Bay.

8             And that's when I -- because I know this

9   was him, I came down here.  First I opened the door.  I

10  screamed to Lee, I said, "Lee, get up.  It's your

11  brother."  So from that moment, I run over to 10817.

12     Q.   -807?

13     A.   Yes.  And to contact Deborah's -- let her know

14  what was going on.  Basically, the policemen are on

15  Pierre.  So they're up and they're out.  And it was a

16  blur at that point whether -- as to whether they were

17  already outside or whatever.

18            But all while -- there -- I'm trying to

19  keep an eye on 10802, where all the policemen were and

20  things of that nature.  And at this point I was on the

21  lawn right here at 10807 Deepwater Bay, in front of

22  Deborah's house.

23     Q.   All right.  I'll tell you what.  Given that

24  we've got now four red Xs on here, why don't you go

25  ahead and number them 1 through 4.

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 25

1        A.    (Complies.)

2        Q.    And 1 is where you were outside --

3        A.    My house.

4        Q.    -- your house.  2 is where the scuffle was

5   going on that you were hearing.

6        A.    Yes.

7        Q.    And then 3 is where you ran to after Pierre

8   ran to X No. 4.

9        A.    Yes.  10802.

10        Q.    All right.  And so you had gone to 10807 to

11   tell Pierre's mother --

12        A.    Yes.

13        Q.    -- that something was going on?

14        A.    Yes.

15        Q.    She's Deborah --

16        A.    Yes.

17        Q.    -- Abernathy?

18        A.    Yes.

19        Q.    Or -- okay.

20        A.    Just Deborah.  I'm not sure her last name,

21   actually.

22        Q.    Yeah, I'm not either, to tell the truth.  But

23   I think it's Bailey, maybe.

24               All right.  So let me back up for just

25   one second.  You said that when he took off running, you

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 26

1    couldn't tell whether it was police officers or dogs

2    that may have stopped him.  And when -- and my question

3    is:  Was it dogs, plural, or a dog?

4          A.   I'm not sure.  I'm not sure.

5          Q.   Okay.

6          A.   I just remember -- I remember it was

7    definitely one.

8          Q.   And did you -- do you recall actually seeing

9    the dog catch up with and contact --

10         A.   I remember the dog was on him.  And like I

11   said, I'm piecing this together.  This happened

12   three-something-odd years ago on a night when it was

13   dark and everything was moving extremely fast.

14              But I remember a dog got ahold of him one

15   time.  I'm not sure if -- whether it was there or

16   there -- or whether it was 10811 or 10802, because he

17   was screaming and the dog was going at him pretty tough.

18         Q.   Okay.  All right.  So -- but what you did see

19   is at least when he was running, he was running, as you

20   described him, as fast as humanly possible?

21         A.   Adrenaline.  His adrenaline -- through the

22   roof.  He -- I wouldn't label him as being combative.

23   I've seen combative people.  I'm from New York.  I've

24   seen people fight back against the cops.  He wasn't

25   doing that.

Tel: (210) 490-6444                          Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 27

1            That's the thing that was -- when I got

2     there -- and to be clear, my brother's a cop in Newark,

3     New Jersey.  I have nothing against cops or policemen or

4     any form.

5            And the thing that struck me was while he

6     was on 10802, even though there was a car in the

7     driveway, you -- I could physically see.  It was like

8     they were pushing each other out of the way to get a hit

9     in.  That's what it -- what it felt like.

10            And while I was standing there -- and the

11     thing that pretty much made me irate -- and I gave a

12     police report -- and when I went down to the police

13     station, the detective, he guided my statement, telling

14     me what I did and what I didn't see, protecting his own.

15            I know the way police say those words

16     because, like I said, I've given a few -- I'm from New

17     York.  I've given a few police statements before.

18     Q.   Okay.

19     A.   To various things back in the -- back many

20     moons ago.  But I could tell when I'm being handled.  I

21     have various training in the Air Force.  As I mentioned

22     earlier, I work for DoD.  We have extensive training in

23     how to talk to people, various things to say.  If you're

24     being handled, if someone's trying to guide a

25     conversation a certain way, they're trying to get

Gulfstream Court Reporting

Tel: (210) 490-6444                         Fax: (210) 579-6507
                                            Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 28

1    information out of you.  Counter- --

2    counter-intelligence.  And I understand that greatly.

3                    But the thing that -- that really angered

4    me that night, besides what I thought was an excessive

5    use of the force -- and he was screaming.  You could

6    hear him towards the end screaming, "Mom, Mom, please

7    help me."

8                    And the two or three cops in the street

9    in front of 10817, about a foot or two off the curb,

10   were facing me, making sure I didn't go over there.  And

11   it took every inch within my body not to go over there

12   because, A, it would have happened to me; B, I'm a U.S.

13   service member with a TS/SCI clearance.  So my -- my

14   level of involvement couldn't be on that level.  They

15   were laughing.  "What are you going to do about it?"

16        Q.   Did they say --

17        A.   Yes, they did.

18        Q.   Okay.  All right.  So the three officers --

19   the three officers in the street said to you, "What are

20   you going to do about it?"  They were laughing?

21        A.   Yes.

22        Q.   Did they say anything else to you?

23        A.   Various chatter back and forth.  "Back up

24   before it happens to you."  They thought it was amusing.

25        Q.   Well, whether they thought it was amusing or

Gulfstream Court Reporting

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 29

 1   not, you do understand the need to -- as given your

 2   background, that you wouldn't want somebody else joining

 3   in that fight to attempt to subdue Mr. Abernathy, don't

 4   you?

 5               MR. WILSON:  Objection; leading.

 6               THE WITNESS:  Excuse me?

 7               MR. WILSON:  You can answer.  I'm

 8   objecting to the form of his question.  You may answer

 9   his question.

10       A.   Oh, I understand that fully or else I'd have

11   went over there.

12       Q.   (By Mr. Ralls)  Right.  Okay.  Well, let me

13   ask it in a different form.  Would it -- do you have --

14   do you know whether it would have been improper for you

15   to join into the fray where they were attempting to

16   subdue Mr. Abernathy or not?

17               MR. WILSON:  Objection; speculation.  You

18   can answer, if you know.

19       A.   Are you asking do I know whether or not it was

20   right or wrong for me to go over there?

21       Q.   (By Mr. Ralls)  Correct.

22       A.   Extremely, yes.  I do know -- it was right or

23   wrong for me to go over there.  That's why I stayed on

24   10817 -- on 10807's lawn and just observed.

25       Q.   Do you know why Mr. Aber- -- why the officers

---

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 30

1    were trying to subdue Mr. Abernathy?

2              MR. WILSON:  Objection; speculation.  If

3    you know.

4         A.   At that point, I did not.

5         Q.   (By Mr. Ralls)  And did you subsequently find

6    out?

7         A.   Not really.  It was a traffic stop, I heard,

8    maybe.  I'm not sure, actually.  It was -- he wouldn't

9    stop.  They were following him home --

10             MR. WILSON:  I'm going to object --

11        A.   -- I think.

12             MR. WILSON:  -- to the speculation of the

13   witness.

14        A.   Yeah.  I'm not sure.  I'm not sure.

15        Q.   (By Mr. Ralls)  All right.  When you were

16   standing in front of 10807, did you have a clear view of

17   the scuffle between the officers and Mr. Abernathy?

18        A.   No, I did not have a -- a clear view.  I could

19   see officers pulling each other off so the other officer

20   could get in.  I'm 6 -- I'm 6-foot-3.  There aren't many

21   vehicles taller than me.  So even though -- and this is

22   where the conversation got guided at the police station.

23             I could hear the sound of the boots

24   hitting him.  I know what it sounds like for boots to

25   hit someone.  I've been wearing boots for 20 years.  I

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

 1    know what boots sound like.

 2        Q.   And have you kicked people yourself?

 3        A.   No.  But I've heard -- I've heard that sound

 4    before.  I haven't kicked people before, but I've heard

 5    people get kicked with boots on.  It's -- it's an

 6    unmistakable sound.  It's kind of like shooting a gun.

 7    If someone shoots a gun outside of this closed room, I

 8    might not know the caliber, the gun, or who's shooting

 9    it, but I know a gun got shot.  It's along that same

10    line, sir.

11            But I did not physically see them kicking

12    him, as I told the -- the detective at the station.  I

13    could see -- when you're about to kick someone and

14    you're about to hold on to something and you hear the

15    sounds of boots, I see the scuffling.

16                It was like -- between the -- him

17    screaming, pleas for help, the Tasers going off --

18    because I could see everybody get back, they'd tase him,

19    he'd scream.  He let out this blood-curdling scream.

20    Those are the things I did not forget about that night.

21                And various things.  And I remember

22    saying to the -- to the two or three cops on the

23    street -- it started out with two.  And they started

24    getting aggressive towards me because I started saying,

25    "You're killing him."  Even though I never tased anyone,

Tel:  (210) 490-6444                    Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 32

1    if you tase someone enough, you can tase them enough to
2    make their heart stop.  I do know that.
3         Q.   Okay.  How do --
4              MR. RALLS:  Well, I need to make an
5    objection as nonresponsive.
6         Q.   (By Mr. Ralls)  But let me ask you this before
7    we move on:  You will be in -- you will probably be in
8    San Antonio for at least the next year, correct?
9         A.   No.  I'm going to Afghanistan.
10        Q.   Oh, okay.
11        A.   I -- I retire.  I'm going to civilian
12   contracting.
13        Q.   Okay.  Okay.
14        A.   I'm going to be gone next year, maybe a few
15   years after.
16        Q.   All right, sir.  All right.  Well -- okay.
17   Then to get back to the issue:  Where did you get the
18   information that you believe that if you tase somebody
19   enough it'll kill them?
20        A.   It wasn't from the training in Yuma.  It was
21   some gee-whiz stuff I believe I looked up one time.  The
22   World Wide Web is pretty -- pretty extensive on the
23   things you can look up.
24        Q.   All right.  So you got that information off
25   the Internet?

Tel: (210) 490-6444                          Fax: (210) 579-6507
                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 33

 1      A.   Yeah.

 2      Q.   Okay.

 3      A.   Yeah, you can say that.

 4      Q.   All right.  You don't have any medical

 5  training yourself, do you, as far as whether a Taser

 6  will kill you or not?

 7      A.   No.  But I have training on -- on the -- I

 8  forget the name of the actual machine that hooks to your

 9  chest and sends you an electric current through it.  We

10  have combative training, field medic training, various

11  training like that.  Even though it's not extensive,

12  since I've been in a war zone, I can . . .

13      Q.   All right.  But you don't have any -- I mean,

14  you've never gone to school on the Taser, correct --

15      A.   No.

16      Q.   -- other than the seminar that you've had?

17      A.   No, sir.

18      Q.   And you've never received any training from

19  any kind of medical doctor that told you that excessive

20  use of a Taser would kill somebody, have you?

21      A.   No.  No, I have not.

22      Q.   And do you know whether there are different

23  ways to use a Taser or not?

24      A.   Like I say, I only had the -- the slight

25  training on the one -- the projectile Taser.  I know

Tel: (210) 490-6444                    Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 34

1   there's a handheld one that you have to get close to

2   use, so I wouldn't know about that one.

3       Q.   Do you know -- so you don't know whether the

4   handheld one is just intramuscular between the prongs of

5   the Taser or not?

6       A.   You want to aim for the -- the chest, the

7   body, the main portion of the body.  They didn't go into

8   the scientifics of it, if that's what you're asking.

9       Q.   Okay.  So the only information that you have

10  with regard to whether or not a Taser -- excessive use

11  of a Taser would kill somebody, to repeat, is what you

12  read on the Internet.

13      A.   Yes.

14      Q.   All right.  So were you able to see

15  Mr. Abernathy's hands at the time that the officers were

16  attempting to subdue him?

17      A.   As I stated earlier, he's on a porch and for

18  me to see his hands, he'd have to be standing upright.

19  With that many cops, the dogs, and the Tasers and all

20  the sounds of the beatings going on over there, no man

21  can stand up for that.  Not even me.

22              MR. RALLS:  Okay.  Let me object as

23  nonresponsive again.

24      Q.   (By Mr. Ralls)  You weren't able to see his

25  hands as the --

Tel: (210) 490-6444                      Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                        JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 35

1        A.    No.

2        Q.    -- officers were attempting to subdue him,

3    correct?

4        A.    No, I was not, sir.

5        Q.    Would you agree with me that the officers have

6    to get him under control at some point?

7        A.    If I get a stick and I'm beating you with a

8    stick -- this is just human nature -- if you're getting

9    tased, the dog is on you, adrenaline is running through

10   your system -- reminds me back when I was a child when I

11   was getting a whooping one time and I'm told, "Stay

12   still," while I'm getting hit.  It's hard to do so.

13             And based on the laughing, the

14   jovialness, like I -- as I stated earlier, the pulling

15   out of the way -- was I over there?  No, I was not.  But

16   it seemed more of a good time than it was a sense of

17   urgency.  A sense of --

18             Like I say, I'm from New York.  I've seen

19   when people fought back at the cops.  I've seen the look

20   in a police officer's face when someone's fighting back.

21   He wasn't laughing.  They were.  It was a good time --

22   it's -- that's pretty much it.

23             MR. RALLS:  Okay.  I have to object as

24   nonresponsive.

