UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

**MAR 3 1 2016**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                                    DEPUTY

|  |  |
|---|---|
| SHAVONDA BAILEY, *et al.*, <br> Plaintiffs <br><br> v. <br><br> CITY OF SAN ANTONIO, TEXAS, *et al.*, <br> Defendants | ) <br> ) <br> ) <br> ) <br> )   Civil Case 5:13-cv-00700-RCL <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

Pending before the Court are defendants' motions for summary judgment, ECF Nos. 43 and 44. After due consideration of the papers, the applicable law, and the entire record, the Court finds defendants' motion for summary judgment, ECF No. 44 shall be **GRANTED**, and defendants' motion for summary judgment, ECF No. 43, shall be **DENIED** as moot.

## I. BACKGROUND

This lawsuit arises out of the tragic and untimely death of Pierre Abernathy, a paranoid schizophrenic, who died after a struggle with City of San Antonio police officers in the early morning hours of August 4, 2011. Officer Francisco Galvan stated in his affidavit that around 2:30 a.m. he spotted a black Ford Explorer belonging to Abernathy driving in the wrong direction on La Cantera Parkway. Defs.' Mot. Summ. J., Galvan Aff., Ex. D, at D-1. Before engaging in a pursuit, Galvan observed Abernathy drive around a car that was headed in the right direction. *Id.* He then advised his dispatcher he would stop the vehicle because he feared Abernathy would cause a major accident. *Id.* Although Galvan activated his emergency lights, Abernathy did not pull over, and did not do so for some time. *Id.* Although Abernathy was not

1

speeding, Galvan stated that he repeatedly ran stop signs and red lights and consistently had trouble staying in his lane. *Id.* at D-2. After pulling into various parking lots, Abernathy eventually led police to Deepwater Bay, a cul-de-sac, and which, unknown to the police officers giving chase, he and his mother lived. There he came to a stop. *Id.*

Officer Nathan Preston, who was equipped with a microphone and whose cruiser was equipped with a dashboard camera joined the vehicle pursuit. Defs.' Mot. Summ. J., Preston Aff., Ex. D, at D-5.[1] According to Preston, once the pursuit ended and Abernathy came to a stop, he then approached the Explorer's driver's side door but found it to be locked. *Id.* It was at this time he claims that Abernathy put his hands up and he was able to discern Abernathy had no weapons; it was also around this time that he states Abernathy unlocked the door, after which he, Preston, opened it. *Id.* Thereafter, Preston stated Abernathy initially complied with his commands to get on the ground, allowing his right wrist to be handcuffed, but he then began to resist by pulling his left wrist away from Preston and attempted to get off of the ground. *Id.* Galvan, who had approached from the driver's side of the Explorer then tazed Abernathy twice to no effect. *Id.* at D-3. Abernathy broke free and ran toward his mother's front door. *Id.* at D-3, D-6.

Upon reaching the door, Abernathy apparently broke through the storm door and attempted to gain entry to the home. Defs.' Mot. Summ. J., Tamez Aff., Ex. D, at D-17; Trigo Aff., Ex. D, at D-20. It was at this time Officers Trigo and Tamez engaged Abernathy with their batons, both hitting him in his right shoulder while directing Abernathy to stop resisting. Tamez Aff. D-17. It was also at this point that Preston rejoined the struggle and tazed Abernathy from a distance, after which Abernathy once again broke free and began to run. Preston Aff., D-6.

---

[1] Defendants submitted two affidavits signed by Preston, Ex. B and Ex. D at D-5. Where discrepancies exist between the two, the Court shall cite to and credit the testimony most favorable to plaintiffs. Otherwise, the Court shall rely on the first of the two affidavits given by Preston.