25        Q.    (By Mr. Ralls)  But my question was:  Would

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 36

 1   you agree -- well, strike that.

 2              Let me ask you this:  Were you aware of

 3   the fact that Mr. Abernathy was on cocaine at the time

 4   of the incident?

 5        A.   I was not.

 6        Q.   And were you aware of the fact that he had

 7   been pulled over previously -- well, strike that.

 8              Were you aware of the fact that when he

 9   was initially pulled over, the officers attempted to

10   handcuff him and he resisted their attempts to handcuff

11   him?

12        A.   No, I was not.

13        Q.   And were you aware of the fact that he fought

14   with the officers -- or at least passively/aggressively

15   with the officers in their attempts to get him

16   handcuffed?

17              MR. WILSON:  Objection; assuming facts

18   not in evidence.

19        A.   You mean while he was at 10802?

20        Q.   (By Mr. Ralls)  Correct.

21        A.   I understand that they tried to put a handcuff

22   on him towards the end.  But there was a good portion

23   there where --

24              MR. WILSON:  Objection as to any

25   speculation of the witness.

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                      Page 37
 1              MR. RALLS:  Well, at least let him finish
 2    the --
 3              MR. WILSON:  I'll let him finish.
 4       A.   There was a good portion there -- like I said,
 5    when -- when I saw when the good portion was laughing,
 6    stuff like that, it's just speculation, as -- as he
 7    said.  It didn't look like any cuffing was going on, to
 8    me.
 9       Q.   (By Mr. Ralls)  Okay.  Were you aware of the
10    fact that he had had one handcuff placed on him when he
11    was initially stopped and then pulled his arms apart and
12    resisted?
13       A.   No.
14              MR. WILSON:  Objection --
15       A.   I was at home.
16              MR. WILSON:  Objection as to assuming
17    facts not in evidence.  And objection to any
18    speculation.  You may answer.
19       A.   I was at home asleep.
20       Q.   (By Mr. Ralls)  Okay.
21       A.   How could I have known?
22       Q.   All right.  Well, you couldn't know, correct?
23       A.   No.
24       Q.   I mean, you don't know what level of
25    resistance Mr. Abernathy offered or --
```

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 38

 1        A.   Initially, yes.

 2        Q.   You don't -- let me finish my question.  You

 3   don't know what level of resistance Mr. Abernathy put up

 4   to the officers when they initially attempted to

 5   handcuff him, correct?

 6        A.   Initially, that is correct.

 7        Q.   Well, assume for me that he did have one

 8   handcuff on him and then yanked his arms away and got up

 9   and ran.  Would you consider that resistance to being

10   brought under control by Mr. --

11             MR. WILSON:  Objection as to assuming

12   facts not in evidence and also leading.

13        A.   Yes.  About to say, I have a two-part question

14   [sic] to that.  Because if you're trying to handcuff me

15   while kicking me and the dog is on me biting me, with

16   adrenaline running, and if -- if, like you say, he was

17   on cocaine -- the Abernathy I saw was scared for his

18   life.

19             And the running was he was fleeing away

20   from them.  Not to get away because if he would have

21   tried to go away, he wouldn't -- if he was trying to

22   flee the scene, per se, he would have went right out of

23   10811 because this is the way to freedom.  He went and

24   curled in a ball on 10802's doorstep.

25             MR. RALLS:  Well, let me object as

                  Gulfstream Court Reporting
Tel: (210) 490-6444                      Fax: (210) 579-6507
                                              Exhibit "2"

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 39

 1    nonresponsive and calling for speculation -- or

 2    actually, and speculation on your part, on the witness's

 3    part.

 4         Q.   (By Mr. Ralls)  Did you see the officers who

 5    were in the cul-de-sac that were talking to you and

 6    laughing, did you ever see them make physical contact

 7    with Mr. Abernathy?

 8         A.   Oh, they were keeping me at bay, so no.  No, I

 9    did not.

10         Q.   And how many officers did you see attempting

11    to subdue Mr. Abernathy?

12         A.   Oh, that would be speculation.  It was a few

13    years ago.  In the dark.

14         Q.   Okay.  So you just don't know?

15         A.   No, that would be spec- -- I could speculate.

16    I would say -- call it eight.  It would be speculation,

17    but --

18         Q.   All right.

19         A.   I don't have an exact head count.

20         Q.   Well, I don't want you to speculate.  So if

21    you don't know, you can just tell us you don't know.

22         A.   I don't have an exact head count, but I know

23    it was more than five.

24         Q.   Okay.  And can you describe any of the

25    officers that were around Mr. Abernathy, other than

Gulfstream Court Reporting

Tel: (210) 490-6444                        Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                       Page 40

 1   being police officers?

 2        A.   I could.  It would sound borderline racist.  I

 3   could.  It was little -- it was some Mexican guys.

 4        Q.   What did you say?  That it will sound

 5   racist --

 6        A.   Yeah.

 7        Q.   -- by you?  Okay.

 8        A.   It was a Latin, I guess you would say.  A

 9   Mexican.  A Mexican -- some Mexican police officers.

10        Q.   Okay.

11        A.   It was -- I believe it was a white guy in

12   there.  Like I said, it was dark.  And more importantly,

13   as that was going on and I was keeping an eye on them,

14   like I said, I had -- I was standing here, so . . .

15        Q.   Okay.

16        A.   I mean . . .

17        Q.   All right.  So you couldn't really see what

18   was going on in the front yard at 10802, correct?

19        A.   I saw flashes.  I saw, like I said, people

20   getting pulled out of the way, so -- and I could

21   demonstrate where someone's getting pulled out of the

22   way so someone can lead in.  Like even though -- I'm

23   going to stand here.  Even though you can't see my foot

24   strike the ground, you can see someone pull away like

25   that.  (Gestures.)

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 41

```
 1        Q.   Okay.
 2        A.   Is what I saw.  So even though you did not see
 3   the color of my shoe when someone is striking the ground
 4   because the table is blocking me right now, you can see
 5   my foot come down in a striking motion as I'm pulling
 6   someone away.  Saw a lot of that.
 7                  It was a lot of pulling away so someone
 8   could get a hit in, is what I saw.  Now, did I see their
 9   boot strike him or the color of their boots or the
10   things of that nature?  No.
11        Q.   Okay.
12        A.   But I saw things of that nature.
13        Q.   All right.  So you saw things that led you to
14   believe that he --
15        A.   Yes.
16        Q.   -- was being kicked --
17        A.   Yes.
18        Q.   -- correct?  Okay.  But you didn't see the
19   actual kicking?
20        A.   As I stated there, even though -- when I gave
21   my demonstration there, even though you couldn't see my
22   foot, you knew I was kicking.
23                  MR. RALLS:  Well, let me object as
24   nonresponsive.
25        Q.   (By Mr. Ralls)  My question is really simple.
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                        Page 42

 1    It's:  You didn't see any actual -- anyone actually kick

 2    Mr. Abernathy?

 3         A.   No, I did not.

 4         Q.   And you didn't see anyone actually strike

 5    Mr. Abernathy with a closed fist, did you?

 6         A.   I saw the closed fist come up and I saw the

 7    closed fist come down.  Now, there is a vehicle on

 8    10802's driveway, so I saw the fist here and I saw the

 9    fist come down.  Now, did I see it actually land?  No.

10    But I know it was thrown.

11         Q.   Okay.  And you could not -- again, you could

12    not see what Mr. Abernathy was doing while that was

13    going on, correct?

14         A.   No.  I could hear him screaming, "Please help

15    me.  Mom, mom, please help me."

16              MR. RALLS:  Objection; nonresponsive.

17         Q.   (By Mr. Ralls)  All right.  How long were the

18    officers and Mr. Abernathy struggling in the front yard

19    of 10802 Deepwater Bay before that stopped?

20         A.   I don't have --

21              MR. WILSON:  Objection; assuming facts

22    not in evidence.

23         A.   I don't -- I don't have the exact time limit.

24         Q.   (By Mr. Ralls)  Okay.

25         A.   I know it started in the early morning and
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                            JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 43

1    when everything came to an end, the sun was coming up.

2         Q.   But I mean, as far as the activity that you've

3    been describing, what you believe to be the kicking and

4    the striking, how long did that continue before --

5         A.   Not sure of the exact time.  I didn't have a

6    clock on.  I was out there in the clothes I went to

7    sleep in.

8         Q.   What happened -- well, did you ever see the

9    officers actually get Mr. Abernathy handcuffed?

10        A.   No.  Towards the end as his -- he was --

11   things were starting to die down and I become more vocal

12   with, "You're killing him.  It don't take this many

13   people to subdue one man," the officers and I was having

14   a conversation there.  They requested I move and go home

15   inside my house.

16        Q.   Okay.

17        A.   And I went from here towards the end -- as,

18   like I said, everything was coming to a close, I went

19   from 10807 back to 10815, in my driveway.  And they

20   followed me up the street and continued to stand in

21   front of my property, telling me to go in my house,

22   which I informed them that, "I pay taxes.  This is my

23   house.  I'm not obstructing you in no way, shape, or

24   form."  They didn't want anyone to see.  They told

25   everyone to go in the house.

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 44

 1        Q.   Well, you can understand -- you don't know why

 2   they told you that, do you?

 3        A.   They told all my neighbors -- well, not all my

 4   neighbors.  I know they told 10814 to go in the house

 5   and he was just on his porch.  It was almost -- and this

 6   is speculation -- it was almost as if they didn't want

 7   people to see what was going on.

 8             MR. RALLS:  Yeah, let me object as

 9   speculation.

10        Q.   (By Mr. Ralls)  My question to you is:  You

11   don't really know what the mindset of the officers was

12   or were at the time that they were telling you to go

13   into the house?

14        A.   I couldn't tell, I mean -- I say, it was hard

15   to gauge for myself their laughing and someone's -- when

16   someone's getting . . .

17             MR. RALLS:  Objection; nonresponsive.

18        Q.   (By Mr. Ralls)  You don't know the reason that

19   they told you to go in the house, do you?

20        A.   I'm not inside their head.  The only thing --

21   you're saying do I know the reason?  The reason why I

22   believe?

23        Q.   Not -- I'm not asking you the reason why you

24   believe.  I'm asking you whether you know what the

25   officers --

                                          Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 45

   1        A.   And I said I -- I don't know the reason.

   2        Q.   You didn't know any of those officers,

   3   correct?

   4        A.   No.

   5        Q.   None of those officers knew you, correct?

   6        A.   No.

   7        Q.   None of those officers knew what you did for a

   8   living, correct?

   9        A.   I informed them while I was there that I was

  10   in the Air Force.

  11        Q.   None of those officers knew whether you might

  12   get involved in this --

  13        A.   No, they --

  14        Q.   -- fray --

  15        A.   -- knew.

  16        Q.   -- or not?

  17        A.   No.  As they were standing in the street and

  18   saying, "What are you going to do?"

  19             I said, "I'm not going to do anything.

  20   I'm in the U.S. Air Force.  I'm not going to risk this

  21   for that, but I know you're dead-ass wrong."  I said

  22   that to them.  I said, "I know -- I know all that going

  23   on over there, you're wrong."

  24             "Yeah, what you going to do, though?

  25   What you going to do?"  That's what was told to me.

Tel: (210) 490-6444                        Fax:  (210) 579-6507
                                               Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                              Page 46

 1                  So they knew exactly what I was and they

 2      knew I wasn't leaving that lawn.  They also said to

 3      me -- when they was trying to get me to go downtown,

 4      that, "We could call your first shirt," which they

 5      cannot because I was on the phone with my first shirt.

 6      I offered to hand them the phone as I was on the phone

 7      with my first sergeant.

 8                  And my first sergeant said, "Give them

 9      the phone."

10                  I said, "You can talk to him."

11                  "Oh, sir, we don't need to talk to him.

12      Could you please just get in the car and come downtown?"

13                  MR. RALLS:  All right.  Let me object as

14      nonresponsive.

15           A.   They knew exactly who I was and what I did for

16      a living.  I identified myself.

17                  MR. RALLS:  Let me object as

18      nonresponsive.

19           Q.   (By Mr. Ralls)  All right.  Were you aware of

20      the fact that Mr. Abernathy was a schizophrenic?

21                  MR. WILSON:  Objection; assuming facts

22      not in evidence and speculation.

23           A.   No, sir.  He's -- no, I didn't know that.  I

24      don't know many things about many of my neighbors.

25           Q.   (By Mr. Ralls)  Were you aware of the fact

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                         Page 47

 1    that Mr. Abernathy had originally been -- or that

 2    officers had originally attempted to stop Mr. Abernathy

 3    because he was driving the wrong way on, I think,

 4    Sonterra Boulevard or Loop 1604?

 5              MR. WILSON:  Objection; speculation,

 6    leading, and assuming facts not in evidence.

 7         A.    Yeah.  See, I -- I was at home asleep.

 8         Q.    (By Mr. Ralls)  Okay.

 9         A.    I stated that three times.

10         Q.    And I take -- then you weren't aware that

11    Mr. Abernathy had led the officers on a 30- or 40-minute

12    chase before he pulled over?

13         A.    To answer --

14              MR. WILSON:  Objection; assumes facts not

15    in evidence --

16         A.    To answer any --

17              MR. WILSON:  -- leading, speculation.

18         A.    To answer any future questions, anything that

19    happened before I got up, I didn't know.