Preston gave chase, and when he was again within a short distance, he tazed Abernathy a second time. *Id.* at D-7. The Tazer had little effect. *Id.* It was also at this time that Abernathy apparently attempted to gain entry to another home, but the door was locked. Galvan Aff. D-3; Fletcher Aff., Ex. D., at D-10; Trigo Aff. D-20. Once again, Trigo engaged Abernathy with his baton, and yet again Abernathy broke free and ran back towards his mother's house. Trigo Aff. D-20. In response, one of the K-9 officers on the scene, Aubrey Plauche, directed his patrol dog to attack Abernathy as he ran. Preston Aff. D-7; Galvan Aff. D-3; Tamez Aff. D-17; Trigo Aff. D-20; Plauche Aff., Ex. D, at D-25. The dog apparently made contact with Abernathy's left buttocks. Plauche Aff. D-25. Preston then caught up with Abernathy, tackling him into a neighbor's flower bed. Preston Aff. D-7. Galvan, Trigo, Tamez, Preston, and Plauche along with his patrol dog once again attempted to handcuff Abernathy, but Abernathy continued to resist. Galvan Aff. D-4; Preston Aff. D-7; Tamez Aff. D-17; Trigo Aff. D-20; Plauche Aff. D-25. At that time, Officers Matthew Flores and Matthew Quintanilla arrived on the scene; while Flores directed himself toward onlookers, Quintanilla joined in the efforts to subdue Abernathy. Flores Aff., Ex. D, at D-13; Quintanilla Aff., Ex. D, at D-15. During this period of the struggle, Abernathy apparently got hold of Tamez's leg and fearing that Abernathy could also get hold of his service weapon, Tamez punched Abernathy twice in the face with a closed fist in order to free his leg. Tamez Aff. D-17. Trigo also admits to hitting Abernathy in his side, as well as kicking his thighs. Trigo Aff. D-21. Likewise, Preston admits to punching Abernathy with a closed fist, while Galvan stated he also punched Abernathy in the back and stomach. Preston Aff. D-7; Galvan Aff. D-4. After some time, Flores then decided to taze Abernathy, administering a five-second shock. Flores Aff. D-14. Abernathy responded by attempting to remove the probes from his back. *Id.* Flores then attempted to taze Abernathy by directly contacting his Tazer to Abernathy's skin but was

apparently dissuaded from doing so after the Tazer arced with the handcuffs dangling from Abernathy's wrist. *Id.* Another officer, Vidal Diaz, had also joined the struggle at this point, and sometime after Abernathy was tazed the last time, Diaz was finally able to get control of Abernathy's left wrist, while another officer latched the handcuffs. Diaz Aff., Ex. D, at D-22. It is unclear which officer was eventually able to handcuff Abernathy.

After Abernathy was finally handcuffed, he was left under the guard of Flores and Diaz. Diaz Aff. D-23; Flores Aff. D-14. Flores and Diaz confirmed Abernathy was still breathing and had a pulse. Diaz Aff. D-23; Flores Aff. D-14. Sometime thereafter, Diaz noticed Abernathy's breathing had stopped and alerted the paramedics who had already arrived on the scene. Diaz Aff. D-23. Flores then assisted the paramedics in administering chest compressions. *Id.* Abernathy was then transported to a hospital where he was pronounced dead a few minutes after arrival. Defs.' Mot. Summ. J., Ex. G, at 12. After an autopsy, the Bexar County medical examiner determined the cause of death to be "the result of the combined effects of intoxication with cocaine, a prolonged struggle, and a cardiomyopathy (an enlarged heart)." *Id.* at 34.

Other witnesses on the scene offer testimony both consistent and somewhat inconsistent with the officers' version of events. The owner of the home where Abernathy was finally brought under control, Gary Hovermale, provides both affidavit and deposition testimony that is largely consistent with the officers' testimony. After being awoken by his wife, Hovermale looked through his front door window, where he saw "a commotion in the flower bed," and heard "noises like someone was giving commands." Gary Hovermale Aff., Ex. D, at D-27. After putting on some clothing, he then opened his front door, where he saw "four to six officers wrestling," while saying "'[p]ut your arms behind your back' . . . and he was resisting." *Id.* Hovermale specifically stated that while he was observing the encounter, he "did not see any of

the officers with a baton or any other type of weapon." *Id.* At deposition, Hovermale once again stated Abernathy was "resisting quite heavy" and that "[t]he officer was trying to get his right arm behind his back and he [Abernathy] appeared to be very strong and they had a very difficult time." Defs.' Mot. Summ. J., Gary Hovermale Dep., Ex. C, at 58–59. Hovermale also stated that once the officers had handcuffed Abernathy, their activity came to a halt. *Id.* at 19.

Jajuan Williams, who also lived on Deepwater Bay, provides a different version of events. Sometime in the night Williams stated he was roused by the commotion outside. Pls.' Resp., ECF No. 52, Jajuan Williams Dep., Ex. 3, at 19. He then went outside, where he could tell there were multiple people in his neighbor's yard, but his view was obstructed by trees. *Id.* at 20. Though he could tell the individuals were police officers, could hear screaming, and could discern they were "tussling," he "wasn't really sure what was going on at that point." *Id.* He then saw Abernathy run into view, and after being knocked down, get up and begin running towards Hovermale's home. *Id.* at 24. At that point, he apparently identified the person as Abernathy and woke up Lee Griffin, Abernathy's younger brother, who was staying the night at Williams's home. *Id.* He then ran to Abernathy's home to rouse Abernathy's mother, Brenda Allen. *Id.* He then, from Abernathy's front lawn, observed the struggle. *Id.* From that vantage, he "did not have a clear view," but "could see officers pulling each other off so the other officer could get in." *Id.* at 30. He could "hear the sound of boots hitting [Abernathy]," though he could not actually see Abernathy. *Id.* He could not see Abernathy's hands. *Id.* at 34. He also stated he heard officers laughing and "being jovial." *Id.* Further, he stated that he was threatened by officers while the struggle occurred. *Id.* at 31–32. He opined "[i]t didn't look like any cuffing was going on, to me." *Id.* at 37. He went on to say Abernathy was "curled up in a ball" on Hovermale's porch. *Id.* at 32. He also saw officers bringing up and down closed fists, but did not see where those blows