20         Q.    (By Mr. Ralls)  Would any of that -- assume

21    for me that that's what happened:  That he was driving

22    the wrong way on the street, that he led them on a

23    30-minute chase, that after they attempted to handcuff

24    him, he -- they got one handcuff on him and he started

25    resisting their attempts to have him -- to get the

                    Gulfstream Court Reporting

Tel:  (210) 490-6444                    Fax:  (210) 579-6507

                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                         Page 48

 1    second handcuff on him.  Would any of that make any

 2    difference to you in --

 3          A.    That's speculation.

 4                MR. WILSON:  Assuming facts not in

 5    evidence, speculation.

 6          Q.   (By Mr. Ralls)  I'm just asking you --

 7          A.    If I can't speculate on various other things,

 8    that's -- I'm not going to speculate to that either.

 9          Q.    Okay.  So you just don't want to give us an

10    answer to that?

11          A.    No, I'd like to give you an answer, but the

12    full answer I give you, the tail end of it will be

13    striked for speculation.  I've seen how this is going.

14    But I could give it to you.

15                Yes, they should have subdued him.  Yes,

16    I'm even okay with force.  The laughing and the amount

17    of force and all the things that ensued were not okay.

18    And that's why I'm here today.

19          Q.    Okay.  But you just don't know, sir, what

20    level of force he was using to resist their attempts to

21    get him handcuffed, do you?

22                MR. WILSON:  Objection; speculation,

23    stating facts not in evidence, leading.

24          A.    Give me three people, give me one person, I

25    could handcuff anybody.

                  Gulfstream Court Reporting
Tel: (210) 490-6444                    Fax: (210) 579-6507

                                        Exhibit "2"

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 49

1        Q.   (By Mr. Ralls)  Well, maybe you can.  I don't

2    know.  But you don't --

3        A.   That's a fact.

4        Q.   That's not my question.

5             MR. RALLS:  Objection; nonresponsive.

6        Q.   (By Mr. Ralls)  My question is:  You just

7    don't know what level of force Mr. Abernathy was using

8    to resist the officers' attempts to bring him under

9    control, do you?

10       A.   Judging from his voice, the laughing, the --

11   as the time went on, it went from a blood-curdling

12   scream to a whimper of "please help me," and they

13   continued to kick him.  So judging from that and --

14   towards the end the scuffling stopped and the kicking --

15   and the sound of boots striking him continued, I would

16   say the force was excessive.

17            MR. RALLS:  Objection; nonresponsive.

18       Q.   (By Mr. Ralls)  And you don't really have any

19   training in the amount of force that's necessary to

20   subdue somebody, do you?

21       A.   Yes.

22       Q.   All right.  You don't know at what point

23   during the scuffle Mr. Abernathy was actually finally

24   handcuffed, do you?

25       A.   For the -- for the use of force, on my part,

Gulfstream Court Reporting

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                              Page 50

 1   when you asked that question, the Law of conf- -- Law of
 2   Armed Conflict, going -- that exactly.  That's military
 3   code of justice, Law of conflict -- Armed -- Armed
 4   Conflict.  That's the training we get.
 5              Before we deploy to Iraq we get extensive
 6   training on IEDs, roadside bombs, use of weapons, use to
 7   hand-to-hand things, various things like that.  The
 8   amount of force that's used.
 9              That's to say if -- if someone pops up, I
10   can't just put full auto on my M16 and lay down the
11   whole field.  Or if someone has got their hands up, like
12   I have my hands up right now, I can't just assume and
13   let a few rounds in them.  You know, so I understand
14   force.  I understand more than many.
15              So do I believe the force was -- you
16   needed to subdue him, I get that.  How the officers
17   acted, I did not get that.  I did not understand that.
18        Q.   Okay.  All right.  And the officers, how the
19   officers acted, you're talking about the officers that
20   were in the cul-de-sac talking to you?
21        A.   Officers laughing over there.  I -- I heard
22   people over there kind of laughing and -- and stuff like
23   that.  The -- as I stated earlier, the pulling away to
24   jump in, various things like that.
25              I understand -- when someone's getting

                     Gulfstream Court Reporting
Tel: (210) 490-6444                    Fax:  (210) 579-6507
                                           Exhibit "2"

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 51

1   subdued, I'm not pulling -- if you're subduing

2   something -- subduing someone, I'm not pulling you off

3   of who you're subduing.  I'm going in with you, grabbing

4   their arm, arm barring them while you're getting the

5   cuff on.

6       Q.   Okay.  And if you can't get in between the

7   officers to grab an arm to arm bar him, then you're

8   going to pull an officer away so that you can get in.

9       A.   No.

10      Q.   All right.  So you're not going to?

11      A.   You -- you would not.

12      Q.   Okay.

13      A.   If you're --

14      Q.   Well --

15      A.   If you're in the middle of cuffing someone and

16  you're fighting to get a cuff on him, for me to pull you

17  off would free him up.  My job -- and if -- and the

18  porch -- our porches are pretty decent size.  You -- the

19  answer isn't to pull people off so you can get in.

20           Unless you are too slight of person to

21  where you can't -- and it's a big guy, then they would

22  bring me in.  And even then, you would hold on, you

23  would look back at me and say, "You get him," and I

24  would jump in.  But the answer is to never grab someone

25  by their back and pull them off while you jump in.

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 52

```
 1       Q.   Unless it's a slight-built guy that's not
 2   having any success subduing the individual.
 3               MR. WILSON:  Objection; leading, assuming
 4   facts --
 5       A.   No.
 6               MR. WILSON:  -- not in evidence --
 7       A.   It's --
 8               MR. WILSON:  -- speculation.
 9       A.   It wasn't -- that was not the case.  I know
10   that.  Because the way they were getting pulled off was
11   like a street fight.
12       Q.   (By Mr. Ralls)  All right.  You are unaware of
13   the point in time that Mr. Abernathy was completely
14   handcuffed, correct, during the scuffle?
15       A.   No, I was -- I was unaware of that.
16       Q.   All right.  You don't know when that occurred,
17   in other words --
18       A.   No.
19       Q.   -- correct?  You don't know whether the
20   hitting and the kicking that you believe you observed --
21       A.   Huh-uh.
22       Q.   -- took place during the attempt to handcuff
23   him or after the handcuffs were applied, do you?
24       A.   Well, if we're speculating, I can speculate --
25       Q.   I'm not asking you to speculate.  My question
```

Tel: (210) 490-6444                    Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                  JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 53

1   is:  Do you know?

2        A.   No, I was not down there to see when he got

3   handcuffed.

4        Q.   Okay.  And so you don't know whether they were

5   still attempting to handcuff him at the time that they

6   were hitting and/or kicking him, do you?

7        A.   No, I do not.

8        Q.   And you would -- and I think you've said

9   several times that you believe that he should be

10  subdued, correct?

11       A.   Within lethal force reasons, yes.

12       Q.   Okay.  And --

13       A.   I said that several times.

14       Q.   Okay.  After -- did you see the officers leave

15  the area where they were attempting to -- where

16  Mr. Abernathy was handcuffed?

17       A.   That part's kind of a blur at the end.

18       Q.   Okay.

19       A.   There were times where -- towards the end when

20  I would turn around, say I would go hug -- hug his

21  mother before I got sent up the street.  Then from then,

22  it was just pretty much everything died down.

23       Q.   Did you see Mr. Aber- -- did you see EMS

24  arrive?

25       A.   Yes.

Tel: (210) 490-6444                        Fax:  (210) 579-6507
                                           Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                           JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 54

1        Q.   Did you see Mr. Abernathy placed into the
2   ambulance?
3        A.   I was down here.  When they arrived, I was
4   down here.  I walked across the street to 10814.  I was
5   talking to him and we were both in disbelief.  And yes,
6   I -- we saw him get put into the -- well, we -- I didn't
7   fully see it.  I think he was on the stretcher, I
8   believe.  I was -- I was just so in shock at that point,
9   everything was just -- I was in awe.
10                MR. RALLS:  Objection; nonresponsive.
11        Q.   (By Mr. Ralls)  Okay.  So --
12        A.   Yes, I did.  I believe I did.
13        Q.   You believe you did see him put into --
14        A.   Yes.
15        Q.   -- be put into the ambulance?
16        A.   Yeah, I believe I did.
17        Q.   Did you see the paramedics performing CPR on
18   Mr. Abernathy?
19        A.   No.  At that time the same officers that
20   were -- that were in the street down here in front of
21   10817 saying to me, "What are you going to do," they
22   were down here all huddled in the street pointing in my
23   direction, saying, "Yeah, that's the MF-er right there
24   that was giving us S."  So at that point in time I had
25   four officers in the street looking at me.

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 55

```
 1      Q.   Okay.  And do you remember any of the officers
 2  having a conversation with Tiffany Allen?  Do you know
 3  who Tiffany Allen is?
 4      A.   Yes.  That's -- that's Pierre's sister.
 5  Like -- as I said, I was over here -- no, I was not.  I
 6  remember the chief came, I believe.  Top brass came.  I
 7  know -- even though I didn't know who they were -- I'm
 8  in the military.  I can tell when guys show up in suits
 9  and hats that they're not regular, you know -- so I know
10  they came.
11              But at that point in time, it was -- I
12  was on the phone with my first sergeant.  They were
13  trying to get me into a car to go downtown to Police
14  Plaza.  Police -- I mean, the -- the reporters, they
15  were -- they were looking for any crumbs, anyone who
16  would talk to them.  It was -- as far as what was all
17  going down down there, nothing.  Soon -- soon thereafter
18  I went downtown to Police Plaza.
19      Q.   All right.  So you did not hear overhear any
20  conversation between Tiffany Allen --
21      A.   No.
22      Q.   -- and any officers?
23      A.   No, sir.
24      Q.   Had you seen Pierre Abernathy in your
25  neighborhood before that night?
```