landed. *Id.* at 42. He heard Abernathy crying out for his mother. *Id.* In Williams' opinion, the use of force was "excessive." *Id.* at 28.

Williams stated he was then told by officers "to get in your fucking house" and was followed back to his property by those same officers. *Id.* at 78. He claims the officers taunted him by asking "what are you going to do?" *Id.* The officers speaking with Williams were not, however, the officers involved in restraining Abernathy. *Id.* at 39.

Brenda Allen, Abernathy's mother, stated in her affidavit that her daughter, Tiffany Allen, woke her and alerted her to the police outside their home. Pls.' Resp., Brenda Allen Aff., Ex. 4, at 2. When she reached the front door, she saw the storm door had been broken. *Id.* Though she could not see Abernathy, she could hear him calling out to her. *Id.* When she approached she was directed to get back. *Id.* She stated she could hear Abernathy being tazed and his resulting screams. *Id.* She went on to say that she heard her daughter and son tell the police Abernathy was a paranoid schizophrenic and was high on crack cocaine. *Id.* She also stated she could hear fists striking Abernathy and police officers stating "Get some man, get some!" *Id.* She stated she heard the Tazer go off "10 times." *Id.* at 3. She also stated she heard Hovermale say "he's down, you don't have to do him like that!" *Id.* She stated the police beat Abernathy for fifteen minutes before they stopped. *Id.* After Abernathy was put in an ambulance, she stated she heard officers "laughing and joking with each other like they had a good time." *Id.*

Tiffany Allen, Abernathy's sister, provides testimony largely consistent with that of her mother. Though she could not see clearly, she could tell the police were beating and tazing someone. Pls.' Resp., Tiffany Allen Aff., Ex. 5, at 2. She stated she could hear the blows landing on Abernathy, and heard her mother tell the police that Abernathy was a paranoid schizophrenic.

*Id.* She stated that the struggle lasted ten minutes. *Id.* She also attested to hearing the police say "Yeah yeah" while they were struggling with Abernathy. *Id.*

Lee Griffin, Abernathy's brother, also provides testimony largely consistent with that provided by his sister and mother. After being awoken by Williams, he says he saw his brother running from the officers towards Hovermale's front door. Pls. Resp., Griffin Aff., Ex. 6, at 2. He then went inside to get his shoes, went back outside, and attempted to approach the scene but was directed to stay back by officers who threatened to "'release the second canine.'" *Id.* He apparently could see his brother's head and shoulder. *Id.* He attested to hearing the Tazer used eight times. *Id.* He apparently also heard the police say "Yeah, get some, [y]eah get some!" He stated he alerted the police to the fact that Abernathy was a paranoid schizophrenic and heard his mother do the same. *Id.* At some point he lost view of Abernathy, but could hear Abernathy screaming and being tazed. *Id.* He stated he never heard the police tell Abernathy to stop resisting or give him any other command. *Id.* According to Griffin, the beating lasted fifteen minutes, and continued even after he could no longer hear Abernathy resisting or screaming. *Id.*

The video and audio recording from Preston's patrol car and microphone largely substantiates the officers' version of events, and largely diverges from that version described by Williams, Brenda and Tiffany Allen, and Lee Griffin. The video recording begins at 3:09 a.m. with Preston joining the ongoing pursuit of Abernathy. Defs.' Mot. Summ. J., Ex A. After fifteen minutes, Abernathy eventually pulls into his mother's driveway and brings his vehicle to a stop. The recording then captured Preston directing Abernathy to exit the vehicle. Two officers can be seen approaching the passenger's side of the vehicle, but the driver's side of the vehicle is not in the camera's frame of view. Preston can then be heard directing Abernathy to open the door to the vehicle. After opening the door, Preston directs Abernathy to get on the ground, to which