                                            Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                            JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 56

```
 1        A.    Yeah, of course.  I've -- I've seen all their
 2   children.  All of them.
 3        Q.    And were you aware before -- or are you aware
 4   at this point that Pierre Abernathy was a crack cocaine
 5   addict at that time?
 6              MR. WILSON:  Objection; stating facts not
 7   in evidence.
 8        A.    I've seen him many times.  I've never seen him
 9   high.  And I know what high people look like.  I know
10   what people on crack cocaine look like.
11        Q.    (By Mr. Ralls)  Well, assume for me that his
12   sister has testified that he was a crack cocaine addict.
13        A.    Okay.
14        Q.    You don't have any reason to dispute that, do
15   you?
16              MR. WILSON:  Assuming facts -- objection;
17   assuming facts not in evidence.
18        A.    No more reason than me telling you that my
19   cousin is a crack cocaine addict.  I mean . . .
20              MR. RALLS:  All right.  Sergeant, I
21   believe I'll -- that's all the questions I have for you
22   right now.  Thank you, sir.
23              THE WITNESS:  Okay.
24              MR. BENNETT:  I have no questions.
25              MR. WILSON:  You want to take like a
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                    Page 57

 1   five-minute break?

 2                 MR. RALLS:  Sure.

 3                 (Recess from 10:05 to 10:10 a.m.)

 4                     EXAMINATION

 5   QUESTIONS BY MR. WILSON:

 6       Q.   Sergeant Williams, my name is Robert Wilson

 7   and I represent Shavonda Bailey and Vivian Lampkins in

 8   this case.  Me and you have never met, have we?

 9       A.   I don't believe so.

10       Q.   I've never even spoken to you, have I?  Do you

11   ever remember speaking to me?

12       A.   No, sir.

13       Q.   So this is the first time that me and you have

14   had an opportunity to talk about this, isn't it?

15       A.   Yes.

16       Q.   Now, you seem quite emotional about this, as I

17   sat at the other end of the table.

18       A.   Yes.

19                 MR. RALLS:  Objection; relevance.

20       A.   Yes.

21       Q.   (By Mr. Wilson)  What's gotten you to be so

22   emotional about testifying here today?

23                 MR. RALLS:  Objection; relevance.

24       A.   It was -- I would say the lack of

25   professionalism.  I understand that police officers have

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 58

 1    a job.  As I stated -- I don't know if I said it before,

 2    my brother's a police officer in New Jersey.  My uncle

 3    is a police officer in New York.  He worked at Sing

 4    Sing, correctional officer.  So I understand people have

 5    a job.  But it was the -- the lack of professionalism.

 6                MR. RALLS:  Objection; lack of predicate

 7    and speculation.

 8         Q.   (By Mr. Wilson)  Now, how -- what type of

 9    relationship did you have with Pierre?

10         A.   Not very much of one.  Just passing, "hi" and

11    "bye."  I was closest with Lee.

12         Q.   And Lee is his brother?

13         A.   Yes.

14         Q.   How close were you with Lee, his brother?

15         A.   When I first moved onto the street, he was the

16    first person to offer to help me cut my grass while I

17    was gone.  I go TDY, deploy, and stuff, just help me

18    out.  When I laid all the sod on my grass, the front and

19    back yard, Lee helped me.

20                When he went to the prom, when he took

21    his date to the prom, I let him -- I let him take my

22    car.  So like I said, as I stated earlier, we treat him

23    like he's a little brother to us.

24         Q.   And when you talk about this in regards to

25    Lee, what time period is this?  What year?

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 59

    1        A.   2008, March.

    2        Q.   Do you know how old Lee was at that time?

    3        A.   I'm not sure.  I think he was 16 or so.

    4        Q.   And do you know what grade he was in?

    5        A.   Not sure, when I first met him, what grade he

    6   was in, so -- I didn't know.  It was 2008.  I just met

    7   him, moved down in March.  I barely knew anybody in the

    8   neighborhood.

    9        Q.   Well, you mentioned or testified that he went

   10   to the prom, so he was in high school?

   11        A.   Yeah, he was in high school.

   12        Q.   All right.  And did Lee ever say anything

   13   about Pierre, his brother, to you?

   14        A.   No.  Not really.  I mean, we don't talk about

   15   family stuff, you know, like that.

   16        Q.   Did he ever mention that Pierre was having

   17   mental issues or problems?

   18        A.   Never.

   19        Q.   Did he ever talk about or discuss any drug use

   20   by Pierre?

   21        A.   No.

   22        Q.   And I believe you testified that -- well, how

   23   long did you live next door to -- well, you weren't

   24   exactly next door to them, but how long did y'all live

   25   on that block next to each other?

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 60

1       A.   I got stationed here in March 2008.

2       Q.   And do they still reside there, live there?

3       A.   Yes.

4       Q.   And do you still have the same type of

5  relationship with Lee?

6       A.   Yeah.  Every time he comes home from college,

7  he usually stays at my house.

8       Q.   Do you stay in contact with him while he's in

9  college?

10      A.   Yeah.  I just texted him two weeks ago, I

11  think.

12      Q.   And do you know where he's going to college?

13      A.   He's up in Kansas.  Some college up in Kansas.

14  I think he was at Bethel, but I think he just switched

15  to another college.

16      Q.   Have y'all ever spoken about this incident

17  that happened on this particular day?

18      A.   In -- in passing.  I found out afterwards that

19  they were saying Pierre was on something.

20      Q.   So did Lee mention to you that Pierre was on

21  some type of drug?

22      A.   It was -- it was speculation.  You know, it

23  was -- you know, Pierre might have been on something.

24  They were saying he was on something, then -- you know,

25  it was spec- -- it was speculation.  I didn't know.

Gulfstream Court Reporting

Tel:  (210) 490-6444                    Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 61

1                   I don't -- one thing about me, sir, is

2      I -- I try and do a good job of minding my business when

3      it comes to other people's family matters.  My family's

4      messed up enough as it is.  So I mean, I don't -- I

5      don't dig.  You know, I -- I stay in my own lane, so to

6      speak.  They'll all tell you that.

7           Q.   Well, did Lee ever tell you that Pierre was on

8      drugs that night?

9           A.   No.  Afterwards, like I said, when it came out

10     in the wash, afterwards and everything, that's when I

11     found out.  But prior to that, no, I never knew.

12          Q.   Okay.  That's what I'm talking about, after

13     that.  Did Lee ever mention to you that he was on drugs?

14          A.   Not Lee.  Mom did.  Mom was down there up the

15     street and they were all talking about it.  I wasn't

16     directly -- they weren't talking to me.  It was a bunch

17     of people grieving in a house, having a conversation,

18     and I was there.  But we don't -- me and no one in their

19     family have private conversations about their family.

20          Q.   Now, I just want to go back into where you're

21     from --

22          A.   Okay.

23          Q.   -- because that wasn't really discussed.

24     Where are you from?

25          A.   Buffalo, New York.

Tel:  (210) 490-6444                        Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 62

1        Q.   And did you graduate from high school?

2        A.   Yes, I did.

3        Q.   What high school did you graduate from?

4        A.   Kensington High School.

5        Q.   And what did you do after you graduated high

6    school?

7        A.   Joined the Air Force.

8        Q.   So you went right directly from graduation

9    into the Air Force?

10        A.   I signed up in August.  I went in February

11    9th, 1995.

12        Q.   And you've been in the Air Force ever since

13    '95?

14        A.   Yes.

15        Q.   And I understand that you're now a sergeant;

16    is that correct?

17        A.   Tech sergeant.

18        Q.   And is -- the appropriate way to address you

19    is "Sergeant"?

20        A.   Yes.

21        Q.   Did you -- you say you're from Buffalo.  Did

22    you live there the entire time you were growing up and

23    going to school?

24        A.   Yes.

25        Q.   And you mentioned, I believe, your brother is

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 63

 1   a police officer as well.

 2        A.    Yes.

 3        Q.    What police force is he a member of?

 4        A.    He used to work in Newark and now he's in some

 5   small town.  I don't know the name of the town he's at.

 6   He used to be a cop in Newark.

 7        Q.    How long has he been a police officer?

 8        A.    I'm not sure the exact amount of years.  Maybe

 9   10.  I'm not sure the exact amount of years.

10        Q.    Do you -- does he ever talk to you about what

11   he does as a police officer?

12        A.    Yeah, at times.  From time to time.  Like I

13   thought he was crazy at one point in time because he was

14   an undercover -- undercover cop doing hand-to-hand drug

15   deals and -- and in Newark.  I'd rather go to Iraq than

16   go to Newark.

17        Q.    Is that -- that's pretty dangerous, huh?

18        A.    Extremely.

19        Q.    It's more dangerous than Iraq?

20        A.    It seems -- well, that's -- probably not, but

21   it feels that way.

22        Q.    Feels like you're in Iraq.  Have you ever

23   heard the term -- or has he ever used the term or have

24   you heard the term where if someone runs from the police

25   officer that he's going to make you pay for that?  Have

                    Gulfstream Court Reporting

Tel: (210) 490-6444                      Fax: (210) 579-6507
                                              Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 64

1   you ever heard that before?

2        A.   It's -- it's understood back at home.

3        Q.   What do you mean, "it's understood"?

4             MR. RALLS:  Objection; nonresponsive --

5   or objection; speculation.

6        Q.  (By Mr. Wilson)  What do you mean, "it's

7   understood"?

8             MR. RALLS:  Objection; relevance.

9        A.   Had a good one back at home one time when we

10  didn't stop at a light.  I was in my friend's car.  He

11  was driving and -- he passed away.  But we didn't stop

12  right away.  He didn't stop right away at the stop sign.

13             He kept going and went around the corner

14  to park on the street, so the cop sat us on the side of

15  the road.  And I remember it was summertime and they

16  brung a wet German Shepherd -- and it hadn't rained in

17  like three weeks --

18       Q.  (By Mr. Wilson)  Right.

19       A.    -- in the back of a truck and they ran that

20  dog through our car and let us go.  So it was -- it's

21  understood that if you run from the cops back at home,

22  it's -- it's not pretty when they catch you.

23       Q.   Did you feel like that night, March 8th, that

24  that was what they were doing with Pierre?  Making him

25  pay for running?

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                        JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 65

1          A.    I came --

2                    MR. RALLS:   Objection; relevance and

3      speculation.

4          A.    I came into it -- as I said earlier, before I

5      saw him at 10811, I didn't know what was going on.

6      During all that, I didn't know what it was all about.   I

7      had no clue on what everything was about.   I just saw,

8      as -- as I said earlier, I saw Pierre take off to 10802

9      with cops chasing him.   It seemed more as if he was

10     fleeing for his life than trying to -- he was -- fear

11     more than anything.   But I didn't know what was going

12     on.

13                   MR. RALLS:   Objection; speculation,

14     nonresponsive.

15         Q.    (By Mr. Wilson)  And now, you also testified

16     that -- you said that he curled up in a ball on that

17     porch.   Did you actually see him curl up in a ball?

18         A.    No, I didn't actually see him curl up in a

19     ball on the porch.   I did not.

20         Q.    What made you say that or testify to that?

21         A.    It was -- it was more of, I guess -- if you're

22     getting beat by multiple people -- and I've seen this

23     many times in my life, more times than I probably care

24     to ever want to share -- the direct result is you're

25     going to curl up.   You get four guys kicking on you,

---

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

                                                      Page 66

1    you're -- you're going to protect your head.  That's

2    human nature.

3                MR. RALLS:  Objection; speculation.

4        Q.   (By Mr. Wilson)  Did you ever see Pierre throw

5    a punch?

6        A.   No.

7        Q.   Did you ever see him resist?

8        A.   No.

9        Q.   Did you ever hear him use foul language

10   towards the police officers?

11       A.   No.  All I ever heard him say was, "Help me,

12   help me.  Mama, please help me."

13       Q.   Did you see him struggle?

14       A.   Yes.  Yes.  When I saw him leave from 10811 --

15   like I said, I'm not a thousand percent sure, but I

16   think I saw him fall in the yard and get up and take off

17   again.  And I think -- like I said, I don't know if it

18   was a dog or a person on him, but something jumped on

19   him and he got up and took off again.

20                And I know he didn't -- the whole time I

21   saw him face 10802, so he didn't turn around and fight

22   or anything like that.  His whole thing was just -- just

23   trying to -- I don't know -- get away.

24       Q.   Was he saying anything as he was running?

25       A.   He was just screaming.

---

                   Gulfstream Court Reporting

Tel: (210) 490-6444              Fax: (210) 579-6507

                                      Exhibit "2"

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 67

  1        Q.   And when he ran across the street to the house

  2   you've identified as 10802, did he run to the front

  3   door?

  4        A.   Yeah.  He was up on their porch.

  5        Q.   Did you see if he was knocking on the door?

  6        A.   No.  I didn't -- I didn't see that because,

  7   like I say, they -- as he was running and he got to the

  8   porch, he had a whole trail behind him.

  9        Q.   And I believe when you testified you said

 10   there was more than five police officers.

 11        A.   Yeah.

 12        Q.   Were they all chasing after him?

 13        A.   Yeah.

 14        Q.   And how many dogs were present, do you know?

 15        A.   I'm not sure of the exact amount of dogs.  I

 16   know there was one for sure, but I'm not sure the exact

 17   amount of dogs.

 18        Q.   So you don't know if there was more than one?

 19        A.   No.

 20        Q.   And how many people did you see out in front

 21   of their houses -- house during -- not just a police

 22   officer; I'm talking about the residents within the

 23   neighborhood.  How many residents did you see outside,

 24   if you can recall?

 25        A.   I know Horton was out, 10814.  I know he saw

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 68

1    it.  I think 10810 saw it, Mr. Jenkins.  But he passed

2    away.  He just passed away like two months ago.

3         Q.   Which one was he?

4         A.   10810.  As I say, he passed away, though.  You

5    know, neighbors saw it from the windows, I think.

6    People were talking about it.

7         Q.   What neighbors are those, Sergeant?

8         A.   I think 10806 said -- now, this is just

9    hearsay, though, because I'm not sure.  They --

10        Q.   That's fine.

11        A.   They were talking to 10810.  They're

12   neighbors.  But -- these two houses.

13        Q.   Okay.  And do you know who lives at 10806?

14        A.   I call him "Mike."  It's -- it's his ex-wife.

15   He -- he's moved out.  So I don't even think he was

16   there that night.

17        Q.   Is that one you said -- the Jack Nicklaus or

18   is that --

19        A.   No.  That's 10802.  Gary.  His name's Gary.

20   10802 is Gary.

21        Q.   Which one is that?

22        A.   10802.

23        Q.   Oh.

24        A.   His name is Gary.  I call him "Jack Nicklaus,"

25   but they call him "Gary."

Tel:  (210) 490-6444                    Fax:  (210) 579-6507
                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                               JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 69

1          Q.    And I believe you said Gordon at 10814, right
2     here?

3          A.    10814, Horton.

4          Q.    Horton.   Okay.   Is that his last name?

5          A.    Yeah.

6          Q.    Or first --

7          A.    I think so.

8          Q.    Do you know his first name?

9          A.    No.

10         Q.    Anyone else that you recall seeing outside or
11    possibly witnessed what happened that night?

12         A.    No.

13         Q.    When you were out in front of 10811, I believe
14    you said there -- well, you put an X and it's marked
15    No. 2.

16         A.    Uh-huh.

17         Q.    Do you see that?   When you were out there,
18    were any words exchanged between police officers and
19    Pierre?

20         A.    Like I say, I didn't hear him say anything
21    other than screaming and "help me."

22         Q.    What about the police officers?   Were they
23    saying anything to Pierre?

24         A.    At this point in time over here, no.   No.
25    10811, when they were on -- marked No. 2, no.

Tel: (210) 490-6444                        Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 70

1        Q.    When he ran to 10802 --

2        A.    Yes.

3        Q.    -- Pierre, when he ran to that location, did

4    the officers say anything to him while he was running?

5        A.    At that point in time -- I don't know why they

6    were running, but at that point in time, I was coming

7    from 10815 to 10807, as I said, to tell -- I called her

8    Deb- -- Brenda.  I'm sorry.  I mispronounced her name

9    earlier.  I said "Deborah" and it's Brenda.  10807, I

10   went and talked to her to let her know what was going

11   on.

12       Q.    And Brenda, is she the mother of Pierre?

13       A.    Yes.

14       Q.    And what did Brenda tell you when you spoke to

15   her?

16       A.    She was screaming.  She was -- mother of her

17   son.

18       Q.    That was --

19       A.    I don't remember the exact conversation that

20   was had, per se.

21       Q.    Did she say anything about why this was

22   happening or why this was going on?

23       A.    No.  She was crying.

24       Q.    Were there any officers around Brenda at that

25   time?

---

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                    Page 71

 1        A.    No.  As I said earlier, they were on the

 2     street.  It was two originally and the third one came on

 3     the street in front of her house.

 4        Q.    And did -- is that where -- did Brenda, did

 5     she move at all or did she just stay right there in

 6     front of her house?

 7        A.    No.  They were -- they had her back there and

 8     she was just crying -- well, with them as -- as he was

 9     screaming out.

10        Q.    And when you were there at the X marked No. 3

11     and there was police officers around you, how many

12     police officers were there?

13        A.    Like I said, originally, it was two and the

14     third one.  And then as I said, it was -- some back and

15     forth between them and I.  I remember another one --

16     like I said, he was standing there and as -- he was

17     talking to me and the -- the one officer said, "What are

18     you going to do?"  One of the officers pulled out these

19     black gloves, looking at me.  Putting on gloves as he's

20     looking at me.

21               MR. RALLS:  Objection; nonresponsive.

22        Q.    (By Mr. Wilson)  Do you know why the officer

23     was putting on black gloves?  If you know.

24               MR. RALLS:  Objection; speculation.

25        A.    Show of force.  I'm next.  Do something.
```

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                              Page 72

  1         Q.   (By Mr. Wilson)  Have you ever seen that

  2    happen before, where a police officer puts on gloves

  3    when he's in --

  4         A.    Yes.  In New York.

  5         Q.    -- confrontation?

  6         A.    They'll do it -- not so much confrontation.

  7    They'll do it when they're about to arrest somebody.

  8    And I asked the question once to my brother and he says

  9    they do it in case they have needles in their pockets or

 10    things like that in their pockets, so a police officer

 11    will put on gloves and stuff like that.