Abernathy responds "Yes, sir" and "Ok." After being directed to put his hands behind his back, Abernathy can be heard stating "Ok, I put my hands behind my back." A few seconds afterwards, Preston says Abernathy is pulling away from him and calls for Abernathy to be tazed. After being tazed, a struggle can be heard, and Abernathy can be heard saying "I'm done." It is at that point that, according to Preston, he either accidently hit the mute button on his microphone, because the audio recording ceases. Preston Aff., Ex. B, at 3. There is no audio recording from approximately 3:26:00 a.m. until 3:28:08 a.m. At 3:26:56 a.m., Abernathy runs into the frame of view along with two police officers in pursuit at which time a police dog catches up with Abernathy and latches onto his left buttocks. Both Abernathy and the dog quickly exit the frame once more. Thereafter, three more officers follow. When the audio returns, Preston can be heard struggling with Abernathy, and a winded officer states "we don't have him under control yet." As the struggle continues, Preston and others can be heard directing Abernathy to put his hands behind his back, and at one point Preston indicates he had already tazed Abernathy twice. Abernathy calls out to both his mother, and at one point, Gary Hovermale. At approximately 3:30:27 a.m., another Tazer can be heard. Shortly thereafter, over Preston's heavy breathing, someone can be heard yelling "get the fuck inside" and others can be heard laughing in the background. At around that time it sounds as if the struggle ends. At 3:31:20 a.m., Abernathy yells out to his mother, while Preston indicates to other officers that he had injured his hand. At this point, four officers are within the dashboard camera's frame of view. Thereafter, Preston can be heard speaking with Abernathy's family, and at 3:37:48 a.m., the audio cuts out permanently. The remaining video reveals no further relevant facts.

## II. DISCUSSION

Plaintiff Shavonda Bailey, as next friend of K.A. and P.A., and Vivian Lampkins, as next friend of J.L., seek money damages from officers Nathan Preston, Vidal Diaz, Michael Fletcher, Francisco Galvan, Matthew Flores, Aubrey Plauche, Matthew Quintanilla, Robert Tamez, and Paul Trigo in their individual capacities under 42 U.S.C. § 1983 for using excessive force in their detention of Abernathy and for failing to intervene to prevent said use of excessive force. Pls.' Compl. 7. Plaintiffs also bring suit against defendants in their individual capacities for assault and battery under Texas law. *Id.* at 11. They seek damages for physical and emotional injury, pain and suffering, emotional shock and distress, and severe emotional distress associated with Abernathy's death. *Id.* They also seek special damages for the costs associated with Abernathy's burial as well as the loss of companionship and support. *Id.* Lastly, plaintiffs ask punitive damages be assessed against the defendants. *Id.* at 12. Defendants move for summary judgment as to the § 1983 claims on the ground of qualified immunity. Defs.' Mot. Summ. J. 4.

### A. Plaintiffs' Section 1983 Claims

*1. Legal Standard*

Under the doctrine of qualified immunity, public officials are protected from suit "unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Once an official pleads qualified immunity, the burden shifts to the plaintiff to overcome the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 476 (5th Cir. 2014) (citing *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)). Resolving a claim of qualified immunity requires a two-step inquiry: first, a court must determine whether the evidence, when viewed in a light most favorable to the plaintiff, raises a genuine issue of

material fact as to the violation of a constitutional right. *Brumfield*, 551 F.3d at 327. And second, whether the official's specific conduct was objectively unreasonable in light of clearly established law at the time the conduct occurred. *Id.* "Even on summary judgment . . . qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012). Where—as here—the issue of qualified immunity is raised at the summary judgment stage, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (quotation marks omitted).

In this instance, plaintiffs allege two distinct—but interrelated—constitutional claims: an excessive force claim and a failure to intervene claim. A claim of excessive force used in an investigatory stop or arrest is evaluated under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail on a claim of excessive force, a plaintiff must demonstrate (1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive; and (3) the excessiveness of which was clearly unreasonable. *Poole*, 691 F.3d at 630 (quoting *Ontiveros v. City of Roseburg*, 564 F.3d 679, 682 (5th Cir. 2009)) (quotation marks omitted). Excessive force claims are necessarily "fact intensive," and a court must carefully weigh the factual circumstances and evidence in each case. Although "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," of salient import is the severity of the crime at issue, the immediate threat the suspect posed to the safety of officers or others, and whether the suspect actively resisted or evaded arrest by flight. *Graham,* 490 U.S. at 396. The inquiry must be undertaken through the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Id.* Objective "reasonableness is [the] touchstone," *Poole*, 691 F.3d at 630, "without regard to [the officer's] underlying intention or motivation." *Graham*, 490 U.S. at 397. It bears underscoring that "[t]he calculus of reasonableness must embody allowance for the fact that officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97. What is more, each individual officer's conduct must be independently evaluated for objective reasonableness. *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

In order to succeed on their failure to intervene claim, plaintiffs must demonstrate the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)) (quotation marks omitted). Of logical necessity, the existence of a constitutional violation is an absolute prerequisite to a failure to intervene claim. *See id.*

*B. Analysis*

In light of the context in which the officers found themselves in their attempts to apprehend and detain Abernathy, the Court concludes that the defendants deployed force that was neither clearly excessive nor clearly unreasonable. Accordingly, plaintiffs' § 1983 claims must fail.