 12         Q.    What kind of gloves were they --

 13         A.    I'm not sure.  I just knew they were black.

 14         Q.    And I believe you said there was three police

 15    officers at that time; is that correct?

 16         A.    Yeah.

 17         Q.    What were they saying to you?  Other than what

 18    you've testified to, did they say anything else to you?

 19         A.    No.  Just laughing.  "What are you going to

 20    do?  You're not going to do -- you're not going to do

 21    shit.  What you going to do?"

 22         Q.    Did you say anything to them?

 23         A.    Yeah.  "You're real tough."  I said,

 24    "That's -- that's unnecessary.  Y'all over there killing

 25    him."
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                         Page 73

 1                "Yeah, what you going to do?"

 2                That's pretty much the extent.  It was

 3    laughing.  "What are you going to do?"  You know,

 4    bravado type stuff -- like more of like he was -- just

 5    showdown, almost.  Like, I'm like this is corny; it's

 6    not about that.  But it was basically, "What are you

 7    going to do?  What are you going to do?"

 8         Q.   And did it seem like they were enjoying

 9    themselves?

10         A.   Yes.

11                MR. RALLS:  Objection; relevance and

12    objection; speculation.

13         A.   Well, the -- the gist I got from them laughing

14    was they were enjoying themselves.

15         Q.   (By Mr. Wilson)  What about the officers --

16                MR. RALLS:  Nonresponsive.

17         Q.   (By Mr. Wilson)  What about the officers that

18    were striking Pierre at 10802?  Did you see what their

19    reactions were?

20         A.   I didn't see the facial reactions.  As I

21    saw -- as I stated and testified earlier, I saw people

22    getting pulled off, heard a little bit of laughing over

23    there, but nothing -- nothing like that was going on in

24    front of me, but it was -- it was a melee.

25         Q.   All right.  Were they laughing?

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 74

1        A.   I heard laughing over there.   I couldn't point

2    as to who.   But it wasn't as extensive as what was going

3    on in front of me, but yes, I heard laughing.

4        Q.   Did you hear them say anything to Pierre at

5    that time?

6        A.   No.  No, sir.

7        Q.   Did you ever hear them ever say, "Quit

8    struggling"?

9        A.   No, sir.

10       Q.   Did you ever hear them say, "Quit resisting"?

11       A.   No, sir.

12       Q.   Now, you stood up earlier to show what they

13   were doing with their boots.

14       A.   Yes.

15       Q.   Could you please -- and we don't have a video

16   here, so could you please describe to the jury what you

17   saw with regards to their boots?

18       A.   Even though I didn't see their boots strike

19   Pierre, as I stated before, I'm 6-foot-3, so I see over

20   most things.   And even though I didn't see the boots

21   physically hit him, I saw the legs come up and go down

22   in a striking fashion.   I saw closed fists come up over

23   heads and come down in a striking fashion.   I seen that.

24       Q.   Did you see any -- did you hear any reaction

25   from Pierre when this was going on?

Gulfstream Court Reporting

Tel: (210) 490-6444                        Fax: (210) 579-6507

Exhibit "2"

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
 1        A.   No.  I mean, I heard the -- the normal
 2    screaming, "Help me, help me," screaming like that.  As
 3    I said earlier, I heard the striking of the boots.  I
 4    heard the boots hitting.
 5        Q.   Did you eventually hear the screaming stop?
 6        A.   Towards the end, it -- it just died down to a
 7    whimper, then it just stopped.
 8        Q.   When you say "a whimper," what type -- what do
 9    you mean by "whimper"?
10        A.   "Mom, just please help me.  Mom."  It -- it
11    was the most pathetic thing -- pathetic and -- I mean,
12    not on his part, of the use of force.  It was -- it was
13    just -- he was -- it's hard to explain.  It's -- it
14    was -- at first it was a loud curdling scream.  It was,
15    "Help me, help me, help me."  And towards the end it was
16    just, "Mom, just please help me.  Mom, help me."
17        Q.   What was --
18             MR. RALLS:  Objection; nonresponsive.
19        Q.   (By Mr. Wilson)  And what was his mother's
20    reaction when he was saying this?
21        A.   She was crying, I mean -- she was crying.  I
22    mean . . .
23        Q.   Does it bring tears to your eyes?
24             MR. RALLS:  Objection; relevance.
25        A.   I'm not an emotional person.  It's a hard
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                              Page 76
 1   thing to watch somebody's mother watch that happen to
 2   their son.  And the reason why I'm crying is I was
 3   helpless.  I couldn't do nothing to help her.
 4        Q.  (By Mr. Wilson)  Why did you feel like you
 5   were helpless, Sergeant?
 6        A.  I don't know.  I -- I don't know, man.  I
 7   mean, you serve your country.  You know, I take pride in
 8   the things I do.  I always do the right thing.  You
 9   know, I made it out of a bad situation back in New York,
10   you know.
11               And it's just -- when someone's like
12   family to me -- if it wasn't for my service to the
13   country and maybe losing my job and losing my clearance
14   and going to jail and doing all that stuff, I just -- I
15   just stood at the end of the street and felt helpless.
16               And to watch her back there getting held
17   by family, hearing the last breaths of her son, and
18   then -- I understand that people have to get restrained.
19   I get that.  But the cops laughing in a mother's face as
20   her son is crying out, that's the most despicable thing
21   I've ever heard in my life.
22               MR. RALLS:  Objection; nonresponsive,
23   relevance.
24        Q.  (By Mr. Wilson)  Do you believe that if you
25   wouldn't have had that exposure with your job, would you
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 77

1    have helped?

2                    MR. RALLS:  Objection; speculation.

3         A.    I think my job taught me restraint because it

4    took every ounce of my body to show restraint.

5         Q.    (By Mr. Wilson)  Did you feel like that the --

6    because of the color of your skin, that the cops were

7    being racist towards you?

8                    MR. RALLS:  Objection; relevance and

9    argumentative.

10        A.    I really didn't.

11                   MR. RALLS:  Did not?

12        A.    I did not.  I didn't feel that way.

13        Q.    (By Mr. Wilson)  They -- I believe you said

14   they -- you testified that they told you to get back in

15   your house; is that correct?

16        A.    They tried to make me go inside my house.

17        Q.    Did they tell you why they wanted you to go

18   back inside the house?

19        A.    No.

20        Q.    They never explained to you the reasons why?

21        A.    "Get your ass up the street.  Get in your

22   F-ing house."

23        Q.    Did they use that type of language with you?

24        A.    Yes.  Verbatim.

25        Q.    Did you respond in kind?

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 78

1       A.   I just walked up the street.

2       Q.   Did you ever use foul language with them?

3       A.   I -- I believe -- I -- not directly at them.

4    I think I used, you know -- excuse -- pardon my French,

5    but, you know, "That's fucking ridiculous.  You're

6    fucking killing this guy.  Is that really fucking

7    necessary?  All that shit over there is necessary?"

8    Various things like that.  I don't remember the

9    verbiage, but it was a pretty emotionally charged

10   moment.

11      Q.   Did they respond when you said that?

12      A.   It was just laughing.  "Yeah, what the F you

13   going to do?"  Not so much "yeah."  They didn't say

14   "yeah."  They just said, "What you going to fucking do

15   about it?  What you going to do?  What can you do?"

16      Q.   Did you ever see Pierre struggling at all?

17      A.   No.

18      Q.   I believe you said that you saw the police

19   officers and their race -- some were Mexican.

20      A.   Yes.

21      Q.   So they were Hispanic?

22      A.   And I think I saw a white guy out there too.

23      Q.   And Pierre, do you know what nationality he

24   is?

25      A.   He's black.

Tel: (210) 490-6444                    Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 79

 1       Q.   Do you have any belief that it was because
 2   Pierre was black, the reason why he was being treated
 3   that way?
 4              MR. RALLS:  Objection; speculation.
 5       A.   I didn't know.  I didn't know.  With
 6   everything going on, I didn't have the -- you know,
 7   sometimes cops -- sometimes cops, they just go too far.
 8   I think they went too far that night.
 9       Q.   (By Mr. Wilson)  Why do you believe they went
10   too far?
11       A.   As I stated --
12              MR. RALLS:  Objection; no proper
13   predicate, and speculation.
14       A.   As I stated earlier, if I'm going to subdue
15   someone -- if you're subduing someone, you don't reach
16   and pull your partner off someone to get yourself in
17   there.  You work as a partner when you're subduing
18   someone.  If I'm trying to subdue someone's arm, we're
19   working to subdue this person.
20              Watching what was going on, the
21   initial -- well, not even the initial.  All the things
22   that was going on, it was -- it was a melee.  It was who
23   could get in there.
24       Q.   (By Mr. Wilson)  How big was Pierre?
25       A.   6 foot.  I think he's -- I think he was 6

                Gulfstream Court Reporting
Tel: (210) 490-6444              Fax:  (210) 579-6507
                                      Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 80

 1    foot, maybe.  He wasn't as tall as me.

 2         Q.   Was he -- how much did he weigh, if you know?

 3         A.   I'm not sure, but, I mean --

 4         Q.   Is he --

 5         A.   I'm not trying to --

 6         Q.   -- a big kid?

 7         A.   He's chubby.  I mean, no disrespect, but he

 8    was -- he wasn't -- he wasn't me.  I could understand if

 9    it's me.  I'm six-three, 260.  Pierre is not -- I go to

10    the gym.  Pierre did not go to the gym.  You know, I --

11    I don't know if he went to the gym, but looking at

12    him -- I'm not trying to be mean here, but there's

13    nothing about him that said it took a -- half a -- half

14    a police station to get him down.

15              MR. RALLS:  Objection; nonresponsive.

16         Q.   (By Mr. Wilson)  Now, you're basing some of

17    your testimony on use of force based upon your training

18    and experience; is that correct?

19         A.   Yes.

20         Q.   And you've testified a little bit about that

21    training previously.  And would you please explain to

22    the jury the type of training you received in regards to

23    the use of excessive force?

24         A.   Like I said, we do this thing -- and it's an

25    annual training and it's beat into our head and stuff

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 81

 1    like that because -- it's just called "Law of Armed

 2    Conflict."  And it goes extensively into the training of

 3    use of force, what's a lawful combatant, what's an

 4    unlawful combatant, things of that nature.

 5              Then we do training before we deploy.

 6    You do defensive driving training.  You do all realms of

 7    training from weapon training to, you know, how the --

 8    you know, if you need to subdue somebody, this, that,

 9    and the third -- or, you know, just various trainings

10    like that.

11              And then when I was in Alaska, like I

12    said, I used to do exercises with the policemen up

13    there.  You know, they wanted someone who was a non-cop

14    to do things.  Like I had one exercise up there where

15    they gave me a whole bunch of pieces of paper that had

16    "bomb" on it and they dropped me off on the flight line.

17              And I took my blouse off.  I took my

18    badge off.  And they wanted to see how many planes I

19    could get to and put "bomb" next to it before the cops

20    on the -- on the flight line would, you know, intervene.

21    I made it to seven planes before one of them was like,

22    "What are you doing?"