Uncontroverted evidence demonstrates that Abernathy was observed driving the wrong direction down a thoroughfare divided by a median while dodging oncoming traffic. Moreover, Galvan's unassailed testimony demonstrates that after he pulled behind Abernathy in his unmarked police car and after turning on his emergency lights, Abernathy did not pull over. Even assuming Abernathy was unsure whether Galvan was indeed a police officer, Preston's

dashboard camera video clearly depicts Abernathy's failure to pull over for a full fifteen minutes with multiple marked police vehicles in pursuit, each with their sirens and lights activated. In the video Abernathy can be seen swerving in his lane and generally failing to observe traffic laws. Preston can also be heard giving commands over his public address system directing Abernathy to pull over and stop. Preston states over his radio at one point that Abernathy was suspected of being intoxicated.

As demonstrated by the audio recording on the video as well as Preston's and Galvan's affidavits, the first use of force against Abernathy occurred after Abernathy had been warned he would be tazed, and after, according to Preston, Abernathy began to resist by pulling his left wrist away during Preston's attempts to handcuff him. Both Preston's and Galvan's affidavits are uncontradicted in this regard, and, moreover, are supported by the audio recording. The Court cannot say this initial use of force by tazing was objectively unreasonable. The *Graham* factors support this determination. As evidenced by the video recording, Abernathy was suspected of driving while intoxicated, and in light of his inability to maintain his lane during the pursuit coupled with Galvan's observation of Abernathy's driving into oncoming traffic on a one-way street, there was reasonable suspicion to believe that was the case. Driving while intoxicated in Texas ranges from a Class B misdemeanor to a third-degree felony. Tex. Penal Code § 49.04(b), 49.09(a), (b). The first *Graham* factor therefore supports Galvan's actions. Further, though not a serious crime in the traditional sense, intoxicated driving poses a great safety risk to the general public—a fact that leads the Court to conclude that the second *Graham* factor also weighs in favor of Galvan's specific actions here. That Abernathy had just evaded police for at least fifteen minutes while demonstrating telltale signs of intoxication leads to the reasonable conclusion that should he escape he may once again attempt to drive a vehicle, thereby once more subjecting

members of the public to the risk of grave injury or death. Adding to the potential risk to the public Abernathy posed, it was objectively reasonable for the officers present to believe Abernathy "posed an immediate threat to [their] safety," because uncontradicted evidence demonstrates Abernathy began to resist Preston's attempts to handcuff him. *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam)) (quotation marks omitted). Also relevant to the safety of the officers was the fact that, at this point, Abernathy was now physically resisting while a set of handcuffs dangled from his right wrist which could be used as a weapon. In sum, the threat Abernathy posed to both the officers and general public weighs in favor of Galvan's use of his Tazer. The last *Graham* factor also supports Galvan's actions. Abernathy had been directed to lie on the ground and put his hands behind his back, two commands he ostensibly disregarded when he resisted Preston and attempted to stand up. Additionally, that Abernathy had just refused to pull over for an extended period of time makes it reasonable to conclude his resistance to being handcuffed was an additional attempt at escape, thereby justifying a heightened level of force to detain him.

The next use of force detailed by the affidavits was Trigo's use of his baton while Abernathy was attempting to gain entry to his mother's house—a fact that was unknown to Trigo and the other officers at the time. Specifically, Trigo explains he struck Abernathy on the right shoulder after verbally commanding him to stop attempting to enter the home and after Abernathy had shattered the storm door. This use of force was likewise objectively reasonable. At this point in the struggle, Abernathy had been tazed twice to no effect, had broken free from Preston, and was now attempting to enter an unknown home. Once again, the *Graham* factors weigh in favor of Trigo's use of force. Namely, the second factor supports Trigo's actions—that

is, the danger Abernathy presented to the officers and the public—to the extent it reasonably appeared to Trigo that Abernathy was attempting to gain entry to what was likely the home of an innocent bystander. That Abernathy was yelling "Momma! Momma!" does little to alter this conclusion; it would be *unreasonable* without more to conclude that because a fleeing suspect calls for his mother—or any another person for that matter—while attempting to forcibly gain entry to a home that his mother indeed lives at the home. Further still, Trigo's use of his baton was reasonably calibrated to the situation, as Abernathy had previously been tazed twice without result, was in an apparent attempt to flee, and had a potential weapon dangling from his wrist. The Court cannot conclude Trigo's use of his baton was clearly excessive or clearly unreasonable.