23              And I said, you know -- you know, excuse

24    my -- "F-you cop," and I ran off and, you know, tried

25    to -- and then the whole exercise ensued where, you

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 82

 1   know, they say, "Exercise, exercise, exercise.  Blah,
 2   blah, blah is on the ramp."  And then we went through
 3   the whole thing.
 4               And after they were subduing me, short of
 5   shooting me -- we trained pretty rough, judging from the
 6   mark on my hand and things.  I mean, I was fighting
 7   back.  And they -- what brought me down was I had two on
 8   me.  We were on the flight line, wrestling.
 9               I was -- as we were wrestling, I was
10   going for their gun and then the other one grabbed the
11   handcuff and twisted.  The one I had on me already --
12   because they got one on me.  And they twisted.  And that
13   brought me down.  I have a high tolerance for pain.
14       Q.   How many did it take to subdue you?
15       A.   Three.  And one of them was maybe 160 pounds.
16   I threw that little kid around.
17       Q.   And on the non-excessive force and excessive
18   force training, how often do you receive that?
19       A.   You do that every time before you deploy.  But
20   you don't get it very often unless you -- unless you
21   volunteer for it.  Like I just volunteer, but I
22   haven't -- I haven't in a few years as far as like that.
23               But that LOAC training, that's annual,
24   the actual training.  But the actual practical
25   application of it, you don't do that often.  But LOAC is

                    Gulfstream Court Reporting

Tel:  (210) 490-6444                   Fax:  (210) 579-6507
                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                          Page 83

 1    an annual requirement for military members.

 2         Q.   And based upon your knowledge and experience,

 3    when do you use excessive force?

 4         A.   When you're life's in danger.

 5         Q.   Did you see any officer's life in danger that

 6    evening?

 7         A.   No.

 8         Q.   Or that morning?

 9         A.   No.

10         Q.   Whose life was in danger that morning?

11              MR. RALLS:  Objection; speculation.

12         A.   His.

13              MR. RALLS:  Argumentative.

14         Q.   (By Mr. Wilson)  Now, did they use a Taser on

15    Pierre?

16         A.   Yes.

17         Q.   Do you know how many times they tased him?

18         A.   Not sure.

19         Q.   Was it more than one?

20         A.   Yes.

21         Q.   More than two?

22         A.   It was more.  Three or more.

23         Q.   It was more than three, possibly?

24         A.   Three.  I'm not sure.  I'm not sure.  I know

25    it was three or more, though.

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                        JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 84

```
 1       Q.    When you went through your Taser training, did
 2   they tell you how many times you could actually tase
 3   someone?
 4       A.    It's based -- it was based on, for lack of a
 5   better term, fighting the person.  You tase somebody and
 6   they're still coming at you, you hit them again.  But if
 7   they're not, then you stop tasing and then you subdue
 8   them.
 9       Q.    Did they ever tell you you can't tase someone
10   more than two times?
11       A.    No.  It was based on -- because of -- it was
12   based on if the person's -- what's the word I'm looking
13   for?  I don't know the exact word.
14       Q.    Resisting?
15       A.    Yeah.
16       Q.    Struggling?
17       A.    Not so much struggling.  Not so much
18   struggling to that aspect.  If -- if you tase somebody
19   and they're coming at you still, then you tase them
20   again to drop them, for lack of a better term.
21       Q.    Did you ever see Pierre go after the officers?
22       A.    No.  Thousand percent no.
23       Q.    Now, you testified about the officers telling
24   you to go back in the house and you also testified about
25   telling the other neighbors to go back in the house.
```

Gulfstream Court Reporting

Tel: (210) 490-6444                    Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                         Page 85
 1   Did you actually see the officers go and do that?
 2        A.   I saw them say something, as I was leaving,
 3   to -- I believe it was Tiffany and them.  And then Gary.
 4   I heard -- I did hear one of them scream, "Shut your
 5   F-ing door."  Well, not "F-ing."  Well, "Shut your
 6   door."  I think Gary opened his door when he heard all
 7   that over there.  10812.  I did hear somebody, I
 8   believe, say, "Shut your door" and things like that.
 9        Q.   Did you see that Pierre was threatening
10   towards any of the neighbors?
11        A.   No.
12        Q.   Do you know if he was armed with a weapon?
13        A.   No, he did not have a weapon.
14        Q.   Were you concerned about your safety in
15   regards to Pierre?
16        A.   No.  Ever.
17        Q.   I'm talking about that particular night.
18        A.   No.
19        Q.   Were you concerned about your safety that
20   night?
21        A.   Yes.
22        Q.   Why were you concerned about your safety?
23             MR. RALLS:  Objection; relevance.
24        A.   The -- the happenings with the police officers
25   in front of me.  I knew they were waiting on me to take

                    Gulfstream Court Reporting
Tel: (210) 490-6444                    Fax:  (210) 579-6507
                                            Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 86

1    one step in that direction.   They were -- it was almost

2    as if they were baiting me.

3         Q.   (By Mr. Wilson)  And what did you believe they

4    were going to do?

5                   MR. RALLS:  Objection; relevance,

6    speculation.

7         A.   Oh, they were going -- they were going to try

8    to kick my ass.

9         Q.   (By Mr. Wilson)  Now, you testified about

10   being interviewed at the police station and being guided

11   through that interview?

12        A.   Yes.

13        Q.   What do you mean by that?

14        A.   The line of questioning was like the first

15   round of questions I received today.  It was, "Well, you

16   didn't actually see boots striking him, did you?"  And

17   then more than one occasion, he told me, "Remember,

18   you're under oath here, so I can lock you up for this.

19   So remember you -- you're under oath here."

20                   I was like, "I understand I'm under

21   oath."

22                   "So you didn't physically see the boot

23   striking him."  And it was extreme -- it was very

24   similar to the first line of questions I received today.

25        Q.   Did they threaten to put you in jail that

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 87

1    night?

2         A.   No.  They just reminded me on every question

3    that he asked me that I am under oath.  "Remember that.

4    Penalty could be jail.  Remember you're under oath right

5    now."  He didn't physically say, "I'll put you in jail,"

6    but it was well understood.  Behind every question he

7    reminded me, as if I'm six, that I'm under oath.

8         Q.   And did he ever seem concerned about Pierre,

9    the person that was interviewing you?

10        A.   Not at all.

11        Q.   Was he professional and respectful to you?

12             MR. RALLS:  Objection; relevance.

13        A.   He was.  He was.

14             MR. RALLS:  Withdraw the objection.

15        A.   I knew the agenda --

16             MR. WILSON:  Too late.

17        A.   He wasn't mean.  He got my name wrong first.

18   He accused me -- he asked me have I ever been arrested

19   for a felony.  I said no.  And then he reminded me that

20   Juan Williams on Rousseau Street got arrested for a

21   felony in 2001.  And then I let him know that in 2001 I

22   was in Anchorage, Alaska.  And then he was nice after

23   that.

24        Q.   (By Mr. Wilson)  He confused you with someone

25   else?

Tel: (210) 490-6444                     Fax: (210) 579-6507
                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 88

1       A.   Yeah.

2       Q.   And you've never been arrested for a felony,

3   have you?

4       A.   No, sir.

5       Q.   And he did tell you or remind you that perjury

6   is a potential -- to be placed in jail?

7       A.   Yeah.  And it -- and to a point, it makes me

8   not want to because -- it made me not want to give a

9   statement because -- like I said, I mean, things

10  happened that night.  I know -- you know, I didn't want

11  to feel like I was getting real -- my trust of the

12  justice system during that day -- and then I just

13  witnessed that and now I'm at Police Plaza an hour or

14  two later at seven o'clock in the morning or whatever.

15  My trust was slim and none.

16              MR. RALLS:  Objection; nonresponsive.

17      Q.   (By Mr. Wilson)  Have you ever experienced

18  this type of situation up in New York with the police?

19              MR. RALLS:  Objection; relevance.

20      A.   I've seen them -- I've seen them beat some

21  people up.  Yeah, I've seen -- I've seen -- some

22  people -- you know, you look at it and -- I know it's

23  wrong to say, but you look at it, you say he deserved

24  it.

25              I've seen one guy in Martin Luther King

Gulfstream Court Reporting

Tel: (210) 490-6444                    Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                              Page 89

 1     Park in Buffalo, New York, take a swing at a cop and the

 2     cop beat his butt.  And I looked and I was like, "dude

 3     deserved it."  You know, but -- you know -- you know,

 4     you see things.

 5          Q.   (By Mr. Wilson)  Did you believe that Pierre

 6     deserved what he received that evening?

 7                    MR. RALLS:  Objection --

 8          Q.   (By Mr. Wilson)  Or that morning?

 9                    MR. RALLS:  Objection; not a proper

10     predicate.

11          A.   Not at all.

12                    MR. RALLS:  Objection; speculation.

13          Q.   (By Mr. Wilson)  Do you know what happened to

14     Pierre after he was beat?

15          A.   Like I said, I -- I have glimpses of him

16     getting loaded into the ambulance.  And then -- then it

17     was -- it was -- as I stated, I was on 10814's porch.  A

18     group of cops in the street was looking at me.  So of

19     course my attention turned towards them as they're

20     referencing me.  And then they were trying to get me to

21     go downtown.

22          Q.   Did you go to his funeral?

23          A.   I don't do funerals.  No.

24          Q.   Why don't you do funerals?

25          A.   I haven't done -- been to a funeral after my

                    Gulfstream Court Reporting
Tel: (210) 490-6444                        Fax:  (210) 579-6507
                                               Exhibit "2"

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 90

 1    grandmother died.  The neighbor across the street, 10810

 2    Deepwater Bay, I was close with him too.  His wife asked

 3    me to be a pallbearer for his funeral, Mr. Jenkins.  And

 4    I loved that man.  Like a grandfather to me.  And I had

 5    to decline that too.  I felt bad, but I don't do

 6    funerals.

 7         Q.   Have you spoken with any of your neighbors

 8    regarding that evening or that -- what happened that

 9    morning?

10         A.   Yeah.  Of course.

11         Q.   What neighbors have you spoken to?

12         A.   Like I said, Horton and I spoke about it.

13    Every- -- the whole street was talking about it.

14         Q.   And what did Mr. Horton tell you about what he

15    saw that night?

16         A.   I don't remember, really.  I don't remember.

17    I don't know exactly what he said to me.  Enough that he

18    just -- we was just all in awe.

19         Q.   Did he -- do you remember the -- just the

20    general nature of the conversation?

21         A.   It was crazy.  I can't -- it was crazy.

22         Q.   And you've used that term before, you were in

23    shock and awe.  What do you mean by that statement that

24    you're in shock and awe?

25         A.   Well, something is so ridiculous that happens

Tel:  (210) 490-6444                         Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)        e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 91

```
 1   that you're just amazed by it, like -- you know, you
 2   just -- you're just taken back by it.  You're -- you're
 3   borderline disbelief in -- in what's going on.
 4        Q.   Have you ever been contacted back by the
 5   police since that night you were interviewed?
 6        A.   Never.
 7        Q.   You mentioned Mr. Horton.  Was there any other
 8   neighbors you spoke to about the incident?
 9        A.   Yeah.  The whole -- the whole cul-de-sac
10   was -- something traumatic just happened.  Everyone
11   wants to talk about it.
12        Q.   Did anyone ever tell you that Pierre was
13   resisting that evening?
14        A.   No.
15        Q.   Did anyone ever tell you they saw him
16   struggling?
17        A.   No.
18        Q.   Did anyone ever tell you that they saw the
19   officers beating Pierre?
20        A.   The people that was all out there:  His --
21   Tiffany, his mom, anyone who was outside saw that.
22        Q.   And they told you the same, that they saw
23   that?
24        A.   Well, everybody -- you know, you can't miss
25   it.  You got all that going on.  I don't know their
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                           JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 92

 1    stories, but the general consensus was -- that was --

 2    they beat him to death.

 3              MR. RALLS:   Objection --

 4        Q.   (By Mr. Wilson)  Did you have a --

 5              MR. RALLS:   -- nonresponsive,

 6    speculation.

 7        Q.   (By Mr. Wilson)  Did you take a video of that

 8    night?

 9        A.   It's funny.  Hindsight's 20/20.  I wish I

10    would have.  But I can't figure out for the life of

11    me -- I looked across the street and there was a guy

12    over there with a camera set up.  I didn't know who that

13    was.  He had an actual tripod and a big camera.  I

14    didn't know who it was.  I -- to this day, I don't know

15    who that was.

16        Q.   Where was he located?

17        A.   He was right here.  He had a bird's-eye view.

18    Whoever that guy was, he was taping.  I don't know who

19    that was, though.  I'll never forget that because I

20    thought it was strange.  And this wasn't -- this -- this

21    was in the heat of the moment.  This wasn't afterwards.

22        Q.   Now, you pointed to --

23        A.   10810.  In front of Mr. Jenkins' house on his

24    sidewalk.  Not quite to his driveway.  I don't know who

25    that guy was, but he had a tripod camera set up.  And

Electronically signed by Stephanie Clark (601-353-121-5420)        e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

Page 93

 1    not a small one.  A big like news crew camera type

 2    thing.

 3          Q.   Was he wearing a uniform?

 4          A.   I have no idea.  It just -- it just struck me

 5    odd to see that camera so -- so . . .

 6          Q.   Did you recognize him from the neighborhood?

 7          A.   No.  I didn't know -- I -- I just -- like I

 8    said, just something where you just -- I was like, "What

 9    the hell's a camera doing out here already?"  It was one

10    of those things.

11          Q.   Did you see anyone else taping the -- what

12    happened that night?

13          A.   No.

14          Q.   How often would you see Pierre like during the

15    week?

16          A.   Random.  I mean, with what I got going in my

17    life, sir, I don't -- I don't have time to . . .

18          Q.   Well, I -- the reason I ask you this question

19    is because there was a question in regards to his mental

20    abilities.  I'm just wondering:  Did you have enough

21    contact to be able to determine whether he had some

22    mental illness?

23          A.   "Hi" and "bye."  It was -- if I saw him, I'd

24    wave.

25          Q.   The contact you had with him, did you see him

---

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 94

 1    have any mental illness?

 2         A.   No.  Like I said, I go down there -- like I

 3    said, his mother cooks sometimes.  So she'll text me --

 4    I can show you my phone.  She'll say, "Lasagna's ready."

 5    And I go down there and I get a plate.  Stuff like that.

 6              Now, when I leave, they watch my house.

 7    Lee cut my grass.  I'd see him sitting on the couch or

 8    something, you know, his kids -- he out there playing

 9    with his kids or something, I'd say "hi" to him.  You

10    know, we have a conversation about sports or whatever

11    else real quick.  Just general.

12         Q.   Now, you said that you're going to be leaving

13    for Afghanistan.

14         A.   Uh-huh.

15         Q.   When are you actually going to be leaving for

16    Afghanistan?

17         A.   Not sure.  Depends on what company picks me

18    up.  Like I said, I retire.  I'm retiring coming up.

19         Q.   When are you going to retire?

20         A.   1 March.

21         Q.   Oh, you're retired?

22         A.   2015.

23         Q.   So when you retire in March 2015, you're going

24    to try to catch on with a company to go to Afghanistan?

25         A.   Yes.

Tel: (210) 490-6444                      Fax: (210) 579-6507
                                          Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 95

1        Q.   So are you going to be in San Antonio until
2    that time, do you know?
3        A.   Should be.  I'm not sure.  This year -- I'm on
4    retirement status right now.  Not so much retirement
5    status.  I put in my papers.  It's approved.  I'm going
6    home sometime, so I don't know when I -- when I'm going
7    to be in town.  I can't give you dates right now.
8        Q.   But your retirement's March 1st, 2015.  Do
9    you -- and you say you're going to be going back home.
10   Are you going to move back to Buffalo, New York?
11       A.   I -- I don't know what the future holds for me
12   right now.  I can leave any- -- I can live anywhere
13   because of what I'm going to be doing.  I don't have a
14   clock where I punch in.
15       Q.   And do you have any plans in the immediate
16   future to move back to Buffalo, New York?
17       A.   I'll go visit this summer.  I don't know.
18   Like I said, I was -- between there and Los Angeles and
19   Houston.  My kids in Houston; my mother in Los Angeles.
20       Q.   If I need to contact you, what's the best way
21   to get in contact with you?
22       A.   My phone number.
23       Q.   What's your phone number?
24       A.   Area code 818, 322-5377.
25       Q.   That's the best way to contact you, just that

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 96