After breaking free of Trigo, it appears Abernathy then ran to his neighbor's door and en route was tazed by Preston. Upon reaching the neighbor's door, Abernathy attempted to kick it in, whereupon both Tamez and Trigo hit Abernathy with their batons, and Preston tazed Abernathy for the second time.[2] According to each officer, Abernathy continued to resist. Once again, the use of force by Tamez, Trigo, and Preston in this instance was not objectively unreasonable, nor was it clearly excessive. Their uncontradicted affidavits describe a calibrated and reasonable escalation of the amount of force deployed to subdue Abernathy. It is worthy of emphasis that, by this point, the officers had observed Abernathy attempt to gain entry by force to two dwellings as part of a by then minutes-long and ongoing physical resistance to arrest that came after a prolonged vehicle pursuit. The *Graham* decidedly weigh in favor of the officers' conduct.

---

[2] It is unclear from the affidavits whether Abernathy was tazed as he was at the neighbor's door or after he had once again broken away from the officers. *Compare* Preston Aff., Ex. 2, at 3 *with* Trigo Aff. at D-20. This inconsistency does not meaningfully alter the Court's analysis, however. Under either version, Preston's second deployment of his Tazer was objectively reasonable under the circumstances.

The officers' affidavits are not in complete agreement as to what happened next. Nevertheless, even under an interpretation most favorable to plaintiffs—that is, an interpretation that includes the highest degree of force inferable from the affidavits—the officers' conduct remains objectively reasonable. According to both Fletcher and Galvan, after breaking free from the officers on the neighbor's porch, Abernathy once again ran to his mother's door and began to struggle with the officers there. Galvan Aff. D-3; Fletcher Aff. D-10. According to Fletcher, he tackled Abernathy when Abernathy reached his mother's door, at which time another officer began hitting Abernathy with his baton, accidently striking Fletcher in the process. Fletcher Aff. D-10. No other officer, however, reports having struck Abernathy with his baton after Abernathy had returned to his mother's porch. Nevertheless, in light of the circumstances, both Fletcher's and the undisclosed officer's use of force was objectively reasonable.

Abernathy then broke free once more and began running down the cul-de-sac, at which time Plauche's police dog made contact with Abernathy's buttocks. Preston's dashboard camera shows this sequence of events. It is clear from the video that Abernathy was attempting to run away from the officers when the dog made contact with him. Because he was in the process of fleeing and in light of the circumstances facing the officers, the Court cannot conclude the use of the police dog was clearly unreasonable or clearly excessive. By this time, the officers had attempted to detain Abernathy by various means, including the use of their lights and sirens, verbal commands, the use of their Tazers, the use of their batons, and the use of their own physical strength—all of which had failed to bring Abernathy under control, and indeed had failed to such a degree that Abernathy had once again more been able flee unhindered. From an objective standpoint, by this time, any reasonable officer would view Abernathy as a grave danger to himself, to the officers on the scene, and most importantly, to the public at large.

Plauche's unleashing of his police dog was an objectively reasonable attempt to prevent Abernathy's further flight and potential escape.

Once the police dog caught up with and got ahold of Abernathy, Preston then tackled him into Hovermale's flower bed. It is somewhere near this point that Jajuan Williams, Brenda Allen, Tiffany Allen, Lee Griffin, and Gary Hovermale began to observe the melee. It is also sometime after this point that Preston's microphone once again began recording.[3] Taking the plaintiffs' proffered evidence as true when construed with the officers' affidavits, Abernathy was kicked, was punched in the body, face, and head, and was tazed at least eight times before finally being cuffed. Specifically, Preston admits that, after the prolonged struggle and fearing that Abernathy may use the handcuffs as a weapon, he hit Abernathy in the head "at least twice." Defs.' Mot. Summ. J., Preston Aff., Ex. B., at 3. Tamez admits to punching Abernathy in the face after Abernathy had apparently grabbed hold of his leg and was in some manner near grabbing his weapon. Tamez Aff. D-17. Galvan admits to hitting Abernathy with his fist in Abernathy's back and stomach. Galvan Aff. D-4. Trigo also admits to punching Abernathy in the rib cage in an effort to knock the wind of out him; he also admits to kicking Abernathy in the thigh. Trigo Aff. D-21. Ultimately, Flores admits to deploying his Tazer two more times before Abernathy was finally brought under control. Flores Aff. D-14. All officers state that until he was eventually handcuffed, Abernathy continued to defy verbal commands and continued to physically resist the officers' attempts to handcuff him.

---

[3] The Court notes the lack of argument or evidence regarding the deactivation of Preston's microphone being anything other than the accidental occurrence averred to by Preston. Preston Aff. Ex. B, at 3. In the absence of facts to the contrary and in light of the fact that at both the time at which the microphone cuts out as well as the time that it reactivates Preston can be heard engaging in a physical struggle, the Court does not view the deactivation of Preston's microphone as probative of misconduct.