```
 1   phone number?

 2        A.   Yeah.  Yeah.  I have a Vonage phone, but it's

 3   just hooked up to the house alarm.

 4        Q.   If you were to move back to Buffalo, New York,

 5   is there -- would you -- is there family that live up in

 6   Buffalo?

 7        A.   That's where I'm from.

 8        Q.   Does your mother still live up there?

 9        A.   My mother's in Los Angeles.

10        Q.   Okay.  What family do you have in Buffalo?

11        A.   One of my six brothers and sisters, my father,

12   my aunts, uncles, my grandmother.  You know, family.

13        Q.   All right.

14             MR. WILSON:  I'll pass the witness.

15             (10:56 a.m.)

16             MR. RALLS:  I have a few follow-up

17   questions for you, Sergeant, if you don't mind.  I think

18   I can -- you can hear me okay, can't you, Madam Court

19   Reporter?

20             THE REPORTER:  I can.

21                  FURTHER EXAMINATION

22   QUESTIONS BY MR. RALLS:

23        Q.   Sergeant, the first thing I want to find out

24   about is:  These officers that you were having your

25   conversation with, you never -- I want to make sure --
```

Tel: (210) 490-6444                        Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 97

 1   you never saw any of those officers involved with Pierre

 2   himself, correct?

 3        A.   I can't -- I know when he left 10'11, it was

 4   all hands on deck chasing him.  Then when I got to

 5   10807, that's when those guys showed up there to keep

 6   everybody -- I guess you would say at bay.  I only saw

 7   them there, but I didn't physically see them over there.

 8        Q.   Okay.  So when you're talking about officers

 9   hitting or kicking Pierre, you're not talking about

10   those three officers, correct?

11        A.   Not -- not to my knowledge.

12        Q.   Okay.  And you're six-foot-three and weigh 260

13   pounds?

14        A.   Yes.

15        Q.   And go to the gym --

16        A.   Yes.

17        Q.   -- regularly?

18        A.   Yes.

19        Q.   And, obviously, I guess, know a fair amount

20   about handling yourself in an altercation --

21        A.   Yes.

22        Q.   -- based on your training and experience?

23        A.   Yes.

24        Q.   Well, can you appreciate, based on the

25   experience that you've had as a police adjunct or

                   Gulfstream Court Reporting

Tel:  (210) 490-6444                      Fax:  (210) 579-6507
                                              Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 98

 1    whatever you termed it --

 2              MR. WILSON:  Augmentee, I think.

 3        Q.   (By Mr. Ralls)  -- can you appreciate the fact

 4    that they would not want you to get involved in the

 5    altercation as well?

 6              MR. WILSON:  Objection; leading,

 7    speculation.

 8        A.   That's -- I -- I understand -- I understood

 9    that.  I understand everyone's a professional.  I'm a

10    professional, they're a professional.  I understand.  I

11    understand that.

12        Q.   (By Mr. Ralls)  Okay.

13        A.   I would only -- I would only add chaos to a

14    situation if I jump in.

15        Q.   Have you ever actually arrested someone

16    yourself?

17        A.   No.

18        Q.   Have you ever actually handcuffed a real live

19    suspect as opposed to in a training exercise?

20        A.   No.

21        Q.   Have you ever attempted to subdue somebody who

22    was on cocaine?

23        A.   No.  No.

24        Q.   Do you know what the effects of cocaine on an

25    individual's strength are?

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 99

 1        A.    Yeah, I have an idea.

 2        Q.    What do you think?

 3        A.    I've seen some crackheads carry a waterbed up

 4    a street before.

 5        Q.    You've seen them carry what?

 6        A.    I've seen some people on drugs do some -- I

 7    know there's -- adrenaline's running or whatever.  I

 8    understand that.  I've seen some -- some things.  Like I

 9    say, I'm from New York.  You -- you see -- you seen some

10    things.

11        Q.    All right.  And so the things that you've

12    seen -- and did those indicate to you that that

13    individual was stronger than you might think he might

14    otherwise be?

15        A.    You could say that.

16        Q.    And do you know the effect of having cocaine

17    in your system on being tased?  Maybe I worded that

18    wrong.  Do you know whether being tased --

19        A.    Did I know it would kill him?  No.

20        Q.    I'm sorry?

21        A.    Did I know it would kill him?  No.

22        Q.    Yeah.  That -- actually, that's not my

23    question.  My question is:  Do you know whether a Taser

24    has the same effect on somebody who has cocaine in their

25    system as it does somebody that does not?

                                                  Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 100

 1        A.   I have an idea --

 2              MR. WILSON:   Objection --

 3        A.   -- because --

 4              MR. WILSON:   -- speculation.

 5        A.   I have an idea because of the training that we

 6   receive with the -- and I forget the name of the machine

 7   for the life of me.  Where you hook to yourself -- I

 8   mean, you hook to someone's chest and you clear, you hit

 9   the button and it sends a shock to restart the heart.

10   If you are on drugs for that, that'll kill you.  I did

11   know that.

12        Q.   (By Mr. Ralls)  All right.  Do you know

13   whether having -- being tased --

14        A.   It's very similar to that.

15        Q.   Do you know whether being tased while you're

16   on cocaine has as much impact on an individual, as far

17   as stopping them, as an individual that's not on

18   cocaine?

19        A.   No.

20              MR. WILSON:  Objection; speculation.

21        A.   I didn't know the stopping force.

22              THE REPORTER:  I'm sorry?

23        A.   I didn't know the stopping -- and whether it

24   would stop him or not.

25        Q.   (By Mr. Ralls)  And as far as this individual

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                        Page 101

 1    with the tripod camera that you noticed, you don't --

 2    it's not your testimony that you believe that was a

 3    police officer, is it?

 4         A.   No.  I don't know who that guy was.  I asked

 5    the question too.  I was like, "Who was that guy?"

 6    Nobody knew.

 7         Q.   Did you ever see any news coverage of this

 8    event?

 9         A.   They showed me at work.  They pulled it up on

10    the -- the local whatever.  They saw me standing in the

11    crowd.  I gave -- I was mad that night.  And they didn't

12    want the -- some of the cops didn't want the news

13    reporter on my lawn.  I was like, "No, it's fine.  Come

14    on my lawn."  And I gave an off-camera depiction of what

15    I saw.

16         Q.   And as far as your interview and statement at

17    the police department, where the officer reminded you

18    that you were under oath all the time --

19         A.   Uh-huh.

20         Q.   -- I haven't done that with you in your

21    questions, have I?  In my questions to you?

22         A.   No, you have not.

23         Q.   Okay.  And you haven't felt like that I have

24    threatened you or intimidated you with regard to whether

25    you're telling the truth --

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 102

```
 1        A.   No.

 2        Q.   -- or not, have you?

 3        A.   Not at all.

 4        Q.   And you can appreciate, based on your

 5   training, the need for someone to know exactly what it

 6   is that you saw as opposed to what you believe may have

 7   happened.

 8        A.   Of course.  You want the facts.

 9        Q.   Now, I'd like to ask you a little bit more

10   about your training in the sort of law enforcement

11   arena.