Even when viewed in a light most favorable to plaintiffs,[4] their evidence does little to contradict the officers' testimony. Both the officers and the witnesses agree Abernathy was punched and kicked,[5] was struggling with numerous officers, and was tazed multiple times. Indeed, the only true tension centers on the number of times Abernathy was tazed while he was in Hovermale's flower bed.[6] The combined testimony of Brenda Allen, Jajuan Williams, and Lee Griffin indicates that Abernathy was tazed between three and ten times from the time they began observing the scene. Pls.' Resp., Ex. 4, Brenda Allen Aff., at 2; Pls.' Resp., Ex. 5, Lee Griffin Aff., at 2; Pls.' Resp., Ex. 2, Williams Dep., at 83. Importantly, none of the plaintiffs' proffered evidence contradicts one of the key facts attested to by the officers and Hovermale: Abernathy's continued resistance to arrest. Brenda Allen, Jajuan Williams, Lee Griffin, and Tiffany Allen all state that from their vantage point they could not see Abernathy—or in the case of Griffin, Abernathy's hands—and consequently would not be able to determine whether Abernathy continued to resist up until the point he was eventually handcuffed. *See* Williams Dep. 42; Brenda Allen Aff. 2; Tiffany Allen Aff. 2; Lee Griffin Aff. 2, 3.

---

[4] Plaintiffs provide testimony indicating that during the struggle the officers may have become aware that Abernathy was a paranoid schizophrenic and was high on crack cocaine. *E.g.*, Brenda Allen Aff. 2. It is somewhat unclear whether the officers to whom the witnesses disclosed this fact were the same officers engaged with Abernathy. Nevertheless, this fact, when analyzed contextually, would tend to support rather than undermine the officers' conduct. Accordingly, the Court shall assume the officers attempting to restrain Abernathy were unaware of his conditions.

[5] Plaintiffs provide testimony indicating Abernathy was punched and kicked. *E.g.*, Williams Dep. 30. That testimony does not, however, indicate the number of times the witnesses observed the officers punch and kick Abernathy. The testimony therefore does not contradict the officers' proffered testimony as to the number of times they kicked and punched Abernathy. The Court, therefore, views the officers' testimony as uncontradicted in this regard. To assume the officers punched and kicked Abernathy in addition to those times admitted to in their testimony would be to assume facts not in or reasonably inferable from the record.

[6] In his affidavit, Lee Griffin stated he did not hear officers giving Abernathy commands, Lee Griffin Aff. 3. Further, plaintiffs have put forth evidence indicating that the struggle they observed lasted between ten and fifteen minutes. Brenda Allen Aff. 3; Tiffany Allen Aff. 2. This testimony is directly contradicted by the footage and audio on Preston's dashboard camera. No reasonable jury could believe it. Consequently, the Court will not factor this evidence into its analysis. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Further, Hovermale provides unequivocal and uncontradicted testimony that Abernathy was resisting up until the point he was cuffed. Defs.' Mot. Summ. J., Ex. D, Hovermale Aff., at D-27; Defs.' Mot. Summ. J., Ex. C, Hovermale Dep., at 58. Hovermale also stated that the officers' activity stopped once Abernathy was handcuffed. *Id.* at 19. Nothing in the plaintiffs' proffered evidence contradicts this testimony. Jajuan Williams admits he could not see Abernathy's hands and was unaware of the time at which Abernathy was finally handcuffed, and, likewise, was unaware of whether any hitting or kicking occurred after Abernathy was handcuffed. Williams Dep. 34, 52–53. Further, Williams admits he never observed Abernathy curled up in a ball. *Id.* at 65. Indeed, Williams's testimony supports that of Hovermale's to the extent he also stated that while Abernathy was in Hovermale's yard,[7] Abernathy was "just—just trying to—I don't know—get away." *Id.* at 66. Finally, although Williams stated at deposition that "[i]t didn't look like any cuffing was going on, to me," he also admitted that conclusion was merely "speculation." Williams Dep. 37.

In light of Abernathy's continued resistance,[8] the Court cannot conclude that deploying a Tazer against Abernathy eight or ten times at this point in the struggle was clearly excessive or clearly unreasonable.[9] Just as with the previous uses of force, the *Graham* factors weigh in favor of the officers' actions. Once in Hovermale's yard, it required seven officers and over three minutes to finally bring Abernathy under control. What is more, Abernathy had, prior to that point, demonstrated a near superhuman ability to resist all previous attempts to restrain him,

---

[7] Williams refers to Hovermale's home by its address, 10802 Deepwater Bay.