12        A.   Okay.  Like I say, it's just augmentee.

13        Q.   Right.

14        A.   I don't pretend to be a professional there.

15        Q.   Okay.  And when was that, exactly?

16        A.   Like I said, in -- when I was up in Anchorage,

17   I did it.

18        Q.   And what years --

19        A.   From '99 to '03.

20        Q.   Okay.

21        A.   Okay.  Then like I said, you're a deployed

22   member, this is a -- every deployed member that goes to

23   a combat zone gets extensive training.  They got a base

24   up in McGuire, New Jersey, where they send people to for

25   like two months, or a month, for just that training.
```

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                         Page 103

 1        Q.   Well, really, what I'm talking about, as far
 2   as the law enforcement, would be actually subduing and
 3   handcuffing a suspect.  Are you -- is that the same kind
 4   of training you're talking about?
 5        A.   I've had -- I've had that training.  It hasn't
 6   been in a few years.  It hasn't been quite a few years.
 7        Q.   And when you did have it, was that the
 8   training that you had in Anchorage?
 9        A.   Yeah.  It was -- it was more of an exercise
10   than training, but I call it training.  It was exercise.
11        Q.   All right.  And was it like, "Okay, today
12   we're going to go out and exercise or perform this
13   exercise of someone being handcuffed or subdued"?
14        A.   Yeah.  Yeah.  It was -- it was -- not much
15   happens on a military base.  So it was things to keep
16   their cops -- their policemen sharp.  And I'm a -- I
17   like playing the war game thing, so they always came and
18   picked me up.  I worked night shift, 11:00 to 7:00 in
19   the morning.  I worked on planes, computer systems on
20   planes.  Did various other things.  So I would go
21   augment with them.
22        Q.   So would you typically be the person that was
23   being subdued or would --
24        A.   It worked both ways.  Because they wanted to
25   see how, you know -- how would -- it -- it went both

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                    Page 104

 1   ways.  It went both ways.  Because like I said, I'm a
 2   big guy so they want to see the other aspect of things.
 3   And, you know, give me, you know, various, you know,
 4   outlooks on things.  It was -- it went both ways.
 5        Q.   And did you have any written -- like books or
 6   training as far as that sort of activity, subduing
 7   suspects?
 8        A.   No, I didn't have any books.  I didn't take a
 9   test or anything.
10        Q.   Okay.  Did you have -- was there any written
11   course material with regard to the amount of force that
12   one should use to subdue someone?
13        A.   Yes.  Law of Armed Conflict.  Annual training.
14        Q.   All right.  And the Law of Armed Conflict is
15   what you --
16        A.   It's military-based training.
17        Q.   Well, it -- but it's primarily designed for
18   deployments, right, for overseas stuff?
19        A.   Yes.
20        Q.   Okay.  It's not like -- for example -- and I
21   wasn't happy about it -- but I got assigned shore patrol
22   once when I was in the Navy and had to work two weeks as
23   a shore patrol.
24        A.   Uh-huh.
25        Q.   Did you ever have anything like that?  Were

Tel: (210) 490-6444                    Fax: (210) 579-6507
                                             Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                        JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                      Page 105

 1    you ever actually assigned as the Air Force police on a

 2    base?

 3         A.   Yes.  During various capacity, I was a --

 4    guard planes.  Do things like that.  Yes, I've had --

 5    I've had things where I've had to guard things.

 6         Q.   Okay.  So --

 7         A.   I've had times and some situations that I

 8    can't really speak about that I've had to guard things.

 9         Q.   Like maybe -- we called it a "line watch."  Is

10    that -- did you have to do like a line watch around for

11    airplanes where you --

12         A.   Yeah, I've done that before.  I've done --

13    like I said, I've done things where I had to watch

14    various things.

15         Q.   Okay.  All right.  And getting back to this

16    force issue -- and you're talking about the training

17    that you received when you would go overseas.  Was that

18    actual classroom training where there would be some

19    written materials for that?

20         A.   I wish it was.  It was windy and cold those

21    days when I wish I was in the classroom.  No, I was

22    outside.

23         Q.   All right.  And as far as the kind of law

24    enforcement activities that we're talking about here

25    where an officer is attempting to arrest a suspect in a

                  Gulfstream Court Reporting

                                              Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)              e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 106

1    real situation, you haven't had that kind of training?

2         A.   No.

3         Q.   I just wanted to clear up one thing that I

4    asked you about earlier, and that is the fact that

5    the -- what initiated this entire incident.  I told you

6    that he -- that Mr. Abernathy was traveling the wrong

7    way on either La Cantera Parkway or 1604.

8                   And, in fact, I'll -- assume for me that

9    Mr. -- if you will, assume for me that Mr. Abernathy was

10   traveling east in the westbound lane of La Cantera

11   Parkway.  That would be something that you could

12   appreciate the need to subdue him for, correct?

13                  MR. WILSON:  Objection; assuming facts

14   not in evidence, speculation.

15        A.   It's funny --

16                  MR. WILSON:  Leading.

17        A.   -- I've driven the wrong way before.  I went

18   home, back home to New York on leave one time.  They

19   turned a two-way street into a one-way street, and --

20   well, I went down the wrong way.

21        Q.   (By Mr. Ralls)  Okay.

22        A.   And I didn't get subdued.

23        Q.   You what?

24        A.   I did not get subdued.

25        Q.   All right.  Well, did an officer --

Tel: (210) 490-6444                    Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                          JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 107

1        A.   Oh, yeah.

2        Q.   -- see you?

3        A.   Yeah.

4        Q.   Did they turn on their overhead lights?

5        A.   Yes.

6        Q.   All right.  Did you stop?

7        A.   Well, he turned on his lights back there.  I

8   didn't even know he was coming for me.  I kept going.

9   And then he ran up -- you know, he got close on my

10  bumper, then I pulled over.

11       Q.   When you understood that the officer was

12  attempting to pull you over, you pulled over, correct?

13       A.   Yes.

14       Q.   You did not continue for another 23 miles, did

15  you, with the officer behind you?

16       A.   Not in New York.

17       Q.   You did not continue for another 23 miles with

18  the officers behind you, correct?

19       A.   No.

20       Q.   You did not commit 20 traffic violations

21  during the course of the officer trying to pull you

22  over, did you?

23            MR. WILSON:  Objection; assuming facts

24  not in evidence, speculation, leading.

25       A.   You can assume the rest of the line of

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 108

1    questioning:  I stopped there and we had a conversation.

2         Q.   (By Mr. Ralls)  You were talking earlier about

3    Pierre Abernathy's mother being like family to you.

4         A.   Like I said, I move around a lot so we

5    generally latch on to the nice people we meet in the

6    neighborhood.  Every four years, I get a new duty

7    station.  Everywhere I went, I know one neighbor that I

8    still -- I may not speak to them anymore, but I know.

9    So . . .

10        Q.   And Mrs. Abernathy or his -- Pierre

11   Abernathy's mother was that person in San Antonio?

12        A.   Well, it's funny because here, my own

13   cul-de-sac pretty much adopted me, so I'm -- I'm pretty

14   friendly with -- 10811, prime example.  Last week she

15   bought a china cabinet and she's about this tall and

16   this big.  (Gestures.)  So me and my brother, because

17   her husband was at work, moved her china cabinet in the

18   house for her because it was about to rain.  We -- we

19   look out for neighbors.

20        Q.   Okay.

21        A.   I say "brother," but he's my best friend.

22        Q.   All right.  And you consider all the people in

23   the Deepwater Bay cul-de-sac as very close friends to

24   you?

25        A.   I like to believe so.

Tel:  (210) 490-6444                    Fax:  (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                           JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

                                                    Page 109

 1        Q.   And Mrs. Abernathy is family?

 2        A.   I like to think so.

 3        Q.   Did you see Pierre at his mother's house with

 4    his children?

 5        A.   Yeah.

 6        Q.   And did you see him at his house -- do you

 7    know how many children Pierre had?

 8        A.   I'm not sure exactly.  I know of three of

 9    them.

10        Q.   Okay.

11        A.   I know Shavonda's kids.  I think he has more

12    kids, but I don't -- like I say, I don't -- that's --

13    that's -- I stay in my lane.  I don't ask too many -- I

14    just know what I see.

15        Q.   All right.  You don't consider yourself an

16    expert in the use of force, do you?

17        A.   No, that's Marines.

18        Q.   Okay.  And you certainly don't consider

19    yourself an expert in the use of -- or rather in the

20    amount of force necessary to arrest someone?

21        A.   No.

22        Q.   And you don't consider yourself an expert in

23    the use of a Taser, do you?

24        A.   No.

25        Q.   And the Taser training that you have is on the

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

 1   use of the probes on --

 2        A.   Yes.

 3        Q.   Do you have -- are you familiar with the other

 4   way that a Taser can be used?

 5        A.   No.

 6        Q.   For just pain compliance?

 7        A.   When the probes are in you and you just --

 8   (gestures).

 9        Q.   No.  When the -- are you aware of the fact

10   that you can take the cartridge off the Taser and use it

11   directly on the body as a pain compliance tool?

12        A.   Didn't know that.  I've heard of it, but for

13   the application that we use it, there was a dog there,

14   he had a Taser.  They didn't go into the dismantling and

15   all the things of that aspect of it.

16             MR. RALLS:  All right, Sergeant.  I think

17   that's all the questions I have for you at this time.

18   Thank you, sir.

19             (11:13 a.m.)

20             MR. WILSON:  I just have a few.

21               FURTHER EXAMINATION

22   QUESTIONS BY MR. WILSON:

23        Q.   You said you spoke with the media; is that

24   correct?

25        A.   Yes.

Tel: (210) 490-6444                        Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 111

1        Q.   Gave a statement to them.

2        A.   Yeah.

3        Q.   You said that the -- I think you said or

4    testified that a police officer told you not to speak

5    with the media?

6        A.   Not so much not to speak.  It was like they --

7    they was trying to push the media back, and I said,

8    "This is my lawn."  And after the interaction, I said,

9    "You can post up right here on my lawn."  Right here on

10   mark 1, which is my house, I was like, you know,

11   standing in my lawn.  I was like, "You can post up right

12   here."

13                  THE REPORTER:  "You can" what?

14                  THE WITNESS:  Post.

15       A.   "You can post up right here."

16                  And she said, "Would you like to give a

17   statement?"

18                  And I said, "Sure."

19       Q.   (By Mr. Wilson)  And what did the police

20   officers tell you in regards to --

21                  MR. RALLS:  Objection; relevance.

22       Q.   (By Mr. Wilson)  -- speaking with the media?

23                  MR. RALLS:  Objection; relevance.

24       Q.   (By Mr. Wilson)  Did they say anything to you?

25       A.   No.  There's nothing they can say.  They know

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

 1    that.  I know my rights.

 2         Q.   Did they try to prevent you from speaking with

 3    the media?

 4         A.   No.  They -- they were out in the street using

 5    choice words in my direction.

 6         Q.   What kind of choice words?

 7         A.   "There's that mother fucker troublemaker.  The

 8    mother fucker right there, that's the troublemaker.

 9    That's the guy."

10         Q.   And were the officers directing that towards

11    you or someone else?

12         A.   They was huddling in the street and they look

13    over at me.  And it was -- and I was on Horton's porch.

14    They looked over and said it at me.  And I moved back

15    across the street and that's when I told them.  And it

16    was no secret they weren't pleased with me.

17                   MR. RALLS:  Objection; nonresponsive.

18         Q.   (By Mr. Wilson)  Were they acting professional

19    towards you?

20                   MR. RALLS:  Objection; relevance.

21         A.   No.

22         Q.   (By Mr. Wilson)  Respectful?

23                   MR. RALLS:  Objection --

24         A.   No.

25                   MR. RALLS:  -- relevance.

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                          Page 113
  1        A.    The cop I rode to the station with -- and I
  2   don't know who he was -- he was the nicest.  He was
  3   genuine.
  4        Q.   (By Mr. Wilson)  Was that police officer there
  5   at the scene?
  6        A.    I didn't see him out there.  I think he came
  7   late.
  8        Q.    Do you remember his name?
  9        A.    No.
 10             MR. WILSON:  I'll pass the witness.
 11             MR. RALLS:  Sergeant, I don't think I
 12   have any other questions.  Thank you very much for your
 13   time.
 14             MR. BENNETT:  I have no questions.
 15             (11:15 a.m.)
 16                  *  *  *  *  *  *  *
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)          e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                      Page 114

 1                   CHANGES AND SIGNATURE

 2    WITNESS: JAJUAN WILLIAMS      DATE OF DEPOSITION: 4-10-14

 3    PAGE    LINE      CHANGE              REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

---

                                                        Page 115

1                    I, JAJUAN WILLIAMS, have read the

2    foregoing deposition and hereby affix my signature that

3    same is true and correct, except as noted above.

4

                        _____

5                        JAJUAN WILLIAMS

6

7    THE STATE OF _____ )

8    COUNTY OF _____ )

9                    Before me, _____, on this

10   day personally appeared JAJUAN WILLIAMS, known to me (or

11   proved to me under oath or through _____)

12   (description of identity card or other document) to be

13   the person whose name is subscribed to the foregoing

14   instrument and acknowledged to me that they executed the

15   same for the purposes and consideration therein

16   expressed.

17                    Given under my hand and seal of office

18   this _____ day of _____, _____.

19

20

21                        _____

                         NOTARY PUBLIC IN AND FOR

22                       THE STATE OF _____

23   My commission expires: _____

24

25   _____ No Changes Made  _____ Amendment Sheet(s) Attached

---

                                          Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

```
                                                        Page 116
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   SHAVONDA BAILEY, as Next Friend   )
     of K.A. and P.A.; and VIVIAN      )
 4   LAMPKINS, as Next Friend of J.L.  )
                                       )
 5   v.                                )   CIVIL ACTION NO.
                                       )     13-CV-700-FB
 6   CITY OF SAN ANTONIO, TEXAS;       )
     NATHAN PRESTON, Individually      )
 7   VIDAL DIAZ, Individually          )
     MICHAEL FLETCHER, Individually    )
 8   FRANCISCO GALVAN, Individually    )
     MATTHEW FLORES, Individually      )
 9   AUBREY PLAUCHE, Individually      )
     MATTHEW QUINTANILLA, Individually )
10   ROBERT TAMEZ, Individually;       )
     and PAUL TRIGO, Individually      )
11
                     REPORTER'S CERTIFICATE
12                DEPOSITION OF JAJUAN WILLIAMS
                        APRIL 10, 2014
13

14        I, Stephanie Clark, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17        That the witness, JAJUAN WILLIAMS, was duly sworn

18   by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21        That the original deposition was delivered to

22   _____.

23        I further certify that pursuant to FRCP Rule

24   30(f)(1) that the signature of the deponent was

25   requested by the deponent or a party before the
```

SHAVONDA BAILEY, ET AL.                              JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 117

1    completion of the deposition and that the signature is

2    to be before any notary public and returned within 30

3    days from date of receipt of the transcript.  If

4    returned, the attached Changes and Signature Page

5    contains any changes and the reasons therefor;

6         That the amount of time used by each party at the

7    deposition is as follows:

8              Mr. Robert Wilson - 0:48
               Mr. N. Mark Ralls - 1:17
9              Mr. Brad Bennett - 0:00

10        I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties or

12   attorneys in the action in which this proceeding was

13   taken, and further that I am not financially or

14   otherwise interested in the outcome of the action.

15        Certified by me this 21st day of April, 2014.

16

17

18        _____

19        STEPHANIE CLARK, RPR, Texas CSR
          Expiration Date:  12-31-15
          Gulfstream Court Reporting, LLC
20        Firm Registration No. 245
          16607 Blanco Road, Suite 1307
21        San Antonio, TX 78232
          210.490.6444 - 713.354.2339

22

23

24

25

Tel: (210) 490-6444                        Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574

SHAVONDA BAILEY, ET AL.                                    JAJUAN WILLIAMS
CITY OF SAN ANTONIO, ET AL

Page 118

1    COUNTY OF BEXAR   )

2    STATE OF TEXAS    )

3        I hereby certify that the witness was notified on

4    _____ that the witness has 30 days after being

5    notified by the officer that the transcript is available

6    for review by the witness and if there are changes in

7    the form or substance to be made, then the witness shall

8    sign a statement reciting such changes and the reasons

9    given by the witness for making them;

10       That the witness' signature (  )was (  )was not

11   returned as of _____.

12       Subscribed and sworn to this _____ day of

13   _____, 2014.

14

15

16                   _____
                     Stephanie Clark, RPR, Texas C
17                   Expiration Date: 12-31-15
                     Gulfstream Court Reporting, LLC
18                   Firm Registration No. 245
                     16607 Blanco Road, Suite 1307
19                   San Antonio, TX 78232
                     210.490.6444 - 713.354.2339

20

21

22

23

24

25

Gulfstream Court Reporting

Tel: (210) 490-6444                          Fax: (210) 579-6507

Exhibit "2"

Electronically signed by Stephanie Clark (601-353-121-5420)                    e9e1bdea-a709-45d3-96d9-911326ef1574