[8] Of crucial importance is the dearth of evidence indicating the officers used any force after Abernathy was finally handcuffed. Indeed, Hovermale provides the only independent testimony on this point by stating that the officers' activity stopped once Abernathy was cuffed. Hovermale Dep. 19.

[9] It bears mentioning that outside of the plaintiffs' testimony, the record fails to substantiate their claim that Abernathy was tazed more than three times while in Hovermale's yard. What amount of audio recording was captured after Preston's microphone was reactivated only contains the sound of a single tazing. Plaintiffs put forth no other evidence that substantiates these assertions, and, indeed, Hovermale testified that he did not see the officers utilize any weapons on Abernathy. Nevertheless, the procedural posture of this case requires the Court to credit this testimony because it is not blatantly contradicted by the record. *See Scott*, 550 U.S. at 380.

while at the same time exhibiting a total disregard for the safety and property of the general public as well as the officers. Given these circumstances, the Court cannot conclude that the deployment of a Tazer—an intermediate and nonlethal use of force—multiple times in an effort to bring Abernathy under control was excessive or unreasonable. Moreover, plaintiffs adduce no evidence and invoked no authority demonstrating that the use of a Tazer eight or ten times on a resisting suspect under such circumstances is objectively unreasonable. Likewise, the officers' kicking and punching of Abernathy—though arguably excessive—fails to rise to the level of objectively unreasonable conduct. Prior to kicking and punching Abernathy, the defendants had deployed nearly every nonlethal means of force available to them. In spite of those efforts, the record demonstrates Abernathy continued to resist. That continued resistance coupled with the prolonged struggle and the officers' prior use of other means of force to detain him prevents the conclusion that the officers' conduct was objectively unreasonable.

On a final note, plaintiffs put forth evidence probative of the subjective state of mind that defendants or other officers at the scene possessed during or immediately after the struggle with Abernathy. Williams Dep. 30; Brenda Allen Aff. 2; Tiffany Allen Aff. 2; Griffin Aff. 3. An excessive force inquiry, nevertheless, is not the proper forum for a second-hand analysis of the officers' subjective feelings and intentions—rather, the officers' underlying motivation and intentions are specifically omitted from the inquiry. *Graham*, 490 U.S. at 397.

As the Supreme Court noted in *Graham*, the determination of whether a particular use of force is "reasonable" "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* (internal quotation marks omitted). Here, given Abernathy's conduct, the government's interests in restraining him were significant. The law permits police officers to

deploy a degree of force commensurate with that interest, although such force may seem severe and even cruel to the spectating public. In the end, reasonableness sets the limits on the permissible use of force, and in this instance the Court cannot say the officers' conduct exceeded those limits.

The Court therefore shall **GRANT** defendants' motion for summary judgment as to plaintiffs' excessive force and failure to intervene claims, and those claims shall be **DISMISSED**. Furthermore, because the Court has not relied upon the objected-to portions of the defendants' summary judgment record, plaintiffs' objections to those portions of the record are **OVERRULED** as moot.

### B. Plaintiffs' State Law Claims

Plaintiffs also bring state law assault and battery claims. In response, defendants move for summary judgment under the so-called election-of-remedies provision contained in § 101.106(f) of the Texas Tort Claims Act ("TTCA"), Texas Civil Practice and Remedies Code § 101.001 *et seq*. Under that provision, where suit is brought against a government employee in her official capacity, upon motion she is entitled to dismissal unless the plaintiff amends the complaint to substitute the government as defendant within thirty days of the date the motion is filed. *Stinson v. Fontenot*, 435 S.W.3d 793, 794 (Tex. 2014) (per curiam). An employee is sued in her official capacity when the conduct underlying the suit was within the general scope of her employment, and the suit could have been brought under the TTCA against the government. Tex. Civ. Prac. & Rem. Code § 101.106(f). This provision applies with equal force to claims involving intentional torts. *See Stinson*, 435 S.W.3d at 794. There is no contention that the conduct underlying plaintiffs' claims was not within the officers' general scope of employment with the City of San Antonio.

Because plaintiffs have failed to file amended pleadings bringing their state law tort claims against the City of San Antonio within 30 days of defendants' motion, defendants are entitled to dismissal of those claims as well.

### III. CONCLUSION

In light of the foregoing analysis, defendants are entitled to qualified immunity as to plaintiffs'§ 1983 claims, defendants' motion for summary judgment, ECF No. 43, shall therefore be **GRANTED** and those claims shall accordingly be **DISMISSED**. Plaintiffs' assault and battery claims shall likewise be **DISMISSED**. Defendants' motion for summary judgment, ECF No. 44, shall be **DENIED** as moot.

Royce C. Lamberth
United States District Judge

DATE: 3/31/16